IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

RLI INSURANCE COMPANY,

Plaintiff,

VS. NO. 3-04-0555

ADVANTAGE CONSTRUCTION
SERVICES, LLC;
TRENT B. SMITH;
ILLIAD JEFFERSON;
and SOUTHERN CONSULTING, LLC,

Defendants/Third Party Plaintiffs,

VS.

TYRONE TACKETT,

Third Party Defendants.

---

DEPOSITION OF: **GARLAND GREGORY HARRIS**

June 6, 2005

---

**BERES & ASSOCIATES**

230 Fourth Avenue North, Suite 503

Post Office Box 190461

Nashville, Tennessee 37219

**A P P E A R A N C E S**

For the Plaintiff: Mr. Angus Gillis III
Attorney at Law
Suite 701
501 Union Street
Nashville, Tennessee 37219

For the Defendants/
Counter Plaintiff: Mr. Timothy V. Potter
Attorney at Law
210 East College Street
Dickson, Tennessee 37055

**I N D E X**

Examination by Mr. Gillis. . . . . . . . . . . . . . 4

Examination by Mr. Potter. . . . . . . . . . . . . .29

**E X H I B I T S**

1 Plans. . . . . . . . . . . . . . . . . . . . . . .22

* Exhibit 1 retained by Mr. Gillis

The deposition of **GARLAND GREGORY HARRIS** was taken by counsel for the Plaintiff, at 2:48 p.m., on June 6, 2005, pursuant to the Federal Rules of Civil Procedure, to be used for ALL PURPOSES, in the above-styled cause, before Lise S. Matthews, court reporter and Notary Public at Large, at the offices of Schulman, LeRoy & Bennett, P.C., Suite 701, 501 Union Street, Nashville, Tennessee, in accordance with the following stipulation.

**S T I P U L A T I O N**

It is agreed that Lise S. Matthews, being a Court Reporter and Notary Public at Large for the State of Tennessee, may swear the witness, take the deposition in machine shorthand and afterwards reduce the same to typewriting, and that the deposition may be used on the hearing of the above-styled cause. All objections, except as to the form of the question, are reserved until the hearing of this cause.

It is further agreed that all formalities as to caption, certificate, transmission, filing, et cetera, including the signature of the witness, are expressly waived.

* * *

GARLAND GREGORY HARRIS

having been first duly sworn, testifies as follows:

EXAMINATION BY MR. GILLIS:

Q. Would you state your full name for the record.

A. Garland Gregory Harris.

Q. Mr. Harris, my name is Angus Gillis. I represent RLI Insurance. I'm going to have a series of questions today. I don't intend for them to be misleading in any way. So if I ask you a question and the meaning of that question is not clear, just tell me and I'll rephrase the question or explain exactly what I mean. Do you understand?

A. Yes, sir.

Q. The other instruction I need to give you is we've got a court reporter. And you need to give a verbal response to your -- to any question that's asked. In everyday conversation we all nod our heads and shake our heads. She can't take that down. And the expressions uh-huh and huh-uh that we all use informally also don't transcribe very well. So if you've got a yes or no question, you need to give me a yes or no response. Do you understand?

A. Yes, sir.

Q. Give me a rundown of your educational background, please.

A. I graduated from Vanderbilt with a Bachelor's of Engineering degree and then stayed an additional year and got an Master's of Science degree there.

Q. Are both of those in civil engineering?

A. Mechanical engineering.

Q. When did you get those degrees?

A. 1985 and '86.

Q. And are you a licensed professional engineer in the State of Tennessee?

A. Yes, sir.

Q. How long have you been so licensed?

A. Since 1996.

Q. Now, there's big a gap between when you got your master's in '86 and when you became a professional engineer in '96. And as I recall the licensing procedure, you had to first pass an EIT examination and then practice for a number of years and then you were eligible to sit for the final examination. Is that what occurred in your case?

A. Yes, sir. That's correct.

Q. Give us a rundown of your vocational experience.

A. I -- after I graduated from college, I was in the military. And that's why there's that longer gap there. And I went to work for John Coleman Hayes, PC in 1990. And started out there working on a project that we had with the airport authority sound insulating homes around the airport authority. I did that for probably four to five years. And then I started working more on the -- with the other civil engineer that was there on various projects, engineering type projects. And then did that for -- well, I've been doing that up until -- up until the present, working on development type projects, apartment projects, that kind of thing.

Q. In the course of your engineering practice, have you designed and overseen the installation of a number of sewer lines, water lines, similar type lines?

A. Yes, sir. More -- more on the design side. Some supervision in the field, but mostly office work for me.

Q. This lawsuit is basically an indemnity action, which RLI is attempting to recover some money it paid out to the City of Portland on a water line project you were involved in. Do you know which water line project we're referring to?

A. Yes, sir.


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 6 of 38 PageID #: 79

Q. I think you all called it Contract 2 Water Distribution Line?

A. Yes, sir.

Q. Okay. When did you first become involved in that project?

A. I was involved in that -- the engineer that was working on that project, John Gilmore, had multiple sclerosis, and I had to assist him. So when he would go to meetings and things like that, I would have to drive and have to assist him to get in and out. And so I would sit in on the meetings. And so that was really my involvement. So from that respect I was involved from the beginning of project, but day-to-day functions, office functions, I really didn't have any involvement in that. That was -- I just did sit in on some of the meetings until he passed away in February of '03. Then I became more involved when -- at that point and trying to work with the bonding company and with the City and trying to get some resolution to the problems they were having.

Q. As I recall, there was an early January 2003 meeting up at the city hall that you attended. I don't believe John Gilmore was there. I was there for RLI Insurance Company. I believe Trent Smith was there. Tyrone Tackett was there. The Mayor and most, if not

all, of the city council was there. Do you recall that meeting?

A. Yes, sir, I do.

Q. Was a decision made at that meeting as to whether they were going to terminate Advantage Construction?

A. I can't recall if that was -- I know there was -- that was a direction the meeting was headed. But I don't know if the Mayor decided to do that at that meeting or -- I just can't recall that. I'm not sure.

Q. We've already introduced a letter, I believe, where Advantage was terminated on or about January 8, 2003. Does that comport with your memory?

A. That sounds the right time frame, yes, sir.

Q. Okay. Before that decision was made, what contact had you had with that project?

A. I -- in -- like I said, I would help John Gilmore go to some of the meetings. And in just talking with him in the office, he was telling me some of the things that he was doing on the project and some of the problems that he was having. And really that's -- that was about it.

Q. Okay. When you went to this meeting in early January 2003 you were aware of leaks occurring on


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 8 of 38 PageID #: 81

the job; is that correct?

A. Yes, sir.

Q. Did you know there were numerous leaks?

A. Yes, sir.

Q. Were they greater on this project than any project you had ever been involved with?

A. Yes, sir.

Q. By a considerable amount?

A. Yes, sir.

Q. At this meeting do you recall Tyrone Tackett saying they had it down to one leak and that they thought they could have it repaired in the next week or ten days?

MR. POTTER: Object to the form.

MR. GILLIS: Go ahead and answer.

THE WITNESS: I don't specifically remember him saying one. What I do remember is him saying that he was going to be finished in a very short order. And I think he had said that probably more than once previously. So, yes, that's what I remember, kind of -- I felt like we were being sort of led along there.

Q. (BY MR. GILLIS) Well, let me not lead you along. Tell me what you remember about that meeting.

A. I can't say that I specifically remember him

saying they have one leak. I do remember him saying that it would be finished in a very short period of time. One to two weeks is what I remember. But I don't remember him committing to one leak. I can't say that.

Q. Okay. Now, at that point in time did you start following this project for John Coleman Hayes?

A. I started following it more closely, yes, sir.

Q. Okay. Now, after Advantage Construction was terminated on or about January 8th, 2003, do you remember Jones Brothers coming onto the project?

A. Yes, sir, I do.

Q. Okay. And did you meet with them about what should be done to isolate leaks, determine where leaks were, et cetera?

A. Yes, sir, we did.

Q. Who did you meet with over there?

A. VanNuck.

Q. Terry VanNuck?

A. Terry VanNuck.

Q. Tell me what you all actually did.

A. We met on the site and discussed some possibilities of trying to isolate portions of the line, maybe even installing some additional valves to

try to isolate portions to figure out can we -- can we repair some of this or do we need -- and do we need to replace whole sections and really just get a feel for how bad it really was.

Q. Okay. And did you cut in two additional valves?

A. I don't remember that. That may have happened after I left, but I don't -- I don't remember that. We discussed, I know, installing some valves.

Q. You don't recall if they did or did not install valves?

A. No, sir, I don't recall that.

Q. Okay. Just sort of lead us through, if you would, and tell us what was done to try to ascertain where there were leaks and what -- what was going to be done about them.

A. I think at one point there were -- Jones Brothers may have done this. There were -- a lot of the joints were uncovered. In other words, they took a piece of equipment and actually excavated out to expose some of the joints. That was one method to try to find the leaks, where the leaks actually were occurring. The other -- you know, we talked about installing some valves. And like I say, I can't remember if they actually did that as a part of that procedure in

looking for those leaks or not. But as I recall that's what they primarily did, was just dig a lot to expose those joints.

Q. Do you recall any sound equipment being brought in?

A. No, sir.

Q. Did you ascertain how many leaks were out there?

A. My -- my best recollection was maybe in the 20 range. I can't remember for sure.

Q. Were these that were not -- that had not been repaired yet?

A. Yes, sir.

Q. Did you find any pipe that was too shallow?

A. I had heard that there was some pipe that was too shallow, but I don't remember that we excavated and found that. I don't think I ever saw that. I think I do -- I remember hearing that there was some pipe that possibly was too shallow, but I never saw that.

Q. Do you recall any of the pipe where the angle at a joint was too sharp, too acute?

A. I didn't have a template or anything to measure it with, but there was a lot of discussion that that was probably the reason for a lot of the leaks,

was the pipe was over deflected at the joint.

Q. Did you ultimately make a recommendation as to what should be done with this line?

A. No, sir.

Q. Did you participate in any meetings where a decision was made as to what should be done with this line?

A. Yes, sir, I was in some of the meetings. And for instance the one we're talking about in January -- and I'm not sure if there was another meeting after that or not, where the actual -- the decision was made to re-bid the work.

Q. Well, certainly in the January meeting, Jones Brothers came in after that time and there hadn't been a decision made at that point in time as to what was going to be done with the line; is that correct?

A. Yes, sir.

Q. Now, what I'm wanting to find out about is what discussions were held, who held these discussions as to what was going to be done with the line and why that action was going to be taken.

A. I don't recall a specific meeting where the Mayor was -- said we're going to take the line up and re- install it or we're going to go and try to repair the line, but I know the Mayor was -- had always leaned

towards just re- installing the line from the very beginning, and that's what he had wanted.

Q. Did you ever -- did anybody at John Coleman Hayes make a recommendation that this line just had too many leaks and the integrity was poor and that the line needed to be taken up and re-laid?

MR. POTTER: Object to the form.

THE WITNESS: I'm not -- I don't recall that specifically coming out unless it was something in support of the Mayor. That may have come out when we were trying to support him. I don't know. I'm not sure, though. I don't remember a specific meeting where someone said this is the best thing to do. I don't recall that.

Q. (BY MR. GILLIS) In your opinion was that the best thing to do?

A. In hindsight I think it was, yes, sir.

Q. Could you explain to us why?

A. I think there were -- you know, when we were trying to find the leaks, probably found 20 leaks, or how many ever there were. I think there was some potential that leaks could have developed in the future. And I think I would question, too, if we even found them all from the beginning. And then is -- the other thing was trying to do the repairs on those

leaks, how well was that repair going to hold up. Was it going to hold up as well as the -- you know, a well laid joint. So I think -- I think replacing it for the long run, the good of the City, it probably was a better idea.

Q. Based on the number of leaks you found and the problems you found at the joints, do you think the line could have been repaired satisfactorily?

A. There are ways to repair the -- repair the joints. So I -- it probably could have been repaired. It just would have -- you would have always wondered what kind of life the line was going to have after the repairs were made. I think that was -- that was the problem.

Q. Is the -- if you put in a -- if you repair the line, I guess you do that with a sleeve; is that correct?

A. Yes, sir.

Q. Is that as good as a properly laid line?

A. Well, it's -- I think the rating on it as far as the pressure is as good as the pipe. So in theory it should hold forever if it's installed correctly. So I'd say, yes, it should, if it's installed correctly and used the right materials and good workmanship and that kind of thing.


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 15 of 38 PageID #: 88

Q. Do you reach a point where it's as cost effective to dig it up and re-lay it as it is to keep hunting leaks and trying to repair leaks?

A. I think that's where we were with this project. So, yes, sir.

Q. If you had been asked the specific question, would you have told the City that, even if they were paying for it, the most cost effective method thing to do would be to dig it up and re-lay it?

A. Well, after we -- after discovering all the leaks and worrying about the future, I think it was a good decision, particularly now looking back on it in hindsight. The line has performed, as far as I know, very well.

Q. You've got in front of you I think four drawings. Can you identify these?

A. These are -- this says construction progress drawings. And it looks like it was -- we were going out and trying -- kind of doing an as-built type drawing I guess is what these were and trying to see exactly what was done. I see some highlighted areas that says they're shallow. The same -- it looks like this is a -- I guess the same thing, another construction progress drawing. And the same thing here. The same thing with some notes about testing. I

think maybe phasing the testing, too.

Q. Okay. It shows on here -- when we look at these four drawings, it shows four phases of testing, correct?

A. Appears to, yes, sir.

Q. Only way you could have four phases of testing would be if you cut in two additional valves; is that correct?

A. Let's see. You would have to have something to test against on -- on both ends of the test section. So I'd say you could test against -- if there's a valve here and then you would have to have a valve or some kind of a cap, something to test against.

Q. There was only one valve on this whole line in the middle of the line when it was originally designed; is that correct?

A. I would have to look. I don't recall that. I would have to look.

Q. Okay.

A. I think I remember there being a valve near one of the property lines in this drawing.

Q. Let me try it this way. I think Jones Brothers did these drawings. This -- you did not do these; is that correct?

A. No, sir.

Q. The -- where the line is and everything comes off of John Coleman Hayes drawings, correct?
A. That's right. Yes, sir.
Q. But where it shows all these sleeves, you did not prepare that, did you?
A. This -- yes, sir, I think we did put this in here, the typed portion. I think we were trying to get an as-built together.
Q. Okay.
A. So I think we did type -- I think we did type that in. I would say that we did that.
Q. Okay. So where these sleeves are shown --
A. We were trying to identify the location of the sleeves and the -- and some of the bends.
Q. Okay. Now, just to show where sleeves -- where you knew then sleeves had been installed, can you count the number of sleeves that had been installed?
A. Let's see. One, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14. Fourteen.
Q. Okay.
A. And here's the valve that we were talking about.
Q. The initial valve that was supposed to be in there?

A. Yes, sir, that you had asked about, how many valves. I see this valve.

Q. Now, you mentioned I think 14 sleeves that were in there. You did not have all the leaks repaired at the time, did you?

A. No, sir.

Q. You still had numerous leaks, did you not?

A. Yes, sir.

Q. And you didn't make the notation on these drawings as to where there were additional leaks, did you? Like here there's a note that says repair number 13.

A. No, sir, I didn't do that.

Q. There's a note here on this drawing that says repair number 12, six plus 95. I assume that's station 6 plus 95; is that correct?

A. Yes, sir.

Q. It says extremely bad leak. Remove and replace --

A. 28 feet of pipe.

Q. -- 28 feet of pipe, one sleeve; is that correct?

A. Yes, sir.

Q. Now, like those handwritten notes, when you counted the sleeves, you didn't count those sleeves,

did you?

A. No, sir.

Q. And these handwritten notes, are they your notes or are those Jones Brothers' notes.

A. They're not mine. I'm not sure who did that.

Q. Okay. When you observed Jones Brothers doing the work out there, were they doing what needed to be done to determine what leaks there were and to properly repair the leaks?

A. I really didn't have any -- I really didn't work with them in the field to observe any of their work.

Q. Okay. Did you meet with them to discuss what they had found?

A. I don't recall.

Q. Did anybody give you a set of plans and say, look, here's where we found leaks and we don't have them all isolated yet?

A. I'm trying to remember exactly how -- what we did. I don't -- not -- I don't think we did it that way. I'm also trying to remember how we found out exactly where all the sleeves had been placed, who gave me that information, too. I didn't get -- I didn't get a set of plans that were marked up like that where

here's where we think the leaks are. I don't ever remember getting anything like that.

Q. Okay. You don't recall getting the actual plans you've got before you right now?

A. No, sir.

MR. GILLIS: Let's mark these plans. There are four pages of them. I think we'll identify them in a minute in the deposition as Exhibit Number 1.

(Whereupon the previously mentioned Plans were marked Exhibit Number 1.)

Q. (BY MR. GILLIS) Did you get any plans showing leak locations and sleeve locations?

A. I had to have gotten something to -- where the sleeves are located, but I don't remember who gave it to me or where I got it because to get this on here.

Q. The John Coleman Hayes file is over here. Can you look in there and tell us what you got?

A. Sure. Okay.

(Brief recess.)

THE WITNESS: I didn't find anything, but I recall that I did get this information from the City. And I think the way they gathered this information where these sleeves were, they have a GIS in their inventory. And I think they went out with our inspector and picked up those points and then I

transferred that onto this drawing, the typed in location of these sleeves. As I recall, that's how I got that information.

Q. How can they pick it up with a GIS drawing?

A. Well, the inspector was there with them and he went and they walked along the line. And he said we repaired a sleeve -- we repaired a sleeve here. They took a reading, got the coordinate, and I was able to put that in and find it along the line.

Q. Had he marked where they repaired a sleeve?

A. He probably did, maybe with some paint in the grass or something like that, some kind of temporary mark as I recall. Maybe a flag. That's it. There was flag -- these were flagged. I think he went and flagged these and then the City came back and took a reading at the little flags.

Q. Who was your inspector?

A. Danny Hawker.

Q. Where does he live now?

A. In Lebanon.

Q. Lebanon?

A. Yes, sir.

Q. Is he employed anymore? Do you know?

A. No, sir. He's not employed with us. He retired.

Q. Does he work for anybody?

A. I don't know. I haven't talked to him since I've been back.

Q. Is that H-A-W-K-E-R?

A. Yes, sir.

Q. Did you have any conversations with Trent Smith and/or Tyrone Tackett about why they had this extreme number of leaks in this line?

A. No, sir, not just face to face. I sat in on some meetings when they -- they tried to explain why they were having these leaks.

Q. Tell me about these meetings.

A. They -- they were always saying we just -- we're getting the leaks fixed. It will be -- it will be two weeks. We're waiting on parts. We're waiting on material. That's what I recall from the meetings. There were a lot of excuses like that.

Q. Did they tell you what was causing the leaks?

A. They blamed -- for a while they were blaming the pipe. They said that the pipe that they had received was bad. I remember that being an excuse. That's -- I think that's the primary excuse that they used, was that the pipe was poor quality.

Q. Did y'all test the pipe?

A. I don't remember doing any testing on it. I remember seeing some photographs. That was while John Gilmore was still alive. So I really wasn't as involved in that. But I do remember some photographs of the pipe that they had sent us.

Q. Did they take up this same pipe and re-lay it?

A. I don't know. I can't answer that. I wasn't around for that.

Q. Did you have anything to do with drawing the specifications for taking up and re-laying the pipe?

A. No, sir.

Q. Who did that at John Coleman Hayes?

A. Yes, sir.

Q. Would did that at John Coleman Hayes?

A. Oh, I'm sorry. John Coleman Hayes. He did that.

Q. Were any of the sleeves leaking?

A. I don't know that.

Q. Did you inspect the pipe when it was being dug up?

A. No, sir.

Q. When did your involvement with this project end?

A. I was re-called on -- and reported on May

28th, '03. So at that point I was out of town.

Q. Okay. So you went to Afghanistan then?

A. Yes, sir.

Q. And were not involved from that point forward?

A. No, sir.

Q. Had Jones Brothers already gone on the job and started when you were re-called?

A. I'm not sure what they had started doing at the job. If they were there, I can't remember.

Q. Did you ever talk to your inspector about why there were so many leaks?

A. I don't know if I specifically asked him, you know, where the leaks were coming from and why they were -- you know, why they were getting them. If I did, I don't remember exactly what he said. I don't specifically remember that, asking that question.

Q. Did you ever -- do you recall any request for an extension of time that Advantage and/or Trent Smith may have filed?

A. I don't remember ever reading it or hearing them ask in a meeting. What I do remember, like I said, in the meetings where they just kept saying it was -- you know, another week, another week, and they would have all their parts in. But I don't remember

them specifically saying I need until this date to finish the job.

Q. Were there any weather delays or anything unusual on this job that would have permitted an extension of time to finish?

A. I don't remember anything unusual about the weather. Wintertime in Middle Tennessee, you're going to have some rain, but I don't remember anything -- or I guess this was in the fall and summer when they did this. So I don't remember anything unusual about it.

Q. Do you remember one place in this line where there were like seven leaks in a 250-foot section?

A. I recall there being a section that did have a lot of leaks. I don't know the number or how long it was, but I do remember that, yes, sir.

Q. What section was that?

A. I'm not sure if I can look at this and tell you or not. I'm not exactly sure where that was. But I do recall there being a section like that where there were several leaks in a small area.

Q. Was that a section where they were making the bend?

A. I'm not sure. I remember, though, we discussed the possibility of -- early on of re-laying that -- that section because there were an unusual

number of leaks in that section. So there was some talk of replacing that section and then trying to sleeve the rest of the leaks and the rest of the pipe. That's what I recall.

Q. Was that a section near the water treatment plant?

A. I'm not sure. I just don't remember where that section was.

Q. Did you ultimately concur that the best thing to do with this line was take it up and re-lay it?

A. Like I said, I think -- looking back, I think it was the best thing to do.

Q. Even at the time they decided to do it, did you concur in that?

A. I was trying to remember if I was here when that decision was made. I don't exactly remember that decision being made to be honest with you. I don't remember when that occurred.

Q. But looking back was that --

A. Looking back, I think it was, yes, sir.

Q. -- a proper decision?

A. Yes, sir.

Q. And I assume you weren't here when the actual work was being done to see what the conditions

were when the pipe was uncovered; is that correct?
A. That's correct.
Q. Do you know of any photographs that show the pipe uncovered that purport to show any of the defects?
A. No, sir. What I do remember is seeing a photograph that the contractor had sent back that -- that summer when they were under construction and all this was going on. And it was something that was sent to John Gilmore. And I remember vaguely seeing that. But that's about all I remember.
Q. What did it show?
A. It -- let me think. I was trying to remember exactly what it showed. My best recollection is that it was kind of a close-up of the pipe and maybe they were trying to show some pitting or something in the pipe. But I can't say for sure.
Q. Okay.
A. That's just my best recollection.
Q. Do you still have that photograph?
A. No, sir. I don't have -- I don't know where it would be. That was something that -- that's when John Gilmore was working on the project and it was just something he showed me in passing.
MR. GILLIS: I don't have any further questions.

EXAMINATION BY MR. POTTER:

Q. Mr. Harris?

A. Yes, sir.

Q. I'm Tim Potter. I represent Advantage Construction in this case. And you were assisting Mr. Gilmore; is that correct?

A. That's right. He had multiple sclerosis. And so when he would go to meetings I would drive him and help him get in and out of the van to go to the meetings.

Q. You weren't the engineer assigned to this project?

A. No, sir.

Q. And were you privy to every conversation Mr. Gilmore had with my client, Advantage Construction, about this project?

A. No, sir.

Q. Were you privy to every conversation that Mr. Gilmore might have had with city officials about this project?

A. No, sir.

Q. How many meetings do you recall attending yourself wherein someone from Advantage or one of Advantage's subcontractors appeared and talked about completion of the line?


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 29 of 38 PageID #: 102

A. I can't say for sure, but two at least and maybe -- maybe more. But two for sure.

Q. Is there any record of when those meetings might have occurred?

A. There probably is in here. In fact, looking through this I think I did see some. So I'd say there are some records of those meetings and an attendance list.

Q. You're referring to the bankers box of material that were brought to today's deposition by John Coleman Hayes?

A. Yes, sir.

Q. Are you familiar at all with the terms of the contract between the City of Portland and Advantage Construction?

A. No, sir, not that well.

Q. Have you reviewed the contract at all?

A. I might have reviewed it in the spring of 2003 when all this was coming about. I don't remember, though. That would have been the logical time to do that.

Q. Did you personally ever produce any documentation of any type in the way of correspondence or letters to Advantage Construction advising them that their performance was not satisfactory?


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 30 of 38 PageID #: 103

A. No, sir.

Q. To your knowledge did Mr. Gilmore ever produce any documentation like that?

A. I'd have to look in the files. My -- my thought is that he -- he probably did because he was working on that every day for a while when all these problems were coming up. But I don't -- I'd have to just look through the files.

Q. Again, if he did, it should be in this bankers box of materials?

A. Yes, sir.

Q. This is the entire file that John Coleman Hayes company has regarding this project?

A. Yes, sir.

Q. Do you ever recall the Mayor of the City of Portland, Mayor Calloway, expressing his desire to have a new line put in in lieu of having the existing line further repaired?

A. Yes, sir.

Q. Did he state a reason that you recall him stating?

A. He was concerned that he was getting a line that was having all these patches done to it and it was almost in his eyes going to be a used line even though, you know, it was new pipe. It was going to be patched


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 31 of 38 PageID #: 104

and cut and patched and cut in so many places it was almost like getting a line that had been in service for a long time and been repaired over time. So that was why he wanted a new line with clean -- clean joints and one that would test -- you know, pass the pressure test.

Q. And he expressed that preference to you and Mr. Gilmore?

A. Yes, sir.

Q. How long has John Coleman Hayes been the engineers for the City of Portland?

A. From -- ever since I've been there when I started in 1990. So it -- some time before that.

Q. Does that company serve as city engineers at the pleasure of the Mayor and the council?

A. Not any longer.

Q. No longer engineers for the City?

A. That's correct.

Q. But at the time it served as engineer for the City at the pleasure of the Mayor and the council?

A. Yes, sir.

Q. Did you personally inspect the line?

A. No, sir.

Q. As we sit here today, have you ever personally gone out and inspected the line itself?

A. Yes, sir, I have.

Q. When would you have done that?

A. Well, as recently as within the last month on our own projects.

Q. Did you personally inspect any of the work done by Advantage Construction or its subcontractors?

A. No, sir. The only thing that I saw is when some of the joints were uncovered and they were looking for leaks. I was -- you're able to see the pipe then. And that's the only -- I guess that's really the only work that I saw in place. I never saw any work going in place, being installed.

Q. The inspector that was assigned to this project would have been the person that inspected the line, correct?

A. Yes, sir.

Q. And that would have been --

A. Hawker.

Q. Danny Hawker?

A. (Witness moves head up and down.)

Q. He would inspect the line and then in turn he would report that to Mr. Gilmore; is that correct?

A. That's correct.

Q. Did Mr. Hawker inspect the line every single day that work was done on the line?

A. He -- unless there was some reason he couldn't be there, I would say, yes, sir, he would have.

Q. Did Mr. Gilmore ever go out and personally inspect the work being done on site by Advantage Construction?

A. No, sir. I -- I don't think so.

Q. In other words, the information he had about whether or not the work was being properly done would have come from Mr. Hawker?

A. That's right.

Q. And in turn the information you had about whether or not the work was being done right would come from Mr. Hawker or from Mr. Gilmore?

A. Yes, sir.

Q. What type of reports, if any, would Mr. Hawker prepare and provide to Mr. Gilmore about work being done?

A. He would -- he had a daily report form that he would complete and turn in probably every two weeks with his time sheet maybe. I'm not sure how frequently he turned it in, but I would think that's probably how it was set up. Maybe weekly, something like that, he would mail them to the office.

Q. And those daily report forms or inspection


Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 34 of 38 PageID #: 107

forms are intended to contain any problems he inspects or witnesses?

A. Yes, sir. That's correct.

Q. Do you know if Mr. Hawker ever actually measured any of the angles of the line to make sure they were proper?

A. I'm not sure. I don't know that. I don't know if he did or not.

Q. Should he have?

A. He needed to ensure that when the pipe was being put together that it was straight. He should have -- yes, sir, that would be -- that's how the pipe should be put together is -- is straight.

Q. Do you have any knowledge or information of the City having locked any valves to prevent Advantage Construction from having access to any water while this project was being performed?

A. I vaguely remember maybe towards the end they needed to fill the line to do a test and then the -- maybe the valve that they were going to supply the water from was closed. That's my best recollection.

Q. Was Mr. Hawker the inspector on this project the entire time Advantage was performing work on the project?

A. He retired. I can't remember exactly when he retired. But he retired sometime -- sometime toward the end of the project. And I don't know if he -- if he was there through the whole thing or not. I'm not sure. I know that we -- as I recall, we did use another inspector from a subcontractor, but I'm not sure if that was while Advantage was still working or not.

Q. When is the last time you had any conversation at all with Mr. Hawker?

A. It's probably been over two years.

Q. Were you assisting Mr. Gilmore the entire time he was inspector on this project?

A. He was the engineer, not the inspector.

Q. I'm sorry. The engineer on this project.

A. I was, yes, sir.

Q. You weren't called to military service during any of the period of time that Advantage was doing work out there, were you?

A. No, sir.

Q. When did you leave for --

A. That was the end of May 2003.

Q. Prior to the time that Jones Brothers began doing work on the project?

A. No. I met with Jones Brothers on the

project early on to try to evaluate how to -- how to find these leaks. And then that's -- I can't recall exactly what they did and when they did it after that. I'm not sure.

Q. Well, if Mayor Wilber testified that the bids for excavation took place in July of 2003, you would have been on leave for military duty at that time, right?

A. Right, I was in country then.

Q. But you wouldn't have been in Portland then?

A. Not Portland.

MR. GILLIS: Ft. Portland.

MR. POTTER: All right. Thank you, sir. I appreciate your time.

MR. GILLIS: I don't have anything further.

FURTHER THIS DEPONENT SAITH NOT

STATE OF TENNESSEE)
) s.s.
COUNTY OF DAVIDSON)

I, Lise S. Matthews, Notary Public in and for the State of Tennessee at Large,

DO HEREBY CERTIFY that the foregoing deposition was taken at the time and place set forth in the caption thereof; that the deponent therein was duly sworn on oath or affirmed to testify the truth; that the proceedings of said deposition were stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my skill and ability.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any such attorney or counsel, nor do I have any interest in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 29th day of June, 2005, at Nashville, Davidson County, Tennessee.

Lise S. Matthews, RMR
Notary Public at Large
State of Tennessee

My Commission Expires:
May 26, 2006



Case 3:04-cv-00555 Document 69 Filed 07/19/05 Page 38 of 38 PageID #: 111