IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

RLI INSURANCE COMPANY,

Plaintiff,

VS. NO. 3-04-0555

ADVANTAGE CONSTRUCTION
SERVICES, LLC;
TRENT B. SMITH;
ILLIAD JEFFERSON;
and SOUTHERN CONSULTING, LLC,

Defendants/Third Party Plaintiffs,

VS.

TYRONE TACKETT,

Third Party Defendants.

---

DEPOSITION OF: **JOHN COLEMAN HAYES, JR.**

June 6, 2005

---

---

**BERES & ASSOCIATES**

230 Fourth Avenue North, Suite 503

Post Office Box 190461

Nashville, Tennessee 37219

LISE S. MATTHEWS, RMR (615) 742-2550

**A P P E A R A N C E S**

For the Plaintiff: Mr. Angus Gillis III
Attorney at Law
Suite 701
501 Union Street
Nashville, Tennessee 37219

For the Defendants/
Counter Plaintiff: Mr. Timothy V. Potter
Attorney at Law
210 East College Street
Dickson, Tennessee 37055

**I N D E X**

Examination by Mr. Gillis. . . . . . . . . . . . . . 4

Examination by Mr. Potter. . . . . . . . . . . . . .22



Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 2 of 24 PageID #: 113

The deposition of **JOHN COLEMAN HAYES, JR.** was taken by counsel for the Plaintiff, at 2:00 p.m., on June 6, 2005, pursuant to the Federal Rules of Civil Procedure, to be used for ALL PURPOSES, in the above-styled cause, before Lise S. Matthews, court reporter and Notary Public at Large, at the offices of Schulman, LeRoy & Bennett, P.C., Suite 701, 501 Union Street, Nashville, Tennessee, in accordance with the following stipulation.

**S T I P U L A T I O N**

It is agreed that Lise S. Matthews, being a Court Reporter and Notary Public at Large for the State of Tennessee, may swear the witness, take the deposition in machine shorthand and afterwards reduce the same to typewriting, and that the deposition may be used on the hearing of the above-styled cause. All objections, except as to the form of the question, are reserved until the hearing of this cause.

It is further agreed that all formalities as to caption, certificate, transmission, filing, et cetera, including the signature of the witness, are expressly waived.

* * *


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 3 of 24 PageID #: 114

JOHN COLEMAN HAYES, JR.

having been first duly sworn, testifies as follows:

**EXAMINATION BY MR. GILLIS:**

Q. Would you state your full name for the record, please.

A. John Coleman Hayes, Jr.

Q. Mr. Hayes, my name is Angus Gillis. We've met before. I've got a series of questions today. I want to be sure we communicate and communicate accurately. So if I ask you a question and the meaning of that question is not clear, please tell me, and I'll rephrase the question and explain exactly what I mean. Do you understand?

A. I do.

Q. Another thing, you need to give me a verbal response and not a shake of the head or an uh-huh or huh-uh because the court reporter has troubling taking those down. Do you understand?

A. I understand.

Q. What's your educational background?

A. Vanderbilt University, 1959, Bachelor of Engineering in civil engineering; YMCA night law school about 1965, doctor of jurisprudence I think they call it now.


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 4 of 24 PageID #: 115

Q. Okay. And are you a licensed attorney in the State of Tennessee?

A. I was after I passed the bar, but I dropped all that and I don't practice, never did.

Q. Okay. And are you licensed professional engineer in the State of Tennessee?

A. I am.

Q. And how long have you been so licensed?

A. I think I was licensed in 1964.

Q. And just so the record's clear, it's not because you failed to pass the engineering exam, but as I recall, back then you had to take one exam and then work for a period of years before you could sit for the final exam; is that correct?

A. That is correct. You had to have four years of engineering experience. And the way it always worked out is even after the four years, the exam wasn't given until later. So it almost was five years by the time you finally were able to take the exam and get your license.

Q. And have you been involved since you got your license in the design of water lines, sewer lines and related type projects?

A. I have.

Q. We're dealing here with a -- in this lawsuit

with a water line that was for the City of Portland, Tennessee. And was your firm the firm responsible for the design of this water line?

A. Yes, it was.

Q. Okay. You are with John Coleman Hayes, PC; is that correct?

A. I'm the president.

Q. Are you the sole stockholder?

A. I am.

Q. Let me just cut to the chase on this. What problems did you encounter with the water line when you started to test it?

A. We encountered numerous leaks in the water line and attempted to have the contractor repair those leaks with various different methods, mainly sleeves that are made for that purpose. And after awhile it became apparent that the leaks were too numerous to -- to repair them all in an expeditious manner. And then there was a question as to the integrity of the line that had that many repairs made on it. So a decision was made to basically re-bid the line, dig it up, replace it and -- using salvageable material. And hopefully that answers your question.

Q. Okay. Was there an area of the line that was too shallow?

A. There was one area of the line, as I recall, that was too shallow.

Q. What's the problem if the line is too shallow?

A. What is the problem?

Q. Yes, sir.

A. Sometimes there's no problem. I would say the problem is that -- that regulations require and the specifications required it to be a certain depth of cover over it.

Q. Do you recall that -- do you have to have certain frost protection for a line?

A. Well, you do on lines that don't have any water flow in them. But with water flow in them -- I would think frost protection with a large line with a lot of water flow would not be a problem at all, not in this part of the country anyway.

Q. And was this line then more shallow than was provided in the specifications?

A. Only a small section of it, as I understand it. An that was in an area of rock. And I think that probably the intent -- I do not know exactly -- the intent was probably to cover it with additional fill material, and that was not done. This was a cross-country line. It was -- that type of a solution

is available.

Q. Were there areas where the angle of the one of pipe going into the other pipe was greater than what was permitted?

A. That's the way I understand it, yes. I did not observe it. But that's the -- according to the records, that is true.

Q. And you say as you understand it. Who gave you that information?

A. I'm not sure anybody gave me that information. I think the records show that that is what was -- what was observed.

Q. Do you have any records that tell us where problems were found on this line and what they were?

A. I brought a box of records and information that y'all are certainly permitted to observe and make copies of, whatever. And it's all in there. Whatever we've got is in there. And there's a lot of it.

Q. Okay. Obviously today in a deposition we don't want to sit here and go through a whole box of records.

A. I sure don't.

Q. That sort of gets nonproductive from everybody's standpoint. Can you point us towards a section of the file that would show us where leaks

were, what leaks were encountered, or where improper construction was encountered?

A. I doubt it. I didn't assemble all that. I had my secretary go through the files and put it all together. And I doubt seriously if I could dig through there and figure that out any quicker than anybody else could. I'm not familiar with it.

Q. In other words, there's not a section of that file that is entitled deficiencies or --

A. I've never looked in the box.

Q. Who at your organization was responsible for cataloging whatever problems there were on this job?

A. The engineer responsible for the design and project construction was John Gilmore, and he is deceased. Now, as far as who is responsible for cataloging, I'm not real sure. He'd be the person to answer that question. As far as cataloging anything, I don't really know.

Q. Do you recall the number of leaks that were encountered on this job?

A. No, I do not.

Q. Do you recall the approximate number?

A. No, I do not.

Q. Who made -- did anybody make a recommendation at the city that this line be rejected?

A. Rejected? We continuously made a recommendation to the City that it not be accepted until it passed all the required tests and so forth and so on. Is that your question?

Q. Well, at some point in time -- you said earlier y'all became so concerned with the integrity of the line, I think was your wording, that you thought that the line ought to be dug up and the materials re-laid; is that correct?

A. That is correct. As to how that evolved, I'm not sure whether the City in their concern insisted that it be done that way or someone with my firm made a recommendation that it be done that way.

Q. Did you get involved in this project at the point in time that they started finding all these leaks?

A. I did.

Q. Tell me when you --

A. Not when they started finding all the leaks, but after it became apparent that the leaks were numerous.

Q. Okay.

A. At that point in time I got involved in it basically from question and answer situation, trying to figure out what -- what the problems were.

Q. And did you actually inspect the line?
A. No, I did not, not at that time. I did, in fact, look at some of the gaskets that came from the line.
Q. Okay. When you looked at some of the gaskets that came from the line, what did you find?
A. I found that some of the gaskets had been rolled. That means that -- crimped or whatever when the pipes were being belled up.
Q. Okay. When the pipes are being belled up, you're referring to pushing a unbelled end of one of pipe into the belled end of the other piece of pipe; is that correct?
A. The terminology is the male end and the female end. I didn't -- yes. I did observe that.
Q. Is that just improper installation?
A. I'm sorry?
Q. Is rolling the gaskets just improper installation?
A. So far as I know, in my opinion, it -- it is through any number of different scenarios. Perhaps not enough lubricant was applied or perhaps being belled up from a -- not a straight standpoint, being belled up at an angle or perhaps rolling gravel up in it at the same time you're belling it up. But there could be any

number of reasons for that. Now, as far as the numerous leaks, I've never experienced that before ever.

Q. The number of leaks they had on this line?

A. Yes.

Q. This line was just under a mile long; is that correct?

A. I believe that's correct.

Q. Was there anything difficult about the installation of this line?

A. I guess it depends on the term difficult. I mean, for people that are used to laying ductile iron line I would think this would be an easy project for them inasmuch it was cross-country, no traffic to deal with.

Q. Didn't have to fit it between any other pipelines or anything like that, did you?

A. Well, it connected to pipes on each end.

Q. Okay. But it's not like when you're going through a city and you've got to fit it between gas lines and sewer lines and that sort of thing?

A. Correct. No. This was pretty -- this was an open country.

Q. Now, did you have discussions with anybody at the City of Portland where you made a specific


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 12 of 24 PageID #: 123

recommendation that this line be dug up and replaced?

A. I don't recall that I did, but perhaps I did. I had numerous meetings with them.

Q. Let's try it this way.

A. As to whether they -- as to whether they suggested and I acquiesced or whether we both at the same time said it needed to be dug up and replaced, I don't know. We attempted forever, it seems like, to repair the line. It's always been my position to work with the -- everybody so everybody can come out whole. But it became obvious that that wasn't going to work in this situation and we were going to have to re-lay that line in order to get the integrity that was -- that was intended.

Q. If you've got too many sleeves put on a line, does that destroy the integrity of the line?

A. Well, that's open for argument. I mean, the sleeve is supposed to be at least as good as the line, but I don't think -- I don't think any good client would expect a brand new line to be covered up with repair sleeves. I know -- I can understand the City's viewpoint in that regard.

Q. In your professional opinion, did this line need to be dug up and re-laid?

A. That was the correct -- that was the correct


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 13 of 24 PageID #: 124

answer to the problem obviously.

Q. Can you explain to the judge why this line, as opposed to other lines where you may have had a leak or something, needed to be dug up and re-laid?

A. Pretty obvious. Just too many problems, too many leaks. Even in isolating portions of the line we couldn't -- couldn't get the leak test to satisfy the requirements of the specifications.

Q. As I recall, RLI employed Jones Brothers to come in after the contractor was defaulted and do some testing of the line. And did you participate in that testing of the line?

A. Me personally, no. I'm not sure whether my firm observed it or not. I don't recall.

Q. Do you recall two extra valves being installed in this line so they could isolate smaller sections of the line?

A. I seem to remember that, but I can't say for sure that that happened.

Q. Do you recall what leak problems were detected after Jones Brothers got on the job?

A. I don't differentiate between the leak problems that are -- were made apparent before or after Jones Brothers got there. So I can't answer that question. I'm sorry.

Q. Okay. Do you recall sound equipment being brought in to try to isolate where leaks --
A. I heard that.
Q. You weren't personally present?
A. No. No.
Q. Who at John Coleman Hayes would have the most knowledge of the leak problems and installation problems that occurred with this line?
A. That gentleman is deceased as I -- as I mentioned.
Q. Well, I understand that. So I -- who's the next one?
A. Other than that I probably got as much knowledge as anybody else. Gregg Harris, who is sitting out front for a deposition whenever mine's over with, he's an engineer with our firm. And he got involved with it after John Gilmore's death. And he got called away to Afghanistan to protect us all so. . .
Q. When did John Gilmore die?
A. I'm sorry. I don't recall. It was February, I believe, three years ago. But I can't remember. I can't -- I don't . . .
Q. Who is Danny Hawker?
A. Danny Hawker was an inspector that was

employed by our firm to inspect the installation of the line.

Q. Does he still work for your firm?

A. No.

Q. Where does he live? Do you know?

A. Last I heard he lived in -- close to Westmoreland, perhaps, maybe in Sumner County. I don't recall.

Q. Do you know who he works for now?

A. He's retired the best I know.

Q. Is he handicapped?

A. Danny had a lot of age on him. I guess anybody with a lot of age is semi handicap. I know I am. So anyway -- I don't think he was handicap to the extent of inspecting this line if that's the question.

Q. Was he in a wheelchair or have trouble getting around?

A. Are you talking about now?

Q. Back then.

MR. POTTER: Are you referring to John Gilmore?

THE WITNESS: No. John Gilmore was the one who was handicap. He had MS. Now, he was in a wheelchair.

MR. GILLIS: Okay.


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 16 of 24 PageID #: 127

THE WITNESS: He was in a motorized wheelchair and had been for years.

Q. (BY MR. GILLIS) Now, in the prior deposition we went over the fact that there was another inspector that came in after Danny Hawker retired. Do you recall who that was?

A. The City had their own inspector.

Q. Somebody with John Coleman Hayes.

A. No, I don't recall who that was.

MR. GILLIS: Off the record.

(Off-the-record discussion.)

Q. (BY MR. GILLIS) Do you remember Ralph Keifer?

A. Who?

Q. Ralph Keifer, K-E-I-F-E-R.

A. I sure don't remember a Ralph Keifer.

Q. Let me show you a document that's been marked as Exhibit 17 to Ken Wilber's deposition. That's what I'm referring to.

A. Well, if he ever worked for us, I don't remember it. Wait a minute. Wait a minute. Pitt Excavating. Okay. That -- I didn't know Ralph Keifer, but Pitt Excavating agreed to put somebody up there. That does ring a bell now. Pitt Excavating at the top of this fax right here. And they agreed to put

somebody up there to fill in for Danny because Danny was -- really I think he reached his limit more from this job than anything else. He -- he didn't want to go back up there again. And he just agreed to stay there because he lived close by. And this guy worked for Pitt Excavation. And I don't know how long he looked at what was going on as far as testing and so forth.

Q. Where is Pitt Excavating located?

A. I think they're out of Kentucky. This -- perhaps you can get better information regarding this from Mr. Harris at a later deposition.

Q. Okay. When the line was re- installed, did it have any leaks?

A. I don't think it did, but I don't know that. I wasn't -- I wasn't there for the testing because the City did their own inspection at that point in time.

Q. To your knowledge was the same pipe dug up and used?

A. To my knowledge it was. I think we ordered maybe -- seems like maybe ten more sections because they had cut a bunch of sections up and we didn't want to use them or whatever. I don't recall. Most all of it was, yes.

Q. Now, did you get paid by the City to prepare

specifications, plans, for digging up the water line and re- installing it?

A. No.

Q. Did you charge them for that?

A. No.

Q. Why?

A. Just trying to get the thing finished. Trying to get the job finished. Just like I'm here. I'm not charging for this.

Q. Did you ever have any conversations with Trent Smith or anybody else from Advantage?

A. Yes, I did.

Q. Who did you have those conversations with?

A. I had conversations with Trent Smith.

Q. Okay. And do you recall when that was and what the substance of it was?

A. No, I don't recall when it was. I recall talking to him about getting the job done, getting it finished and getting it done right. That's all I recall.

Q. Can you tell me what he said?

A. No, I can't remember what -- anything about it. He just -- he just said he would get the job finished, get it done.

Q. Did you make any written notations of that

conversations?

A. If I did I don't -- they would be in that file over there, I'm sure. I don't know that I made any.

Q. What about Tyrone Tackett? Did you ever have any conversations with him?

A. I did.

Q. Do you recall when those were?

A. No, I don't. During the course of the construction.

Q. Do you recall the substance of them?

A. It was over getting the job done and getting it finished and doing it right. That's all I remember. That was the substance of it.

Q. Did either of them ever express to you what they felt the problems were that were causing all these leaks?

A. Oh, yeah. Yeah. They -- something wrong with the pipe or anything but -- anything but construction technique.

Q. Did you investigate to see whether the pipe was the problem?

A. Sure. Had the pipe company investigate it, as well. We measured it for roundness and checked it for burrs, various other checks and so forth.

Q. Did you ever find any problem with the pipe?
A. I never found any problem with the pipe at all.
Q. Do you know --
A. Otherwise, we wouldn't have reused it. We would have been back on the company to supply new pipe.
Q. And when this same pipe was reused did it work satisfactorily?
A. As far as I know. I haven't heard anything any different.
Q. Whether you actually made the recommendation, did you concur that the pipe needed to be dug up and re-laid?
A. I concurred. Whether I made the recommendation or not, I do not recall.
Q. When you made that recommendation, were there still numerous leaks out there?
A. I'm not saying I made the recommendation.
Q. Okay. When you either made the recommendation or concurred.
A. Yes, there were numerous leaks.
MR. GILLIS: Let's go off the record.
(Off-the-record discussion.)
MR. GILLIS: Back on the record.
Q. (BY MR. GILLIS) There was some earlier

testimony about a letter that was written by Advantage Construction requesting a time extension on this project. Do you know anything about it?

A. That could have happened. I don't know.

Q. You don't have any memory of it?

A. Not really.

MR. GILLIS: I don't have anything further.

**EXAMINATION BY MR. POTTER:**

Q. Mr. Hayes, Tim Potter. I represent Trent Smith and Advantage. If there were any documents written by Mr. Gilmore, the engineer who was assigned to this project, to the City about the quality of work being performed by Advantage, would that be included in this bankers box of materials you brought us today?

A. I would certainly hope so.

Q. Do you know if you were asked personally to get involved in this project before or after Advantage Construction was terminated as the contractor on this project?

A. If I was asked to get involved? Asked by who, sir? I'm not sure about the question.

Q. Okay. I'll rephrase it. You said earlier, I believe, that you personally got involved in this project at some point in time; is that correct?


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 22 of 24 PageID #: 133

A. Correct.

Q. Do you know if that was before or after Advantage Construction was terminated as the contractor by the City of Portland?

A. Oh, it was definitely before.

Q. Okay. Did you personally get in the car and drive up to Portland and inspect this line at any point?

A. I did. But that was after it was re-let and another contractor started in there to lay -- to re-lay the line. I went up there and met with the City on more than one occasion. I can't recall how many -- to discuss solutions to the problem.

Q. Would it be fair to say that you were relying upon the information supplied to you by your employee and engineer John Gilmore as to how the project was being performed?

A. It was his project. And I -- I got information from him. I mean, he would communicate with me about it when -- when problems arose. If no problems arose, then I never heard of one of his projects. I mean he took care of it.

MR. POTTER: Thank you. I don't have any more questions.

MR. GILLIS: No more questions.

FURTHER THIS DEPONENT SAITH NOT


Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 23 of 24 PageID #: 134

STATE OF TENNESSEE)
) s.s.
COUNTY OF DAVIDSON)

I, Lise S. Matthews, Notary Public in and for the State of Tennessee at Large,

DO HEREBY CERTIFY that the foregoing deposition was taken at the time and place set forth in the caption thereof; that the deponent therein was duly sworn on oath or affirmed to testify the truth; that the proceedings of said deposition were stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my skill and ability.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any such attorney or counsel, nor do I have any interest in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 29th day of June, 2005, at Nashville, Davidson County, Tennessee.

Lise S. Matthews, RMR
Notary Public at Large
State of Tennessee

My Commission Expires:
May 26, 2006



Case 3:04-cv-00555 Document 70 Filed 07/19/05 Page 24 of 24 PageID #: 135