IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

RLI INSURANCE COMPANY,

Plaintiff,

VS. NO. 3-04-0555

ADVANTAGE CONSTRUCTION
SERVICES, LLC;
TRENT B. SMITH;
ILLIAD JEFFERSON;
and SOUTHERN CONSULTING, LLC,

Defendants/Third Party Plaintiffs,

VS.

TYRONE TACKETT,

Third Party Defendants.

---

DEPOSITION OF: **KENNETH ALLEN WILBER**

June 6, 2005

---

---

**BERES & ASSOCIATES**

230 Fourth Avenue North, Suite 503

Post Office Box 190461

Nashville, Tennessee 37219



Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 1 of 49 PageID #: 136

**A P P E A R A N C E S**

For the Plaintiff: Mr. Angus Gillis III
Attorney at Law
Suite 701
501 Union Street
Nashville, Tennessee 37219

For the Defendants/
Counter Plaintiff: Mr. Timothy V. Potter
Attorney at Law
210 East College Street
Dickson, Tennessee 37055

**I N D E X**


Examination by Mr. Gillis. . . . . . . . . . . . . . 5

Examination by Mr. Potter. . . . . . . . . . . . . .52

Further Examination by Mr. Gillis. . . . . . . . . .77



Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 2 of 49 PageID #: 137

# E X H I B I T S

1 Specifications/Contract Documents . . . . . . . . . . 10
2 (Late-filed) Plans. . . . . . . . . . . . . . . . . . 10
3 Check and Partial Pay Estimate. . . . . . . . . . . . 13
4 Change Order. . . . . . . . . . . . . . . . . . . . . 14
5 Partial Pay Estimate 2. . . . . . . . . . . . . . . . 15
6 Letters/Memos . . . . . . . . . . . . . . . . . . . . 22
7 Check/Letter(9/10/03) Release/Assignment Agreement. 35
8 Completion Pay Estimate/Related Documents . . . . . 39
9 Specifications/Contract Documents . . . . . . . . . . 40
10 Memorandum (12/5/02) . . . . . . . . . . . . . . . . 41
11 Memorandum (12/27/02). . . . . . . . . . . . . . . . 42
12 Letter (1/10/03) . . . . . . . . . . . . . . . . . . 43
13 Letter (12/30/02). . . . . . . . . . . . . . . . . . 44
14 Letter (12/19/02). . . . . . . . . . . . . . . . . . 45
15 Letter (10/8/02) . . . . . . . . . . . . . . . . . . 45
16 Memorandum (12/13/02). . . . . . . . . . . . . . . . 46
17 Memorandum (12/18/02). . . . . . . . . . . . . . . . 47
18 Letter (8/7/03). . . . . . . . . . . . . . . . . . . 47
19 Resolution 4750. . . . . . . . . . . . . . . . . . . 48
20 Letter (7/23/02) . . . . . . . . . . . . . . . . . . 49
21 Collective File Documents. . . . . . . . . . . . . . 51
22 (Late-filed) Valve Locked Documents. . . . . . . . . 67
23 Letter (9/17/02) . . . . . . . . . . . . . . . . . . 72

The deposition of **KENNETH ALLEN WILBER** was taken by counsel for the Plaintiff, at 11:09 a.m., on June 6, 2005, pursuant to the Federal Rules of Civil Procedure, to be used for ALL PURPOSES, in the above-styled cause, before Lise S. Matthews, court reporter and Notary Public at Large, at the offices of Schulman, LeRoy & Bennett, P.C., Suite 701, 501 Union Street, Nashville, Tennessee, in accordance with the following stipulation.

**S T I P U L A T I O N**

It is agreed that Lise S. Matthews, being a Court Reporter and Notary Public at Large for the State of Tennessee, may swear the witness, take the deposition in machine shorthand and afterwards reduce the same to typewriting, and that the deposition may be used on the hearing of the above-styled cause. All objections, except as to the form of the question, are reserved until the hearing of this cause.

It is further agreed that all formalities as to caption, certificate, transmission, filing, et cetera, including the signature of the witness, are expressly waived.

* * *


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 4 of 49 PageID #: 139

**KENNETH ALLEN WILBER**

having been first duly sworn, testifies as follows:

**EXAMINATION BY MR. GILLIS:**

Q. Would you state your full name for the record, please.

A. Kenneth Allen Wilber.

Q. Mr. Wilber, my name is Angus Gillis. I represent RLI Insurance Company. We're taking your deposition today. And I want to be sure we communicate and communicate accurately. So if I ask you a question and the meaning of that question is not clear to you, just tell me and I'll rephrase the question and explain exactly what I mean. Do you understand?

A. And I just -- like I told you, you know, I left the city and it's been two years. So a lot of these things may be a little vague to me.

Q. Well, we'll get to that. The other instruction I need to give you is I'll ask a lot of yes and no questions. And when I do, please answer yes and no, rather than saying uh-huh or huh-uh and shaking your head because the court reporter has a real difficult time with those. And uh-huh and huh-uh look a whole lot alike when we go back to read what's been said today. So if you can follow those basic

directions we'll do great. What is your educational background?

A. High school education and I have a -- in fact, I only lack three hours to have my associate's degree in business.

Q. Lack three hours getting your associate's in business?

A. (Witness moves head up and down.)

Q. Where would have been from?

A. Vol State.

Q. You're a lifelong resident of Portland, Tennessee; is that correct?

A. Yet.

Q. Okay. When did you graduate from high school?

A. 1972.

Q. What's been your employment background since graduation from high school? Or -- yes. Since graduation from high school.

A. Basically, right out of high school I went to electronics school for a little while, then I dropped out, came back home. That's the only time I wasn't at home. Worked for a TV and appliance store there. And I worked for a fabricating company in New Deal called Imperial Fab Hydro Systems which built

sewage lift stations. I worked in the electrical part of that. And then after that me and another gentleman started a plumbing and electrical supply place in Portland. We went through the rough times of the early '80s, if you remember the oil prices, interest prices. We had to sell. And then I went to work for an electric company in Gallatin, electrical supply company. And then I went to work for the City of Portland. And then from that time I worked for a utility contractor and then presently as Mayor.

Q. When did you go to work for the City of Portland?

A. In '97 or '96.

Q. What were your job responsibilities when you went to work for the City of Portland?

A. Originally when I started out with the City of Portland I was over the sewer department and I worked up to public works director in about two to three years.

Q. Okay. And when were you public works director for the City of Portland?

A. I believe it was '99 until 2003, when I left. About the end of August I believe it was.

Q. And then you left in 2003. And what did you do at that time?

A. Went to work for a company called Jenkins Construction. It was a utility contractor.

Q. What did you do for them?

A. The first job I worked on was in Ridgetop putting in sewer systems in the City of Ridgetop. And then -- this year I worked in the Hartsville and Castalian Springs area a little bit putting in water lines.

Q. Were you the job superintendent for that?

A. Basically, yes. Uh-huh.

Q. And I believe at some point in time then you ran for Mayor for the City of Portland?

A. Yes.

Q. And you are now the Mayor of the City of Portland; is that correct?

A. That's correct.

Q. When did you become the Mayor of the City of Portland?

A. I was sworn in the night of May the 20th.

Q. Of 2005?

A. Yes, sir.

Q. Okay. You've been asked to come to this deposition and bring certain documents today. Let's start with the contract at issue in this case. Do you have the contract between Advantage Construction

Services and the City of Portland for the job in question?

A. I believe it's in this stack here. I didn't go completely through what they assembled. Well, I don't see it right off. I believe it is right here. Yes, I do have it.

Q. Could I see that, please.

A. (Witness complies.)

Q. Okay. You handed me a whole stack of documents. Are these all of the specifications and contract documents for the water system improvements for the City of Portland?

A. Now, without going back to the original book and going page for page, I believe they are. Of course, added into it is his bid bond. And the bids are on the back, some other things. But as far as I can tell right here I believe they are. And there are some other notes where we had a pre-bid meeting to this same document.

Q. Okay. And is the contract in there executed?

A. Yes.

MR. GILLIS: Okay. Let's mark this set of documents as Exhibit Number 1.

MR. POTTER: Those documents that he's

identified as the contract?

MR. GILLIS: Yeah. Do you want to see them?

MR. POTTER: If I could, please. I have no objection.

MR. GILLIS: We'll give him a minute to look at them.

THE WITNESS: And there are a set of plans that should be with this to make it a complete package as far as --

(Whereupon the previously mentioned Specifications/Contract Documents were marked Exhibit Number 1.)

Q. (BY MR. GILLIS) You didn't bring the plans today; is that correct?

A. No.

MR. GILLIS: Could you furnish us with the plans and we'll mark those as late-filed Exhibit 2?

THE WITNESS: Yes.

(Whereupon the previously mentioned Plans were designated to be marked Exhibit Number 2, when furnished.)

Q. (BY MR. GILLIS) Could you briefly describe this project for me?

A. This project is a 16-inch water line that

originated at the water plant property and went through some property of the City of Portland and by the city lake. Then we went onto a private property, which we had purchased easement from a gentleman named Bill McLaughlin. We went across his farm and we ended up at Portland Boulevard to tie into the existing water line.

Q. How long was the total project?

A. I believe it was approximately about 51, 5200 feet, somewhere in that.

Q. Close to a mile?

A. Yes.

Q. And what type pipe was used?

A. 16-inch ductile iron pipe.

Q. How was Advantage Construction chosen?

A. This was -- the project was through grant money and loan money through rural development. And through -- any bid, there's a policy the City will publicly advertise. We publicly advertised and received bids, and Advantage was the lowest bidder.

Q. Now, let's get the money on this thing. How much money was paid out on this job to Advantage?

A. I'll have to look at some documents to tell you that.

Q. Can you do that?

A. You'll have to bear with me. I'm sorry. I


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 11 of 49 PageID #: 146

believe it was somewhere in the neighborhood of $75,000 but I'll have to. . .

Q. Okay. Let me show you a document and ask you if you can identify this as the check written by the City of Portland to Advantage Construction Services for $75,348?

A. Yes. That is correct.

Q. Is that the only payment that the City made to Advantage Construction Services?

A. I can't be absolutely positive without -- but I believe it was.

Q. Okay. Now, were there any change orders on this job?

A. I don't believe there was.

Q. Okay. Let me show you -- Okay. Before we --

A. I may --

Q. Before we get out of order, let's mark the City of Portland Water Plant Upgrade II check to Advantage Construction Services for $75,348 as Exhibit Number 3, along with -- attached to it is the partial pay estimate. And is that, in fact, the partial pay estimate that this check was based on?

A. Yes.

MR. GILLIS: Let's mark that as Exhibit

Number 3, Collective Exhibit 3.

(Whereupon the previously mentioned Check and partial pay estimate were marked Exhibit Number 3.)

Q. (BY MR. GILLIS) Let me show you a document entitled contract change order and ask you if that is a change order to this job.

A. I believe that is correct. It looks like it's for pipes. Yeah, that's a change order. Then, of course, it was -- yes. Of course, there was an increase and decrease. And a lot of times on a job when they're originally bid, you know, the engineers -- the quantities are estimated. So when you're getting close to a point you adjust those quantities.

Q. The original contract amount was $136,169; is that correct?

A. That sounds right.

Q. And then this increase was in the amount of $2,839.32; is that correct?

A. Yes.

Q. Now, am I correct then that the City had $63,660.32 in funds that it had not paid out to Advantage at the time the default was declared in this contract?

A. That sounds correct.

MR. GILLIS: Let's mark this change order


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 13 of 49 PageID #: 148

as Exhibit Number 4.

MR. POTTER: No objection. Can I see it, please.

MR. GILLIS: Sure. That's the one that was in the disclosure stuff.

(Whereupon the previously mentioned Change Order was marked Exhibit Number 4.)

Q. (BY MR. GILLIS) Okay. Now, when did you as the public works director become aware that there were some problems on this job?

A. I can't tell you the exact day, but Danny Hawker who was the inspector for the engineering firm John Coleman Hayes had mentioned some problems. One was not capping the pipe off at night. In fact, I had to go out there one time, and they were getting off our easement, and I had to stand behind Danny and make them move the pipe back over to the easement. And then when they started testing then we realized that it wasn't testing and started having a lot of problems at that point.

Q. And before I get on to all the problems, let me show you a document marked partial payment estimate number 2 and ask you if that's the partial pay estimate that contains the amount of the change order?

A. Yes. The second item shows it here change

order.

Q. Okay. And am I correct that that -- nothing was ever paid under that partial pay estimate number 2?

A. I believe that is correct.

MR. GILLIS: Let's mark the partial pay estimate number 2 as Exhibit 5.

(Whereupon the previously mentioned Partial Pay Estimate 2 was marked Exhibit Number 5.)

Q. (BY MR. GILLIS) Now, I may have cut you off in mid-sentence. I think the question I asked was when did you become aware of some problems with this particular water line.

A. Well, it's when it was starting to be laid. One of the things that you do on a water line is every night you cover the ends up so items cannot get into your water line. And we was having problems with that. And then they would -- we had to purchase an easement, as I stated earlier, and they was getting off it one time. And Danny called me to come out to reinforce to them they had to stay on the easement. So we had to go back to that.

Q. Who is Danny?

A. Danny Hawker. He was the inspector for John Coleman Hayes.

Q. Do you know where he is now?

A. He retired before the project -- maybe after it was over. And I think he lived in Lebanon. Now, I've not heard from him since.

Q. Okay. I'm sorry. I interrupted you.

A. Oh, you're fine.

Q. You were telling me the pipe ends weren't covered up and Danny Hawker called you about that and about getting back on the easement?

A. Right.

Q. What other problems did you become aware of?

A. And then when they started pressure testing the pipe we realized it wasn't holding pressure. So that's . . .

Q. When you realized that these problems existed what action did you take as the public works director?

A. Well, we -- of course, actually, our contact -- if you follow proper procedure, the engineer was the one that's supposed to, you know, who -- we had have several conversations at that time with Mr. Gilmore, who is deceased, who worked for John Coleman Hayes. He was the engineer directly in charge. So we would -- between Danny and myself and, you know, him we would have conversations with him. And then at one point we had a meeting there in Portland -- and I

cannot tell you what -- because they really had gotten behind as far as time-wise on the job, and was trying to get them to -- because this line was important to us. And -- to get them back on track and then, of course, Mr. -- not Trent, but Tyrone -- is that his name -- Tackett?

Q. Tyrone Tackett.

A. Would always be the one who -- of course, he was a talker and he would make you believe tomorrow he'd have it done. Just, you know, things never seemed to follow through.

Q. You mentioned you had a meeting in Portland. Who was present at this meeting?

A. I think the engineer was and some city people and so forth. It was just kind of a meeting to, you know, see what we could do here to get back on track and what's your schedule. Because they wouldn't -- most contractors show up at daybreak and work until dark on this type of job because it's a wide open job in a field. There was no houses, to go through yards. I mean it was a good job. Well, they would show up at dinner and work until 5:00 or not show up. The inspector would never know when they was going to be there. You know, we weren't getting -- they had the pipe laid and they weren't testing. It seemed like

it was a month or so before they even started testing after they had it laid. And, you know, it was just all different problems like that.

Q. Okay. At this meeting at the City was a decision made at that time to terminate --

A. No.

Q. -- the contract?

A. No. At that time it was just more or less, hey, we need this line. That's what -- what are you going to do? Is there anything we can -- it was kind of just a meeting to kind of see where everybody was, you know, just to kind of get back on track and. . .

Q. Did anybody make any notes of this meeting?

A. I'll have to go back and find out. I just don't remember. I didn't see any in here and that's something that I need to ask about. And I will do that.

Q. And I gather this was before lawyers were involved or anything of that nature?

A. No. No. This was before y'all's names ever appeared.

Q. Okay. And were the -- was it known that there were leaks at that time?

A. Yes. Uh-huh.

Q. What did Tyrone Tackett say about the leaks?

A. Oh, he, you know, blamed the pipe company. The pipe was out of tolerance, pipe was out of round, bad gaskets, you know, everything except, you know, installation problems.

Q. Was Trent Smith or anybody from Advantage present at this meeting?

A. To the best of my knowledge I do not believe he was. And I think he was told about it.

Q. Tell me the end result of this meeting.

A. My feeling was we didn't accomplish anything. Everybody felt like we accomplished a lot, that Tyrone was going to get on it and get it done. I didn't feel like we accomplished anything.

Q. Did you give anybody a schedule of completion at that time?

A. Yeah. It was -- like I say, I don't remember exactly when this meeting was. But it was hopefully in the next two to three weeks they would have it completed at that time. And that was well -- I think still in warm weather. So it was probably around September sometime.

Q. When was this contract to be completed?

A. I'll have to go back to. . .

Q. For the record he's looking at Exhibit Number 1.

A. Bear with me. It's been a while. Should have been completed by October 31st, 2002, because the notice to proceed was issued on June 24th, 2002, and they had 150 days to complete that.

Q. Okay. Was this meeting that you had before or after the scheduled completion date?

A. I believe it was before. Sometime in -- I believe, like I say, it was still kind of warm weather. But I'll have to try to find that record.

MR. POTTER: I'm sorry, Mr. Wilber. What was the completion date? October --

THE WITNESS: 31st, 2002.

Q. (BY MR. GILLIS) Okay. So am I correct that at that time Tyrone Tackett blamed all the leak problems on defective pipe?

A. Correct.

Q. Was there any question raised by the City as to whether the pipe ought to be taken up at that time if they had this much defective pipe?

A. I don't think -- because at that time it was just two or three or four. It was a minor number of leaks.

Q. That you knew about?

A. And, you know, it's not unusual on a job to maybe -- you hope you don't have any. But, you know,

one or two are acceptable, you know.

Q. Okay. Tell me after this meeting that occurred sometime in warm weather what next transpired.

A. Nothing much.

Q. Could you explain that for me?

A. I just don't remember any more activity on the job. In fact, if I remember correctly, I think he was waiting on some repair sleeves and was waiting until they got in to correct the leaks to start testing again. But their work was very spotty after that. They'd show you a day or two and be gone a few days, show up a day or two. And there was just not much regular about it.

Q. What was the City's next action with respect to the problems that were encountered?

A. Well, then we started having meetings among ourselves and with the engineers. And then I think some calls started being made to, you know, RLI and then Trent. You know, so it just kind of worked its way, trying to see what our options was, what they were not. I know we had some conference calls with you up to the City attorney, with David Amonette present.

Q. Did the City ultimately terminate the contract of Advantage Construction Services?

A. Yes.

Q. When did you do that?

A. I believe it was in January of 2003.

Q. Do you know what day in January 2003?

A. Yeah. I seen that letter in here. So just bear with me. I seen it. There's a letter from our attorney. It looks like a letter was sent to Trent on January 8th, 2003.

Q. Could I see that letter, please?

MR. GILLIS: Okay. Let's mark this letter, January 8th, 2003, as the next exhibit.

(Whereupon Collective Letters/Memos were marked Exhibit Number 6.)

Q. (BY MR. GILLIS) Mr. Wilber, while he's looking at that, do you remember a meeting being held there at the city hall at Portland, Tennessee, near the time this letter was written in which various members of the -- where the City Mayor was present, I think you may have been present, the representative of John Coleman Hayes was present, the commissioners for the City were present, I was present for RLI Insurance Company? Do you recall that?

A. I remember some meetings. There was so much going on at that time, but I do remember.

Q. And do you remember that day a decision was made that they would terminate the contract of

Advantage Construction Services?

A. I don't remember if it was made exactly at that time. I think it was kind of the general feeling, but I cannot tell you for sure if it was actually made at that time or not, but I believe the general feeling from that meeting was that was probably the way we probably needed to go.

Q. Do you recall if there were any minutes made of the -- put in City records that they -- as to when the decision was made to terminate Advantage Construction Services?

A. No, I don't know. But I'll try to find that out.

MR. GILLIS: Okay. For the record -- and so we don't get things confused -- the court reporter has marked Exhibit Number 6. And Exhibit Number 6 contains a memo to Tim Winship from David M. Amonette, dated January 21, 2003; the letter terminating -- to Trent Smith, terminating Advantage Construction Services, LLC, dated January 8th, 2003; a fax transmission to Mayor Jim Calloway from David Amonette, dated January 20th, 2003; and a letter from Jim Calloway, the Mayor, to John Coleman Hayes, dated January 20th, 2003. We had only talked about the January 8th, 2003, letter, but the rest of this all

pertains to the termination of Advantage Construction Services; is that correct?

A. Correct.

MR. GILLIS: Okay. Let's the record reflect that all four of those documents are included in Exhibit Number 6.

MR. POTTER: What was Exhibit 5?

MR. GILLIS: Pay Estimate 2.

Q. (BY MR. GILLIS) Okay. Tell me the status of the job when Advantage Construction Services was terminated.

A. The pipe had all been laid. I mean as far as the construction part. But it would not hold the test pressure that's required by the specs for final approval.

Q. What attempts had been made at that point in time by Advantage Construction Services to repair the leaks?

A. They had put on several sleeves, you know, tried -- they just cut the pipe and put on a mechanical joint. It's like a big coupling that has gaskets at each end and so forth. And I think had actually pulled some pipe up. They had tried different methods. But every time they fixed one there would be another one so. . .



Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 24 of 49 PageID #: 159

Q. Okay. And I may be using the wrong term here. I asked what Advantage Construction Services did. Am I correct that Advantage Construction Services really didn't do any of this work? It was a subcontractor that was doing this work?

A. If Tyrone Tackett was a subcontractor, it was him doing it. I don't know their situation among each other so I cannot. . .

Q. Okay. If Tyrone Tackett operates a construction company known as Cyclone, Inc., or Cyclone Construction Company, Inc., it could have been that entity that was doing the work?

A. Correct.

Q. But Tyrone Tackett was the individual that was there overseeing the work; is that correct?

A. Correct.

Q. Or supposed to be overseeing it?

A. Correct.

Q. Was he there on a regular basis?

A. Seemed like -- like I say, I wasn't on the job every day. Seemed like at first he was, but then, according to that inspector, he was seeing less and less of him.

Q. Okay. So you mentioned some sleeves had been used. Do you have any records showing how many

sleeves were used?

A. We probably do. I don't remember recalling that in this here, but I can get that information for you. I can't recall right at this time.

Q. You do have those records?

A. I think we do.

Q. Okay.

A. We should have or John Coleman Hayes should have. So we should be able to get those records.

Q. Okay. Representative -- or John Coleman Hayes will be here later today. So we may have them -- we may get those later today.

A. Do you just want to send me a list of things you need after you meet with him then?

Q. Why don't you go ahead put that on your list of things to be produced and we can -- you and I can touch base by telephone or something Wednesday probably, and I can tell you what we picked up and not picked up.

A. Okay. Because he may have these plans when he comes.

Q. Okay. Was Advantage or Tyrone Tackett ever successful in getting the leaks stopped where this line would pressure test?

A. No.

Q. Did the City then call on RLI Insurance Company pursuant to the terms of the performance bond?
A. Correct.
Q. Now, did RLI Insurance Company hire Jones Brothers Construction Company to come on the job and do certain things?
A. Yes, sir.
Q. Tell me what Jones Brothers did.
A. They -- that's going to be kind of vague. I think they repaired -- did repair some leaks that they found but could not find them all and finally came to the conclusion that the whole line was going to have to be just -- basically start over, take the whole line up, re-lay each joint and just. . .
Q. Who made that decision?
A. Jones Brothers was there. There was a gentleman -- I can't call his name. He was kind of the overseer of Jones Brothers. He was the contact with the engineer firm John Coleman Hayes. And they were just getting to the point they felt like they were spending a lot of time and not accomplishing a lot to track them down.
Q. Did the City ultimately make the decision that the entire line would have to come up?
A. Yes.

Q. Whose decision was that?
A. I'd say it was -- it would be a joint decision. Probably myself involved, our engineer involved, Mayor, council, the engineering firm.
Q. Did the City then reject the line that was in the ground?
A. I guess you could say that, yes.
Q. When the City rejected the line, did it then have new specifications prepared and plans prepared regarding what would have to be done to the line?
A. I won't say they were new. They were revised to meet the -- of taking it out and putting it in. They basically were probably the same -- basically the same plans and same specs, but they had to be adjusted to a different type of construction process.
Q. And tell me what was done to repair this line.
A. Basically, it was taken out of the ground, each joint was. The contractor pressure washed it, put new gaskets in and re-layed, you know, the pipe. Some joints were completely replaced, the ones that had been cut on and repaired. They were completely taken out of the line. But the majority of the pipe in the ground was used again.
Q. You're talking about the sleeves that had

been put in were removed?

A. Uh-huh.

Q. And where a bell housing had been cut out, those pieces of pipe thrown away?

A. I wasn't there when that job was done and I don't know what happened to that pipe.

Q. Okay.

A. I cannot tell you that.

Q. I guess what I'm trying to get to, once you cut out the bell housing, you had to use a sleeve to repair the pipe; is that correct?

A. That's correct.

Q. And if you found a leak at a joint -- the joint had this bell housing and then the other piece of pipe fit into the bell housing; is that correct?

A. That's correct.

Q. And there was a gasket in there?

A. Correct.

Q. And if that was leaking, the only way you could repair it was to cut out the bell housing and cut off some of the pipe on the other piece of pipe; is that correct?

A. That's correct.

MR. POTTER: Object to form.

Q. (BY MR. GILLIS) Okay. Tell us how you had

to repair it then if you had a leak there at the bell housing.

A. Okay.

Q. Tell us how you had to repair it if you had a leak where one piece of pipe joined the other piece of pipe.

A. There's two methods that could be used. The way they chose was sleeves and gaskets. And you actually had to cut it out. You would have to go beyond -- because your bell would have a sloped end. So you had to go passed that until you got a good piece of pipe back here and would actually put a sleeve back in the joint to take care of it. So actually took out, you know, reasonable ends and put in a gasket -- I mean, a mechanical joint, coupling. And sometimes you may have to use two because you may not be long enough without -- depending on where your pipe was and so forth so. . . And there was another method that could have been used. And I don't know why they didn't use that. They do make fittings that go -- what they call a bell repair, where actually you don't cut it. You put it around the bell. And it actually -- it's like a sleeve, but it's another gasket on the back of it. And they may have been a whole lot more expensive. I don't really know. But that's the only two ways you can

repair it. And the reason you cannot just pull that piece of pipe out and put another pipe in is because you've got joints of pipes. So you would have to take out every joint to get up to that point, which basically was done, you know, at the end. Unless you had a fitting or something. . .

Q. So when the repair was ultimately accomplished, were all of these sleeves taken out?

A. As far as I know. And I don't know if one or two were used in a spot where they needed to make up for a piece or fitting, you know, but -- but, you know, as far as I know they all were. It was all -- the old pipe was used and if there was small sections, they were took out and a new joint -- pipe was put back in.

Q. Did you run into any sections where the original pipe had been installed at too shallow a depth?

A. Yes. They -- like I say, I was -- I left the City at that time, but from -- and this secondhand. That it was -- some was too shallow. In fact, at one place I was told that where the contractor had actually bore drilled -- we had rock up toward the plant site. There was some rock areas there. They actually core drilled.

MR. POTTER: For the record I'm going to

object. I think Mr. Wilber is testifying to what he's been told.

THE WITNESS: Right.

MR. GILLIS: He's made that clear. Go ahead.

THE WITNESS: And they core drilled. And actually the trench was there, but they laid the pipe up. They didn't actually lay it into the trench that was there. And the new contractor laid it in the -- used the trench that was there. And that's the only place it was not exactly in the same place that it was laid.

Q. (BY MR. GILLIS) Okay. Now, who told you about this?

A. Steve Whitehead, the public works inspector.

Q. Were there any places where the change in angle of the pipe was too great at a joint?

A. That I cannot say.

Q. Do you recall any sound detection equipment being brought out to try to ascertain where there were leaks?

A. I don't know if -- I think Jones Brothers -- but I cannot -- may have, but I don't know if. . .

Q. Okay. Now, when the pipe was -- when this job was re-bid and the pipe was taken up and re-laid,

did the City receive anything that it was not entitled to receive under the original contract?

A. As far as I'm aware, the job was like it was supposed to be put in. I -- I think the only thing that was added that -- there was a fire hydrant added that was not on the original job, that was chosen to be put in.

Q. What was the cost of that fire hydrant?

A. $1,750.

Q. Okay. Now, what was the amount paid to get the line taken up and re-laid as you described?

A. The bid from Norris was $107,037.50. And I'll have to find if that was the exact amount. Because that was bid on unit price. So I don't know if the job ended up below or over.

Q. What I'm interested in finding out is what actually had to be paid.

A. Okay. I'll have to get -- I don't see that document showing the exact final pay. I'll have to get that for you. It was somewhere in that neighborhood. I can't tell you exactly. I'm going to have to get that figure for you.

Q. Did that $107,037.50 figure include the fire hydrant?

A. Yes.


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 33 of 49 PageID #: 168

Q. Now, did RLI ultimately settle its performance bond liabilities with the City of Portland for $46,216.50?

A. I believe that is correct. I'll need to find it.

Q. You can --

A. I mean that sounds correct.

MR. GILLIS: To save us time, do you have any problem stipulating what we paid is $46,216.50?

MR. POTTER: No.

THE WITNESS: It's somewhere in here.

MR. GILLIS: Okay. He's stipulated it's $46,216.50

Q. (BY MR. GILLIS) Do you recall there being some price increases above the $107,037.50? That's the amount that you testified was the contract amount --

A. Right.

Q. -- to dig up and replace that line.

A. Like I say, I'm going to have to get that figure. I can't tell you that today. The only reason it would have been is, just like I stated before, on engineering drawings you have a footage. And like this job, it may be a job say 5,000 feet, but you may actually lay 4800 or 5100. So you just adjust your quantities at the end.

Q. Do you have the contract for the replacement of the line?
A. Yes. Uh-huh.
Q. Who was the -- was that actually bid?
A. Yes. Uh-huh.
Q. Who was the low bidder?
A. Norris Construction.
Q. And when did they complete the work?
A. I don't recall anything in here saying the exact date they completed it. I'll have to. . . And you can go back on the question before. Here is the check from RLI for 46.
MR. GILLIS: Since you've got it, let's mark the check from RLI for $46,216.50 as the next exhibit. And attached to that is my letter to David Amonette, dated September 10th, 2003, along with the release and assignment agreement.
(Whereupon the previously mentioned Check/Letter, 9/10/03, Release/Assignment Agreement was marked Exhibit Number 7.)
THE WITNESS: Okay. On one of Norris' pay requests here, pay request number 2, they have a completion date noted of 11/20/03.
Q. (BY MR. GILLIS) And that would have been over a year after this job was supposed to be complete?

A. Yes.

MR. POTTER: What was that date again?

THE WITNESS: 11/20/03.

MR. POTTER: Thank you.

THE WITNESS: And that's probably going to answer your other question. Let me go back and look.

Q. (BY MR. GILLIS) You've handed me a completion pay estimate from Norris Excavating; is that correct?

A. Yeah. Let me look at that copy. Yes. Uh-huh. And I can answer your question before now.

Q. Okay. What is that?

A. You asked what the total pay to Norris was for the completion of this project. It was $107,110.

Q. Okay. Now if you look on through -- on through this document, you will find a contract change order increasing the contract amount by $72.50. Do you see that?

A. Right.

Q. Is that what increased it to the $107,110?

A. That's right.

Q. Now, did the City incur attorney fees handling this matter?

A. Yes.


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 36 of 49 PageID #: 171

Q. Did the City incur additional inspection fees to handle this matter?

A. That I'll have to go back. Well, yes, because our inspector -- Steve Whitehead was the city inspector at that time and he could have been doing other things. So actually it did cost us. He was having to spend time on this job that . . .

Q. Did the City incur additional engineering fees to re-bid and re- let this work?

A. I cannot tell you if John Coleman Hayes charged us for this process or if they did not charge us. That I cannot tell you. But I would say they more than likely charged us.

Q. And was the -- was the City over a year late getting its water line in operation?

A. Yes. Uh-huh.

Q. Were there liquidated damages provided for in the original contract?

A. Yes. Uh-huh.

Q. And did the City -- with the settlement reached with RLI Insurance Company, did the City actually collect any liquidated damages?

A. I'd have to go back. I know there was a lot of figures in that 46. And I don't remember if there was any liquidated damages or not in that or if we

decided to forget that and go on.

Q. The total you accepted was $46,216.50?

A. Right. Correct.

Q. I think we've already established that there was $63,660.32 that remained in contract number 1, the Advantage contract; is that correct?

A. Correct.

Q. And the difference between the total amount payable under contract number 2, the contract where it was -- where the pipe was taken up and re-laid, the City had to come up with about $43,449.68; is that correct?

A. That sounds right.

Q. RLI Insurance Company paid you $46,216.50?

A. (Witness moves head up and down.)

Q. Is that correct?

A. I think that's right.

Q. And that small 2 or $3,000 difference would have been what the City applied to attorney fees, extra engineering expense --

A. And I don't -- I believe this amount was agreed to before we actually took bids. So we was kind of -- or it may have been after. I don't remember. I know we were trying to come up -- I know the City was just wanting to come out even. That's all we was



Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 38 of 49 PageID #: 173

hoping to come out, where we weren't out any more money.

Q. When the line was taken up and re-laid using the -- were the same complete pipe joints utilized?

A. Yes. Uh-huh.

Q. Okay. And these complete pieces of pipe, did they then provide a pipe that didn't leak?

A. Yes.

Q. Is that water line in service today?

A. Yes.

MR. GILLIS: Okay. Now, I've asked you to bring a number of documents with you. Okay. Let's mark the completion pay estimate and the related documents as Exhibit Number 8.

(Whereupon the previously mentioned Completion Pay Estimate and related documents were marked Exhibit Number 8.)

Q. (BY MR. GILLIS) I asked you to bring all other documents today indicating -- or that pertained to any of this construction. Could I see the other documents that you brought?

A. Yes. What basically they did was went through the file and basically copied everything that was in the file.

Q. Okay. First of all, the top document you've

got there, are those the plans and specifications for the re-bid of this project?

A. Specifications, not the plans.

Q. Okay. Specifications. Does it include the contract documents?

A. Yes.

MR. GILLIS: I'd ask that the specifications and contract documents for the re-laying of the pipe be marked as the next exhibit.

(Whereupon the previously mentioned Specifications/Contract Documents were marked Exhibit Number 9.)

THE WITNESS: Like I say, they pulled everything and put it in there. Inspection reports.

(Brief recess.)

Q. (BY MR. GILLIS) Let me show you a memo dated December 5th, 2002, to Jim Calloway from you. I'd ask you if you can identify that?

A. Well, basically -- I can't remember exactly what meeting I'm referring to, but I think they had agreed to go ahead and get all the repairs done and get the testing. And, of course, December is wintertime. And with any test pump -- and I know from personal experience, that if you don't winterize them every night they freeze. That's just -- they're real soft

metal. So it froze and busted where they could not test. And then they were supposed to test on a Saturday. Which everything was set up. And I just -- at that point I was disgusted. I just felt like nothing was going to get done. You know, they weren't doing anything that they said that they were doing.

Q. Is this when you recommended contacting the bonding company; is that correct?

A. Well, I think we'd already been in contact. I think we was more or less letting them know that things weren't going as it had been kind of verbally agreed to.

MR. GILLIS: Let's mark this as the next exhibit.

(Whereupon the previously mentioned Memorandum, 12/5/02, was marked Exhibit Number 10.)

Q. (BY MR. GILLIS) Let me show you another memo dated December 27th, 2002, and ask you if you can identify it.

A. Well, basically, this is after that memo. This is toward the end of December. And the line was not tested. We were no closer. And at that point I just felt like we needed to start looking at -- really taking legal action, which I state here that I'm not an attorney, don't know what we can do, but I feel like

it's time we needed to start getting closure to this process.

Q. And this is something you wrote to Jim -- to Mayor Calloway?

A. Right. And as you can see, I copied all the council members.

Q. You refer to the number of leaks already repaired. Do you know how many leaks had been repaired at that time?

A. I believe at that time it was somewhere around 20, I believe.

Q. And would the line even test at this time?

A. No. Advantage --

MR. GILLIS: Let's mark this document as the next exhibit.

THE WITNESS: Advantage never did get the line to test.

(Whereupon the previously Memorandum, 12/27/02, was marked Exhibit Number 11.)

Q. (BY MR. GILLIS) We're talking about testing. Just for the record, how were you supposed to test this line?

A. You fill it full of water. I'd have to look at the specs. There's two or three -- I don't remember whether -- but you either -- you fill it full of water

and then you take a little water pump and you -- it pumps and you'll have like a little barrel with extra water to pump it up. And it's either 150 or 200 pounds of pressure. And you let it hold. Different engineers say two hours, some say three hours. But it has to hold that amount of pressure with no droppage for that amount of time.

Q. Let me show you a letter dated January 10th, 2003, to David Amonette from Trent Smith. And it refers to a letter dated October 14, 2002, notifying the engineer of reasons for delay and requesting an extension. I didn't see that October 14th, 2002, letter anywhere. Do you know if you've got a copy?

A. Let me see. That was from Trent to -- to the engineer, wasn't it?

MR. POTTER: I didn't hear the answer.

THE WITNESS: I don't have it with me. I'll look and find it and see if we've got it. That was for an extension.

MR. GILLIS: Let's mark that January 10th, 2003, letter from David Amonette to Trent Smith as the next exhibit.

(Whereupon the previously mentioned Letter, 1/10/03, was marked Exhibit Number 12.)

Q. (BY MR. GILLIS) Let me show you a letter

dated December 30, 2002, to Jim Calloway from John Coleman Hayes, Jr., with a copy to you. Ask you if you did, in fact, receive that letter.

A. Yes.

Q. It mentions in there some seven leaks and 250 feet of pipe. Do you know what that's referring to?

A. I think that was another test later on. Which your joints of pipe on that ductile iron are either like 18 foot to 20 foot. So you had, you know, what 14 -- 12, 14 joints, and you had seven leaking. You know, half of them were leaking so. . .

Q. Do you know where that was on that line?

A. No. I can't tell you.

MR. GILLIS: I'll ask that that letter be marked as the next exhibit.

(Whereupon the previously mentioned Letter, (12/30/02) was marked Exhibit Number 13.)

Q. (BY MR. GILLIS) Next let me show you a December 19th, 2002, letter to Robert L. Harris, Patricia S. Phipps, Charles B. Royse, at RLI Insurance Company from David Amonette and ask you if you can identify that.

A. Yes.

Q. Is that the letter by which RLI Insurance

Company was put on notice of potential problems?

A. I don't know if that was the official letter. There may have been actually -- you know, I think there was some discussion before then, but that may have been the official. I can't answer that for sure.

MR. GILLIS: Let's mark that letter as the next exhibit.

(Whereupon the previously mentioned Letter (12/19/02) was marked Exhibit Number 14.)

Q. (BY MR. GILLIS) Let me show you a letter dated October 8th, 2002, to Trent Smith from John E. Gilmore, Jr., professional engineer, with John Coleman Hayes, PC. Did you receive a copy of that letter?

A. Yes.

Q. From that did you -- based on that letter did you feel that the pipe that was down there was adequate?

A. Yes. Uh-huh.

MR. GILLIS: Let's mark that letter as the next exhibit.

(Whereupon the previously mentioned Letter (10/8/02) was marked Exhibit Number 15.)

Q. (BY MR. GILLIS) Let me show you a fax memorandum, dated December 13, 2002, to John E. Gilmore

at John Coleman Hayes from Trent Smith. It shows a copy to you. And ask you if you, in fact, received that memo.

A. Yes.

Q. Did Advantage proceed to do any of the work they discussed in that memo?

A. I think they may have fixed that leak, but then the line still didn't test. So they couldn't do the rest of it.

MR. GILLIS: Let's mark this memorandum dated December 13, 2002, as the next exhibit.

(Whereupon the previously Memorandum (12/13/02) was marked Exhibit Number 16.)

Q. (BY MR. GILLIS) The next memo is a memo to you from John Coleman Hayes indicating that Danny -- I'm assuming he's referring to Danny Hawker?

A. Yes.

Q. Would not be the inspector anymore and a man named Ralph Keifer whose address is apparently 700 Welch Drive, La Vergne, Tennessee 37086, will be the inspector. Do you see that?

A. Yes. Uh-huh.

Q. Do you know what, if anything, Mr. Keifer did on this project?

A. This was toward the very end. And I think

he did come out and observe some testing. I believe he was -- I did meet him. And he was --

Q. Do you know where he lives now?

A. No, sir, I sure don't.

MR. GILLIS: Let's mark this document as the next exhibit.

(Whereupon the previously mentioned Memorandum (12/18/02) was marked Exhibit Number 17.)

MR. GILLIS: Next document I'm going to show you is a letter to me from David Amonette, dated August 7th, 2003. It's apparently rejecting a $40,000 settlement offer I had made and proposing a $46,216.50 settlement offer, as being the amount of settlement that was ultimately agreed on. Did you receive a copy of that?

A. Yes. Uh-huh. Yes.

Q. And had that been discussed with you and the Mayor and the council, settling for $46,216.50?

A. I believe that's correct.

MR. GILLIS: Let's mark that as the next exhibit.

(Whereupon the previously mentioned Letter (8/7/03) was marked Exhibit Number 18.)

Q. (BY MR. GILLIS) Let me show you Resolution No. 4750 of the City of Portland and ask you if that's


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 47 of 49 PageID #: 182

resolution by which the City awarded the renovation -- contract for the renovation of the line to Norris Construction?

A. Yes, it is.

MR. GILLIS: Let's mark that as the next exhibit.

(Whereupon the previously mentioned Resolution 4750 was marked Exhibit Number 19.)

Q. (BY MR. GILLIS) Let me show you a letter dated July 23rd, 2002, to Trent Smith from you. Ask you to identify that?

MR. POTTER: I'm sorry. What was the date?

THE WITNESS: July 23rd, 2002. Yes.

Q. (BY MR. GILLIS) What is that?

A. They -- they had laid the pipe. And they were cleaning up. Instead of hauling off some debris, one of their track hoe operators decided to dig a hole and bury some brush, rock, whatever. When he did, he dug right into the existing water line and shut us down for the biggest part of the day. So we felt like, you know, if it had been a legitimate break in the line, it would have been different, but this was just something that was useless and uncalled for. And so we felt like we deserved some money back for our efforts that day.

Q. Okay. And the amount you claimed you were

entitled to was $2,937.03?

A. Right.

Q. Do you think that's fair and reasonable for the damage that was done?

A. Oh, yes. Because there's a lot of things we didn't really charge for.

Q. Was that ever paid?

A. Not to my knowledge. Now, I -- I can't -- you know --

Q. No separate check for it?

A. Not that I'm aware of. They could have --

Q. Is that something that would have been included in the 46,250 --

A. It shouldn't have been because this had nothing to do with the original contract.

Q. Just -- they were performing work on the original contract?

A. Right. But that was not. . .

Q. And they hit another water line?

A. Right.

MR. GILLIS: Let's mark this as the next exhibit.

(Whereupon the previously mentioned Letter was marked Exhibit Number 20.)

THE WITNESS: Ran all over Nashville trying


Case 3:04-cv-00555 Document 71 Filed 07/19/05 Page 49 of 49 PageID #: 184