to find the parts. I remember that day specifically. In fact, we borrowed parts from Metro to get it fixed.

MR. GILLIS: I think most of the rest of these documents are fairly self-explanatory. I'm just going to ask that the balance of your file be marked as a collective exhibit. And those are all documents you all have kept in the normal course of business; is that correct?

A. (Witness moves head up and down.)

Q. The person keeping -- you've got to say yes.

A. Yes.

Q. And the person keeping those documents has a business obligation to keep the documents; is that correct?

A. Correct.

Q. Since this contract was terminated, have you had any conversations with Tyrone Tackett?

A. I'm pretty sure I haven't.

Q. When -- did you ultimately come to the conclusion as the public works director that this line just had too many sleeves in it, too many leaks to ever work?

A. Uh-huh. And it wasn't getting any, you know, closer to being, you know, tested.

Q. How many leaks were ultimately identified?


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 1 of 30 PageID #: 185

A. I think it was 20 something. And I can't verify that. I'd have to go back and try to verify it. But I believe it was 20 something. And that's after Jones Brothers. I mean, that was the total at the end when Jones Brothers came out.

Q. What would be normal for a line of that length?

A. One or two at the most.

MR. POTTER: I'm going to object. I don't know that proper foundation has been laid for Mr. Wilber to know the answer to that.

Q. (BY MR. GILLIS) Do you lay water pipe yourself?

A. (Witness moves head up and down.)

Q. You've done that in the jobs you've had?

A. Uh-huh.

MR. POTTER: Is that "yes"?

THE WITNESS: Yes. I'm sorry.

MR. GILLIS: I don't have any further questions.

MR. POTTER: I'd like to take about a five-minute break if we could and then -- what time is your next witness? 1:00? I'll move as quick as I can.

(Whereupon the previously mentioned Collective File Documents were marked Exhibit Number

21.)

(Brief recess.)

**EXAMINATION BY MR. POTTER:**

Q. Mr. Wilber, I'm Tim Potter. I do represent the defendants in this lawsuit. And that would be Advantage Construction Company, Trent Smith, his wife Illiad Jefferson and Southern Consulting. A few questions. Tell me why it took until November of 2003 to complete the excavation and repair or replacement of the water line.

A. Well, of course, it was January of 2003 before we actually terminated the contract.

Q. Right.

A. I guess the time it took in getting -- of course, the security company, RLI, brought in another contractor to see -- I think they thought they could get up there and fix it in a day or two and be done and over with. But it ended up being determined a whole lot of work was going to have to be done. So from that point to them being there, to get settled up and get specs redrawn and rebid, just the whole process.

Q. When was it resubmitted for bid?

A. I'd have to go back and look.

Q. I think I saw a document in this Collective

Exhibit 21 that alludes to a pre-bid meeting in July of 2003. Does that sound correct?

A. That sounds correct.

Q. Would this Collective Exhibit 21 include all of the daily inspection reports of the work done by Advantage?

A. There was -- we did not pull them out separate, I don't believe, did we? There's a file in there from Danny Hawker with John Coleman Hayes. And I believe that's one right there. And then there's also some from Steve Whitehead on the re-bid in that section also. These are from Danny Hawker.

Q. Tell me what days are referred to on that group of inspection reports.

A. 6/7/02 through 6/26/02. And there should be more. That's not all of them.

Q. Let me see if I can find some others. Danny Hawker was the inspector at the time that Advantage and its subcontractors were doing work on the line?

A. Correct. Except for when he brought up about Mr. Ralph right there at the very end.

Q. Why was Mr. Hawker replaced?

A. He -- if I remember correctly -- he was at the age to retire and he was starting his retirement process.

Q. This looks like some more. Can you tell me what dates are covered there?

A. These are -- well, it looks like we've got some duplication. 6/7/02 to 7/18/02 on these.

Q. How often would the daily inspection reports be completed? On a daily basis?

A. They should have been on a daily basis. But they would have been first been submitted -- because he worked for John Coleman Hayes. And he would submit them first to John Coleman Hayes and then they would send us copies of them.

Q. Was the contractor provided with a copy of the daily inspection reports or not?

A. That I cannot answer. I'm sure if they requested them they were.

Q. But if they didn't request them?

A. They probably were not.

Q. Okay. This looks like some others that I've been able to locate in this Collective Exhibit 21. They appear to be out of order.

A. Yeah. These go on through -- there's some duplications also.

Q. What's the most recent date you see in there?

A. 11/29/02. 11/29/02.

Q. Do you have any daily inspection reports with you today after 11/29/02?

A. All I have is what's in this packet right here with me today.

Q. Do you know if any daily inspection reports were completed after 11/29/02?

A. I'll put it this way. They should have been. And I'll try to find those if you want me to. The gentleman coming in after me may have those.

Q. The representative from John Coleman Hayes?

A. Correct.

Q. Okay. I do not see in my review of Collective Exhibit Number 21 any daily inspection reports more recent than 11/29/02. So I would request that if you can find some more recent than that, if you would please supplement those as responsive to the subpoena.

Mr. Gillis asked you about a letter dated December 19, 2002, that was marked as Exhibit 14 to this deposition, that appears to be a letter addressed to Robert Harris, Patricia Phipps and Charles Royse, R-O-Y-S-E, at RLI Insurance Company, from David Amonette, city attorney. And you were copied on that letter. You were copied on that letter and you identified it earlier. It appears to bring to RLI's

attention what the City perceives to be problems with the contract between the City and Advantage; is that correct?

A. Correct.

Q. Are you aware any other letters from the City attorney or from any city official other than that Exhibit 14 to RLI which outline problems with the contract between Advantage and the City?

A. I would just have to go back through all the files and see. I cannot say yes or no to that question in complete honesty.

Q. Okay.

A. I doubt very seriously that the City would have had any on its own. I imagine they would have been from Mr. Amonette.

Q. Well, could you clarify what you mean by that. I mean Mr. Amonette is the City attorney.

A. Right. Uh-huh.

Q. Would it be a reasonable statement to say that the City would be copied on any correspondence the City attorney --

A. Yes.

Q. -- sent to RLI on Advantage?

A. Yes. Uh-huh.

Q. And if the City was copied would it be part

of these documents you've brought to the table today?

A. It should have been, uh-huh. But I'll go back and be sure that we didn't have another file maybe that somebody missed or something just to be sure.

Q. Okay. In a nutshell, Mr. Wilber, what I'm trying to find here -- we're looking through a lot of documents today. I'm trying to find or pinpoint all of the written correspondence between the City and Advantage or its bonding company, RLI, that says, hey, there's a problem with the performance under this contract.

A. All right.

Q. I know that we've got a letter that's been marked as Exhibit 14 that I was just asking you about. There's a letter dated October 8, 2002, from John Gilmore, who's obviously not with the City, but he's the chief engineer for John Coleman Hayes, the City's engineering company --

A. Right.

Q. -- to Trent Smith. And that's been marked as Exhibit 15. That letter -- I'll show you that letter again -- basically refers to inspection of the pipe and basically instructs Mr. Smith and his company to repair the leaks; is that correct?

A. That's correct.


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 8 of 30 PageID #: 192

Q. And that letter's dated October 8th?
A. Yes.
Q. And, of course, we've talked about a letter that was dated January 8th, 2003, from Mr. Amonette to Trent Smith, basically informing Mr. Smith that the City considered his company to be in default of the contract, correct?
A. Yes.
Q. As you sit here right now, are you aware of any other correspondence from any official with the City to my clients, Advantage or Trent Smith, outlining problems with the contract?
A. As far as I'm aware -- like I said, I did not go through every file myself. This was given to me by some other people to bring. They went through the fires. As far as I know, every attempt was made to bring every piece of information we had. It's possible we overlooked something or be another file. But I'll go back and double-check.
Q. Okay. Thank you. But if you could please find -- or go back and look and confirm that there was no other correspondence sent by the City or the City's representatives to my clients Advantage Construction or Trent Smith outlining problems with his company's performance of the contract, I would appreciate that.


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 9 of 30 PageID #: 193

A. Okay.

Q. Would you do that for me?

A. Uh-huh.

Q. And this letter that we talked about a few minutes ago, Exhibit 14 -- that's the letter dated December 19th, '02, to RLI Insurance Company from David Amonette -- it doesn't declare the contract to be in default at that point in time, does it?

A. No.

Q. Mr. Gillis asked you this question when he was questioning you, and that was, Mr. Smith wrote a letter back to Mr. Amonette dated January 10, 2003, that's been marked as Exhibit 12 to this deposition. That letter appears to be responsive to the January 3rd, 2003 letter giving notice of default; is that right?

A. Yes. Uh-huh.

Q. Okay. Mr. Smith makes reference in there to an October 14, 2002, written request for extension; is that right?

A. Uh-huh. Yes.

Q. But you don't have a copy of that document with you here today?

A. No. I've got it on my list to try. . .

Q. Okay. Thank you. Now, at the time that

Advantage was performing services under this contract, who was the City engineer?

A. You're talking about the engineer for this project or the City engineer as a --

Q. The City engineer, not for this project.

A. Okay. We have a city engineer. His name is Brian Goodwin.

Q. What role, if any, did Mr. Goodwin have in this contract?

A. This contract, basically none.

Q. Okay. Was there someone who preceded Mr. Goodwin who had some role in this contract?

A. No.

Q. Okay. Who would be responsible, if anyone, during the time that Advantage was performing work under this contract to inspect Advantage's work and approve it or disapprove it?

A. It was the engineering firm, John Coleman Hayes.

Q. Okay. And it would be -- and whoever they assigned to this project?

A. That's correct.

Q. Presumably I'll find out more about that when we talk to their representative here in a moment, right?

A. Right. Our contract was with -- the engineering inspection and all was with John Coleman Hayes.

Q. Would these documents that you've brought us today also -- this Collective Exhibit 21 -- would it also include any correspondence the City might have received from the engineering firm of John Coleman Hayes about this project?

A. Yes. And hopefully it's all in the correspondence. It may not be. I'll double-check. Hopefully it is.

Q. Would it have been the responsibility of John Coleman Hayes engineering firm to put the City on notice that -- if Advantage was not correctly performing under the contract?

A. Yes.

Q. Are you aware as you sit here today of any written notice received from John Coleman Hayes putting the City on notice that Advantage was not performing under the contract?

A. I won't say we actually received a letter of a certain notice, but I think you will find in correspondences there was references to the work not being satisfactory.

Q. Okay. And again that correspondence should


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 12 of 30 PageID #: 196

be in included with this exhibit, and if it's not you're going to look for it?

A. Right. Right.

Q. Now, some point in here -- looking through this Collective Exhibit 21, I see some correspondence going back and forth between you and the Mayor who at the time was Mr. Calloway --

A. Yes.

Q. -- around the holidays of 2002; is that right?

A. Yes.

Q. And Mr. Gillis has already marked as an exhibit to this deposition a memo to Mayor Calloway from you as Exhibit Number 10. And he's already marked a memo from you to Mayor Calloway as Exhibit Number 11 regarding this project, correct?

A. Yes.

Q. In one of these memos -- it might not be Exhibit 11 or Exhibit 10 -- but in one of these memos I think I saw somewhere in here where you make reference to the fact that the Mayor didn't -- no longer wanted a repaired line. He wanted a new line laid.

A. That's correct.

Q. Where is Mayor Calloway now?

A. He still lives in Portland.


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 13 of 30 PageID #: 197

Q. What does he do for a living?
A. I do not know what he's doing right now.
Q. Was he your opponent in the election or how did that work?
A. Yes, he was.
Q. How long had he been Mayor?
A. Four years.
Q. You're familiar with the contract between the City and -- between the City and Advantage Construction, correct?
A. As a general view. I really -- I can't go through it item by item, but overall I'm pretty familiar with it.
Q. Just tell the Court, if you could, what authority, if any, do you think that the City had as public works director to demand a new line and not accept a repaired line.
A. That's what we had contracted for, was for a new line. And it just got to the point that -- like I said, a total of 20 something repair joints is just not acceptable. That's not what we contracted for. That's not what we were paying for.
Q. Okay. And if you could just tell me again why you believe that to not be acceptable. Isn't the objective to have the line working properly?


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 14 of 30 PageID #: 198

A. Yes.
Q. Okay. Now, let's assume that Advantage Construction could have properly tested the line.
A. They did not properly test the line.
Q. Okay. If they had properly tested --
A. They did not properly test the line.
Q. I understand that. But if they had properly tested the line, would the repairs have been acceptable?
A. At what point of number of repairs?
Q. And that's my question to you. That's my point.
A. I don't want to try to be smart with you.
Q. Right. I understand. Would it be fair to say that one municipality might accept ten repairs and one might accept 20 repairs, but the City of Portland decided that the number of repairs in this case were too many?
A. I think any utility district or municipality would have a difference of a personal opinion, public works director versus engineer versus -- you know, everybody is going to have a difference of opinion on that. But I think with this line, when you got to the point of that many repairs, and we're no closer to getting tested, and we're not gaining any ground, that


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 15 of 30 PageID #: 199

it's time to -- we felt like that what we were -- had contracted for and were paying for was not what we agreed upon.

Q. Okay. It's a subjective decision?

A. As far as -- yes, because there's not a rule of thumb or -- I won't say the AWAWA manual -- you know, that there's any specific number.

Q. Okay. And for clarification, when you say they could not get the line to test -- I read in those daily inspection reports references to testing the line. Do you mean testing and holding pressure?

A. Correct. That's right.

Q. When you say they couldn't get it test, you're not saying they didn't attempt to test it?

A. No. I'm saying they could not get it to hold the pressure it needed to hold.

Q. In fact, there were several attempts to test?

A. Correct. That's how they found there were leaks.

Q. That's how a leak is determined, when the pressure is not held?

A. Right.

Q. Okay. At some point in time did the City deny water access to Advantage and its subcontractors


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 16 of 30 PageID #: 200

for further testing of the line?

A. A problem that -- when you test the line, when you fill a line such as that, what you do, you turn a valve on on your existing line and let the line fill. Then you valve it off. Then they will bring a tank with extra water to bring it up to that pressure. As far as I know, we never denied that. I think at one time they were opening and closing the valve at will. And there's a reference made in a letter from Trent to David Amonette that I opened and closed the valve. That is completely false. I never touched the valve on that job. So we had a problem with them opening and closing valves. So I think that's where it was denied. And we tried toe addresses that problem. And the reason that's a problem is -- is you can syphon back water in -- like, the line being tested, if it was leaking, you can get contaminants from the ground and they can get back into your system and show you a bad test. So that's the reason that was done. But as far as I know they never were denied water. There was a problem with them turning the valve off and on.

Q. But they were denied access to sufficient water to test?

A. I'm not aware of that.

Q. Well, if they weren't denied -- tell me


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 17 of 30 PageID #: 201

again exactly what did the City do.

A. I think at one time we locked the valve off because they were opening and closing it without telling us.

Q. And how long was it locked off?

A. I cannot tell you that.

Q. Do you know what month it was locked off?

A. No, I cannot tell you without going back and trying to find some records of that. I cannot.

Q. Would there be some records of that?

A. There should be. And they would probably not be in this file. They would be over at our water shop, the people that handle our water distribution. So -- do you wanted me to try to get --

Q. Yeah. If we could specifically make those late-filed Exhibit 22. If you could provide those --

A. And I think if you'll go back to the contract --

Q. Let me define what I'm asking for. And that would be any records --

A. Right.

Q. -- that the City may have reflecting the valve being locked.

A. Right. Right.

Q. And how long and when that occurred.

(Whereupon the previously mentioned Valve Locked Documents were designated to be marked Exhibit Number 22, when furnished.)

MR. GILLIS: Can he finish his statement that he started about the contract?

THE WITNESS: I would have to review the contract. But I believe if you go back and review the contract that normally the City is not obligated to furnish that water. That's just an in-kind thing.

Q. (BY MR. POTTER) How many total meetings do you recall being held with Advantage or its subcontractors about performance under the contract?

A. I can't tell you exactly. That's been -- you know, too much time has passed. But there was some meetings. But I cannot begin to tell you how many or the number of them.

Q. You talked about one that you remember having when the weather was still warm.

A. Uh-huh.

Q. And you said that in that meeting Tyrone Tackett came but Trent Smith did not?

A. Right.

Q. And Mr. Tackett talked about time for completion and what they were going to do or not do, right?

A. Right.

Q. Do you recall any meetings after that meeting?

A. I know there was, but I can't specifically tell you what exactly.

Q. Was there a meeting held to make a final decision on terminating the contract?

A. There were several meetings that the Mayor had and I was involved in and I think -- like I said, Mr. Gillis was involved in one and others at the time. And, yes, to tell you exact meeting, time and date, I cannot tell you that. But there was meetings to discuss that.

Q. Okay. Was Mr. Smith invited to that meeting or any of those meetings?

A. Some of them he was not because that was an internal decision we were making.

Q. Okay. What about Mr. Tackett --

A. No.

Q. -- the person doing the work? Now, two payment requests were submitted to the City by Advantage; is that right?

A. Yes.

Q. The City paid the first one?

A. Yes.

Q. Did not pay the second one?
A. That's correct.
Q. Do you recall the date of the second payment request? You may have already been asked that, but I can't remember.
A. No, I don't recall the date.
Q. Actually, there's a letter here that I'll ask you about. It's part of this Collective Exhibit 21. It's a letter dated September 17, 2002. Appears to be a letter to Trent Smith from Mayor Jim Calloway; is that correct?
A. What was your question again?
Q. I was asking you to tell the Court what that is. Is that, in fact, a letter from Mayor Jim Calloway to Trent Smith dated September 17, 2002?
A. Yes.
Q. Does that letter make reference to payment request number 2?
A. Yes.
Q. Okay. And in that letter what reason does the Mayor give for the City not honoring that request at that time?
A. That there was kickers that were covered were not inspected, then response from the letter, August 8th -- and I can't remember exactly what that

letter, August 8th was. I can't remember.

Q. And I can't seem to find that letter either. That was -- that leads up to my next question.

A. Okay.

Q. That does not appear to be in Collective Exhibit 21, I don't think. I looked real hard for that letter dated August 8th, that Mayor Calloway's referring to in his letter dated September 17th, '02. Would you please do me the favor, Mr. Wilber, Mayor Wilber, and try to find that letter for me? Would you do that for me?

A. Yes.

Q. So if we look at the four corners of this letter dated September 17th, '02, from the Mayor to Mr. Smith, basically the Mayor is saying that, number 1, kickers were covered on the work before the project inspector viewed and approved the installation on July 15th, '02?

A. Yes.

MR. GILLIS: I object to his interpretation of the letter. I mean the letter speaks for itself. He can't testify as to the Mayor's statement --

MR. POTTER: Right. I'm not asking him that. I'm just asking him to tell me -- this letter does speak for itself, but I want to ask you a


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 22 of 30 PageID #: 206

follow-up question after I say this.

Q. (BY MR. POTTER) The Mayor makes reference in this letter to kickers being covered before inspection, correct?

A. Yes.

Q. And he also makes reference in this letter to Mr. Smith not responding to an August 8, 2002, letter?

A. Yes.

Q. Okay. Other than those two issues, does the Mayor state in this letter any reason why payment request number 2 has not been paid?

A. Just referring to those two issues.

Q. Okay.

MR. POTTER: Let's pull this letter out and make it a separate exhibit, please.

(Whereupon the previously mentioned Letter (9/17/02) was marked Exhibit Number 23.)

Q. (BY MR. POTTER) As we sit here today, has the City of Portland paid Advantage Construction anything subsequent to the first payment request that it submitted?

A. Not that I'm aware of.

Q. Do you have any idea, Mr. Wilber, why a new line wasn't put in the ground without removing the


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 23 of 30 PageID #: 207

existing line that Advantage put in?

A. I think it was a general feeling that the pipe from U.S. Pipes's investigation, that the pipe was okay; we don't need to do that.

Q. Okay.

A. And then you would -- you know, that was -- we didn't want two lines in the ground right there either, even though one was not being use and abandoned. It's just if you was out there and had a leak and needed to get into it, it was just -- plus, we had purchased easement. And to do that we may have to purchase more easement. And so we was just trying to keep our costs down.

Q. Do you know as you sit here today whether or not putting a second line in the ground would have been more cost effective or not?

A. In my opinion, working as a contractor, it would be cheaper probably to do, because to take a line out and put it back takes more time. You have to be more careful than what you had.

Q. But that's not something the city wanted to do?

A. Huh-uh. Because we were going through this farm and had purchased easement. You know, we needed to try to keep it confined to that easement area.

Q. Okay.

A. And this -- where we bought the easement -- the gentleman we bought the easement from, we laid the line -- he was probably going to develop that piece of property later on. So we couldn't afford to get off of it without, you know, interfering with his plans later on, also. So that's why it was important to stay on that particular easement.

Q. How wide was the easement?

A. Oh, I'd have to go back and see. I think it was 20, 25 feet, something like that.

Q. Do you know as you sit here whether or not it would have been possible to put a second line in the ground and still stay within the easement?

A. You could have done that, but what happens, if you have problems later on or need to work on it, you get out of your easement to get your equipment in and work on it. So I mean you could have done it, but then you would have to get off of it later on if there was problems with it down the road.

Q. I think Mr. Gillis asked that the specs which you're going to provide be marked as an exhibit to this deposition. You know, without the Court having to take a look at those specs, can you just give me a general description about the lay of this line? In

other words, was it straight? Was it --

A. No. It was -- there was some bends in the line. It was not a straight line. There were not any real major bends. We went like across a field by a lake. It was -- construction-wise it was a pretty good land line. We did encounter some rock right there at the plant where we started, but most of it dug pretty easy.

Q. How many times did you personally go out and inspect the line?

A. I never actually went out and inspected the line because we had an inspector do that. I did visit the job site probably half a dozen times or so just to kind of, you know, be there to look at it. But I actually never did go out and inspect. I left that up to the inspector.

Q. And all of the opinions and statements that you've given the Court today about Advantage's performance of construction are basically what you've been told by the inspector?

A. Yes, and then the results of the tests.

Q. And what you've read from those test results?

A. Right.

Q. You haven't conducted any tests of your own?

A. No.

Q. And you didn't perform any performance inspections of your own?

A. No.

Q. Did you ever have any direct communication with Trent Smith about his performance on the job?

A. No.

Q. Have you spoken to Mr. Smith since Advantage was terminated under this contract?

A. No.

Q. You made reference to a gentleman earlier that you said is now deceased. Who is that?

A. John Gilmore, who was the engineer with John Coleman Hayes.

Q. Was he the engineer assigned to this job by John Coleman Hayes at the time --

A. Yes.

Q. -- Advantage was performing the work under the contract?

A. Yes.

Q. Was he assigned to it the entire time they were doing work under the contract?

A. Yes.

Q. Would he have been the one responsible for inspecting the project to determine whether or not the

job was being properly performed?

A. That would have been up to Mr. Hawker. He's the inspector in the field. And the communication would flow. You know, Mr. Hawker -- normally what happens in that process is the inspector answers directly to the engineer in charge.

Q. Mr. Hawker would answer to Mr. Gilmore?

A. Correct.

Q. And Mr. Gilmore and/or his company John Coleman Hayes would presumably provide any necessary information to the City?

A. Correct.

MR. POTTER: Thank you, sir, for answering my questions and congratulations on your election.

MR. GILLIS: A couple quick follow-ups.

**FURTHER EXAMINATION BY MR. GILLIS:**

Q. Were you present at a meeting that occurred in January of '03 in which Trent Smith and Tyrone Tackett were present; I was there as a representative of RLI Insurance Company, and I think the -- most of the aldermen or councilmen were there and the Mayor was there, and I think you were there.

A. I can't recall. But I'm pretty sure I was.

Q. Okay. Do you recall Tyrone Tackett at that


Case 3:04-cv-00555 Document 72 Filed 07/19/05 Page 28 of 30 PageID #: 212

time saying he had it all ready to go except for one leak that they were getting ready to fix?

A. I can't say for sure but I imagine he did.

Q. And do you recall whether there were numerous leaks found after that time?

A. Yes, there was.

MR. GILLIS: Okay. Nothing further.

MR. POTTER: What was the date of that meeting?

THE WITNESS: January -- early January.

MR. POTTER: Of 2003?

THE WITNESS: Right.

MR. POTTER: All right. Thank you.

FURTHER THIS DEPONENT SAITH NOT

STATE OF TENNESSEE)
)                    s.s.
COUNTY OF DAVIDSON)

I, Lise S. Matthews, Notary Public in and for the State of Tennessee at Large,

DO HEREBY CERTIFY that the foregoing deposition was taken at the time and place set forth in the caption thereof; that the deponent therein was duly sworn on oath or affirmed to testify the truth; that the proceedings of said deposition were stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my skill and ability.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any such attorney or counsel, nor do I have any interest in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 29th day of June, 2005, at Nashville, Davidson County, Tennessee.

Lise S. Matthews, RMR
Notary Public at Large
State of Tennessee

My Commission Expires:
May 26, 2006