I apologize that this has become a difficulty for you as our engineering representative, but surely you realize what a difficulty it has become for us! And we hope to see it resolved as soon as possible.

I anticipate hearing from you very soon. Thank you for your assistance in this matter.

Sincerely,

Jim Calloway

Jim Calloway
Mayor

JC:tk

cc: David Amonette, City Attorney
Brian Goodwin, City Engineer
Kenneth Wilber, Public Works Superintendent

John Coleman Hayes, P. C.
Engineers, Architects & Construction Managers
Woodmont Centre
104 Woodmont Boulevard, Suite 401 • Nashville, Tennessee 37205
(615) 269-6397 FAX (615) 269-6415

RECEIVED ... 2003

March 7, 2003

Honorable Jim Calloway
Mayor
City of Portland
100 South Russell Street
Portland, Tennessee 37148

RE: Water System Improvements - Contract 2
Water Distribution Line
Portland, TN

Dear Mayor Calloway:

I faxed a copy of your letter to Angus Gillis in order to demonstrate your concern for the integrity of the pipe and your desire that it be re-laid without the numerous repair sleeves. I felt it was appropriate to do this inasmuch as we have the same objective - to complete this project in an acceptable manner. Furthermore, you made no mention in your letter that it was confidential and Mr. Gillis could have requested it in interrogatories, or discovery depositions should this matter come before the courts.

As to my response to Item #4. of your February 12, 2003 letter, please read my response to Item #2., as well as my responses to Item #5. and Item #6., all of which are essentially the same question.

Please understand that repairs were not made during the pipe laying operation. The pipe line was laid in its entirety and then tested. Even then, there was no reason to conceive of the numerous leaks that were eventually encountered. As these leaks were discovered and uncovered, repair sleeves were utilized to eliminate the leaks; it was only during the testing operation that the extent of the leak problem became apparent.

Also, please understand that as the leak test procedure is undertaken, there is no need for the contractor to present a "written request" to repair the leak. The leak is readily observed by the inspector and repair is mandatory and the common repair method is use of a repair sleeve.

Now, as to the number of leaks that have been discovered thus far, I stand firmly with you, Mayor, that this number is unacceptable and I shared this opinion with the bonding company's attorney and suggested he get a second opinion from Jones Brothers Construction Company. I felt, and still feel, that this was the prudent thing to do.

Sincerely,

for John C. Hayes, Jr.
President

/dlm.JCHLtr.9611.1

cc: Mr. David Amonette, City Attorney
Mr. Brian Goodwin P.E., City Engineer
Mr. Ken Wilber, Director of Public Works
File

CITY OF PORTLAND
100 South Russell Street
Portland, TN 37148
Fax: (615) 325-5345
Phone: (615) 325-6776

TO: John Coleman Hayes
Fax# 269-6415

FROM: Mayor Jim Calloway

DATE: 1/8/03

SUBJECT:

Number of pages: 5
MESSAGE: Please let us know as soon as you receive this fax. We have just been notified the contractor has connected to our water line for test purposes and it should be noted that this line does not have a back flow preventer. This could cause contamination to our water system.

Thanks,
Mayor Jim Calloway

CITY OF PORTLAND, TN
Proud, Progressive Portland
Home of the STRAWBERRY FESTIVAL

Jim Calloway
Mayor

Luther Bratton
Vice-Mayor

City Council:
Don Anderson
Jim Butler
Jerry Denning
Ronnie Meadows
Walter "Buck" Morris
Marilyn Utley

100 South Russell, Portland, Tennessee 37148
615-325-6776

January 20, 2003

John Coleman Hayes
Woodmont Centre
104 Woodmont Blvd. Suite 401
Nashville, Tennessee 37205

Dear Mr. Hayes:

Pursuant to the City Attorney David Amonette's letter to Advantage Construction Service, LLC, dated January 8, 2003, please notify Advantage Construction Services, LLC they are hereby requested to vacate the City property relative to the construction of a water distribution line.

Sincerely,

Jim Calloway
Mayor

JC/dbb

Enclosure

CC: David Amonette, City Attorney
Ken Wilber

# Advantage Construction Services, LLC

101 B West Railroad Street
Dickson, TN 37055

COPY

January 10, 2003

Mr. David M. Amonette
City Attorney
Amonette and Stubbs
554 West Main Street
Gallatin, TN 37066

Transmitted via Facsimile (615) 452-5592
and US Mail

RE: City of Portland Water System Improvements

Dear Mr. Amonette:

I received your letter dated January 8, 2003, regarding execution of specification section 18.02 of the General Conditions of the Contract. At this time we believe that the execution of this Section of the contract is improper and will lead to a greater dispute than what already exists. Please consider the following:

1. The pipeline has been fully installed and as of January 10, 2003, each joint of the pipeline has been fully exposed to allow for visual inspection for leaks. The pressure testing of the pipe is commencing, with the exposed joints being viewed directly for any leaks.
2. As you stated in your earlier correspondence, we have been performing repairs associated with a defect presented by the pipe manufacturer.
3. The City's Engineer failed to comply with the contract requirements General Conditions Section 19.1, which states that the engineer shall approve or reject the payment request within 10 days of the request. The approval (of PPE 2) was approximately one month after receipt of the request.
4. The City failed to comply with the General Conditions Section 19.1, which relates to payment within 10 days of receipt of the Engineers recommended payment. The Engineer did approve/recommend payment.
5. The lack of payment by the City has caused us to operate on reduced funding impacting the level of resources that could be placed on this job.
6. In accordance with General Conditions Section 15.4.2 the Contractor is due an extension to the contract for causes beyond the control of the Contractor. We submitted a letter to the Engineer dated October 14, 2002 notifying him of the cause of delay and notifying him that we were due an extension of time. To date we have not been informed that we did not receive that extension.
7. On two occasions the Public Works Director has "opened" a valve that then allowed unsanitised water to enter the operating City water system. This creates a condition in which the residents are exposed to contaminated drinking water. The Engineer's inspector was notified of this problem (following the first incident) and was requested to ask the City to not exercise this valve. This valve is part of the "new" waterline and is not an integral



Case 3:04-cv-00555 Document 86 Filed 07/19/05 Page 6 of 26 PageID #: 789

component of the City's operating system (i.e. there is no reason that the City should have opened this valve).

8. Since receipt of your letter, the City has threatened our staff, with police arrest if they perform any work on the project. While the arrests have not occurred, the harassment is impacting our ability to perform.

It is unfortunate and obvious that we are entering an adversarial relationship that if continued will result in our challenging the City and both of us raising issues that will cause damage to both parties. There is no doubt that both parties have made mistakes in this process, ranging from our assumption that the pipe was not defective and would test in a short time period to the City's contaminating the residential water system.

It is our goal to have completed the testing and if needed, repair of any leak prior to the 10-day deadline. However, the complete cleanup and punchlist remediation may not be practically completed within that time. I recommend that the City, you and myself meet on-site to discuss the timing involved with our completing the work vs. our leaving the project and having new and different staff performing the same work that we would be performing. There is no doubt that the completion would be reached sooner with our forces remaining.

If you have any questions, please call me at (615) 740-0930.

Sincerely,
ADVANTAGE CONSTRUCTION SERVICES, LLC

Trent Smith, P.E.
Project Manager

AMONETTE AND STUBBS
ATTORNEYS AT LAW
AN ASSOCIATION OF SOLE PRACTITIONERS
554 WEST MAIN STREET
GALLATIN, TENNESSEE 37066

DAVID M. AMONETTE
WALTER H. STUBBS

GALLATIN
(615) 452-6637
TELECOPIER
(615) 459-5592

January 8, 2003

Mr. Trent B. Smith
Advantage Construction Services, LLC
101-B W. Railroad Street
Dickson, TN 37055

**CERTIFIED-RETURN RECEIPT REQUESTED and REGULAR MAIL**

RE: Advantage Construction Services, LLC
Performance and Payment Bond No. SSB-337832
Project: Water System Improvements, Contract 2 - Water Distribution Line

Dear Mr. Smith:

The status of your company's performance under the contract dated May 15, 2002 relating to the construction of a Water Distribution Line has been reviewed by City of Portland officials in consultation with Mr. John Coleman Hayes, the City Engineer. It has been determined that your company has failed to meet the requirements of this contract by having the project completed properly and within the time period required by the contract and there has been no apparent progress made in correcting the significant number of installation errors that have occurred.

Therefore, pursuant to Section 18.02 of the General Conditions of the Contract, notice is hereby given that the services of your company are terminated effective ten (10) days after the receipt by you of this letter. The City of Portland intends to take over the project and finish the work by whatever means and methods the City of Portland deems expedient. As indicated, notice of this action is being sent to you and your surety and you are respectfully asked to remove your company and subcontractors within the time required.

By taking this action, the City of Portland does not release your company or its surety for all costs and damages that the City of Portland may occur as a result of the failure of your company to perform the contract.

Should you have questions, feel free to call me.

Very truly yours,

David M. Amonette
City Attorney

DMA/jm

cc: RLI Insurance Company, Surety (sent Certified and Regular)
Mayor Jim Calloway, City of Portland
Mr. Ken Wilber, Superintendent of Public Works
City of Portland
✓Mr. John Coleman Hayes, Engineer, John Coleman Hayes, P.C.

C:\OFFICE\WPWIN\WPDOCS\MUNICIPA\COP-ADV.WPD

17.2 The OWNER shall promptly investigate the conditions, and if it is found that such conditions do so materially differ and cause an increase or decrease in the cost of, or in the time required for, performance of the WORK, an equitable adjustment shall be made and the CONTRACT DOCUMENTS shall be modified by a CHANGE ORDER. Any claim of the CONTRACTOR for adjustment hereunder shall not be allowed unless the required WRITTEN NOTICE has been given; provided that the OWNER may, if the OWNER determines the facts so justify, consider and adjust any such claims asserted before the date of final payment.

18. SUSPENSION OF WORK, TERMINATION, AND DELAY

18.1 The OWNER may suspend the WORK or any portion thereof for a period of not more than ninety days or such further time as agreed upon by the CONTRACTOR, by WRITTEN NOTICE to the CONTRACTOR and the ENGINEER which shall fix the date on which WORK shall be resumed. The CONTRACTOR will resume that WORK on the date so fixed. The CONTRACTOR will be allowed an increase in the CONTRACT PRICE or an extension of the CONTRACT TIME, or both, directly attributable to any suspension.

18.2 If the CONTRACTOR is adjudged a bankrupt or insolvent, or makes a general assignment for the benefit of its creditors, or if a trustee or receiver is appointed for the CONTRACTOR or for any of its property, or if CONTRACTOR files a petition to take advantage of any debtor's act, or to reorganize under the bankruptcy or applicable laws, or repeatedly fails to supply sufficient skilled workmen or suitable materials or equipment, or repeatedly fails to make prompt payments to SUBCONTRACTORS or for labor, materials or equipment or disregards laws, ordinances, rules, regulations or orders of any public body having jurisdiction of the WORK or disregards the authority of the ENGINEER, or otherwise violates any provision of the CONTRACT DOCUMENTS, then the OWNER may, without prejudice to any other right or remedy and after giving the CONTRACTOR and its surety a minimum of ten (10) days from delivery of a WRITTEN NOTICE, terminate the services of the CONTRACTOR and take possession of the PROJECT and of all materials, equipment, tools, construction equipment and machinery thereon owned by the CONTRACTOR, and finish the WORK by whatever method the OWNER may deem expedient. In such case the CONTRACTOR shall not be entitled to receive any further payment until the WORK is finished. If the unpaid balance of the CONTRACT PRICE exceeds the direct and indirect costs of completing the PROJECT, including compensation for additional professional services, such excess SHALL BE PAID TO THE CONTRACTOR. If such costs exceed such unpaid balance, the CONTRACTOR will pay the difference to the OWNER. Such costs incurred by the OWNER will be determined by the ENGINEER and incorporated in a CHANGE ORDER.

Bill Carpenter
377-5145



Case 3:04-cv-00555 Document 86 Filed 07/19/05 Page 9 of 26 PageID #: 792

City of Portland
**Office of the Mayor**
**100 South Russell Street**
**Portland, Tennessee 37148**
**615/325-6776**

January 2, 2003

TO: Ken Wilber

RE: Advantage Construction

I agree with your concerns about Advantage Construction. I plan to discuss this with David Amonette and I'd like you to be included in the discussion. I'm not sure what the solution will be to our dilemma, but I'd prefer to see this water distribution main completely replaced. Surely Brian could do the engineering and Steve Whitehead could do the inspection. And maybe we could install it with our labor. **It's obvious that we need to do all we can to save money.**

Please let me know your thoughts so that we can explore all our options.

Thank you,

Jim Calloway
Mayor

JC:tk

c: David Amonette, City Attorney

Jim Calloway,
Mayor

Luther Bratton,
Vice-Mayor

City Council:
Don Anderson
Jim Butler
Jerry Denning
Ronnie Meadows
Walter "Buck" Morris
Marilyn Utley

CITY OF PORTLAND, TN
Proud, Progressive Portland
Home of the STRAWBERRY FESTIVAL

100 South Russell, Portland, Tennessee 37148
615-325-6776

November 8, 2002

David Amonette
554 West Main Street
Gallatin, Tennessee 37066

RE: Advantage Construction Services, LLC

David:

We are very concerned that Advantage Construction, awarded the contract for installation of the water distribution main from the Water Treatment Plant into town, has stalled so long on the work after we called their hand for work issues that were improper.

The contract completion date was set for October 31, 2002, yet we haven't heard from them in weeks. The contract allows for liquidated damages of $300.00 per day. But right now we're interested in getting this distribution main completed, with all the disputed problems corrected by Advantage.

As City Attorney, would you please send a letter to their bonding company to make them aware of our problem? Their surety amount is $136,169.00 and the company is:

RLI Insurance Company
P. O. Box 30669
Middleburg Heights, OH 44130

Ken Wilber and I have discussed this and we believe that a letter from our City Attorney will be more effective than one from either of us. Please copy the Mayor's office with your correspondence.

Thank you,

Jim Calloway

Jim Calloway
Mayor

JC:tk

cc: Ken Wilber

Mayor:
Jim Calloway

Vice-Mayor:
Luther Bratton

City Council:
Don Anderson
Jim Butler
Jerry Denning
Ronnie Meadows
Walter "Buck" Morris
Marilyn Utley

CITY OF PORTLAND, TN
Proud, Progressive Portland
Home of the STRAWBERRY FESTIVAL
100 South Russell, Portland, Tennessee 37148
615-325-6776

December 19, 2002

John Coleman Hayes
Woodmont Centre
104 Woodmont Blvd. Suite 401
Nashville, Tennessee 37205

Dear Mr. Hayes,

After correspondence, meetings and much discussion, we continue to experience operational problems with our new water treatment plant. Likewise, there's no indication of progress on construction of the 16" water distribution main. Both these issues are critical to the well being of Portland's citizens. The City of Portland contracted in good faith to provide these services for our citizens. We've "placed our fate", so to speak, in the hands of an engineering firm that we believed would assist and lead us through to completion on these projects, yet we've long since exceeded contract completion dates with work still undone. Promises of solutions have just been promises thusfar.

Given these circumstances, and the fact that the Tennessee Department of Environment and Conservation, Division of Water Supply, has in investigation underway of the entire situation at the WTP, I am very reluctant to release payment of invoices #972 and #999.

I will be available to discuss this matter with you should you wish to do so.

Sincerely,

Jim Calloway

Jim Calloway
Mayor

JC:tk

cc: David Amonette, City Attorney
Ken Wilber, Public Works Superintendent
John Gilmore, Project Engineer

John Coleman Hayes, P. C.
Engineers, Architects & Construction Managers
Woodmont Centre
104 Woodmont Boulevard, Suite 401 • Nashville, Tennessee 37205
(615) 269-6397 FAX (615) 269-6415

COPY

# MEMORANDUM

**FROM:** Mac

**TO:** JCH

**DATE:** 2/19/03

**RE:** Mayor Calloway's Letter of February 12, 2003

Paragraph 1. Copy of Project Engineer's letter of recommendation, dated March 26, 2002, is attached.

Extract of General Conditions of the contract - 26.2 is attached.

Regarding the Mayor's question about "how much investigation was done on the contractor and the subcontractor"; I do not know. I believe any investigation JEG may have conducted was done so by telephone; I did not see, or file, any documentation regarding any such investigation(s), or have knowledge of degree of same.

Paragraph 2. Copies of the project inspector's log sheets are provided. They are included in Recommendation for Payment packages 1 & 2 that were mailed to Ms. Teresa Keen (Portland) and Barbara Brown (Rural Development) on July 3, and August 29, 2002, respectively. Why Mayor Calloway did not view the August 29, 2002, Recommendation for Payment package No. 2, I can only venture to guess. I put all Recommendation for Payment packages together and I know, without doubt, that the applicable inspection journals were included in the Mayor's package which was forwarded to Ms. Keen, as always, for the Mayor's review and signature; Ms. Keen would have notified us immediately had they been received without the journals. Journals 26, 27, 28 & 29 are included separately as JEG wanted them held pending submittal of the last Recommendation for Payment package (No. 3) should there be one; these are the last four days that Danny conducted inspector duties; we are still holding them.

Other than Inspector Log Sheets, I have never seen any written communication between Danny and JEG. I did, however, review our files for any communiqué that might exist, without success. Danny and JEG did communicate by telephone regularly.

Extract 16.1 of General Conditions is attached

Paragraph 3. Extract 11-2 of General Conditions is attached.

I reviewed our Portland files beginning prior to Mayor Calloway's August 8, 2002 letter to Trent Smith with their billing and requesting their call in ticket as proof they contacted TN One Call. I did locate a fax from Teresa Keen to JEG providing him a copy of a letter, dated September 20, 2002, that Trent Smith wrote and sent to Mayor Calloway. JCH was not info'd on Trent Smith's letter, but in it he did address the Tennessee One Call issue and provided what he (Smith) describes as "Tennessee One Call Receipts". He also states that he believes that "TN One Call was appropriately notified and the existing lines were not flagged." I also asked Gregg if he personally knew of anything further regarding this particular matter; he said "no". I also asked him if he ran across anything regarding this matter when going through the paperwork on JEG's desk; he said "no". I personally know that JEG spent considerable time attempting to contact , and eventually, speaking with Trent Smith about the water line problems, fixes, hold on payment, etc., any written record of these discussions could not be located in our files.

A copy of Mayor Calloway's August 8, 2002 letter is attached, as well as Teresa Keen's fax and Trent Smith's letter of September 20, 2002

Paragraph 4. Copy of Technical Specification 01045, Cutting and Patching, is attached

Paragraph 5. Thus far, I have been unable to locate any such written request(s).

Copy of Technical Specification 01045, Cutting and Patching, is attached

Paragraph 6. Technical Specification 02713, Water Distribution Systems, is attached

Brian - Ken:
Please review for accuracy

Mayor:
Jim Calloway

Vice-Mayor:
Luther Bratton

City Council:
Don Anderson
Jim Butler
Jerry Denning
Ronnie Meadows
Walter "Buck" Morris
Marilyn Utley

CITY OF PORTLAND, TN
Proud, Progressive Portland
Home of the STRAWBERRY FESTIVAL

100 South Russell, Portland, Tennessee 37148
615-325-6776

February 12, 2003

John Coleman Hayes
Woodmont Centre
104 Woodmont Blvd., Suite 401
Nashville, Tennessee 37205

RE: Water System Improvements - Contract 2
Water Distribution Line

Dear Mr. Hayes,

As you're aware, we've experienced many difficulties with the contractor, Advantage Construction, in construction of the above mentioned project. Even though the contractor's surety provider is now involved, **I still have serious concerns about accepting this line with the excessive number of repairs that have been made during installation.**

Even your letter dated December 30, 2002 stated that seven leaks in a 250-ft. length of pipe is totally unacceptable, and that that section and perhaps other sections should probably be re-laid in its entirety. And even further, the representative from Jones Brothers Construction who met with us on January 22, 2003, made these comments: "it's an unusual number of leaks"; "it's acceptable to use sleeves - you could live with one or two but for the long term, ten is not good"; "too many potential leaks"; and "best if no fittings at all".

Having discussed this matter extensively with City Engineer Brian Goodwin and Public Works Superintendent Kenneth Wilber, they share my concern in accepting a line that is far from what we expected when we contracted with Advantage last year. In meeting with them and reviewing

the contract, we have the following statements to make and questions to ask that we feel should be addressed before we're required to accept such a project:

1. The Project Engineer's letter of recommendation, dated March 26, 2002, stated that *"...the low bidder intends to sub most, if not all, work out to Cyclone Construction Company"*. This appears to be in violation of the General Conditions of the contract - 26.2 states *"The contractor shall not award work to subcontractors in excess of fifty (50%) percent of the Contract price, without prior written approval of the Owner"*. Granted, we took that recommendation and signed off on the contract, but I fail to understand why our representative (Engineer) would recommend Advantage when it was known that they planned to sub almost all the work to another crew (Cyclone); especially when the letter went on to say: *"...Cyclone Construction Company performs adequately, although I did not get shining praises about their work..."*. How much investigation was done on the contractor and the subcontractor?
2. Would you please provide copies of all the project inspector's log sheets on this work? We also request that copies be provided of all correspondence that may have passed between the inspector and the Engineer. We have the log sheets that were provided with the first pay request but nothing beyond that. And if these log sheets indicated excessive repairs being made, why was the construction not halted and these problems brought to our attention much earlier? General Conditions of the contract (16.1) allow for the Engineer to reject the contractor's work and cause it to be removed from the premises - with the contractor to promptly replace or re-execute the work in accordance with the contract documents.
3. The General Conditions (11.2) also direct the contractor to notify owners of adjacent utilities when prosecution of the work may affect them. In our case, this would have been Tennessee One Call. The contractor buried debris on site (another violation - the debris was to have been removed from the site) and damaged our water main, causing disruption and water loss. We billed them for water and repair materials, requesting their call in ticket as proof they contacted TN One Call. They've submitted neither.
4. The specifications of the contract, Section 01045, CUTTING AND PATCHING, Submittals: 1.03 A. The contractor is required to *"Submit a written request to the Engineer well in advance of executing any cutting or alteration which affects: 2. The structural integrity of any element of the project, and 4. The efficiency, operational life, maintenance, or safety of operational elements"*. We feel that the excessive sleeve repairs fit both those descriptions.
5. In that same section, 1.03 B. *"That written request shall also include..."* - 8 items are listed there instructing the contractor to describe the project, the reason for the cutting and patching, the effect on the work, the alternatives to cutting and patching, etc. and further instructing that written notice be given the Engineer to designate the date and the time that the work would be uncovered. And in 1.03 C. The contractor is also required to *"Report unsatisfactory or questionable conditions to the Engineer in writing and not proceed with the work until the Engineer has provided further instructions"*. Did the

contractor submit any of the above-described written requests to the Engineer? If so, would you please provide copies?

6. In Section 02713-11, Item E 2. The contract states *"Repair, or replace, any damaged, or defective pipe, fittings, valve or hydrants, that are discovered with sound material and repeat the test until it is satisfactory to the Owner".* Does this not protect our right to reject a **new** line that has been repaired to the extent that it is **no longer a new line**?

Accepting a line that is sleeved in numerous places seems unfair to the taxpayers of the City of Portland, who are paying for a new water distribution main. Their water rates will reflect every nickel that's spent on this project and any potential problems that can be prevented now will save considerable dollars on expensive repairs to the line in the future. Not to mention the loss of treated water and we absolutely can't afford either.

As the City's representative for this project, I'd like your answers to the questions posed and to know your stance on the issue. Your prompt attention to this matter will be very much appreciated.

Sincerely,

Jim Calloway
Mayor

JC:tk

c: Brian Goodwin
Kenneth Wilber

RECEIVED FEB 24 2003

John Coleman Hayes, P. C.
Engineers, Architects & Construction Managers
Woodmont Centre
104 Woodmont Boulevard, Suite 401 • Nashville, Tennessee 37205
(615) 269-6397 FAX (615) 269-6415

COPY

February 20, 2003

Honorable Jim Calloway
Mayor
City of Portland
100 South Russell Street
Portland, Tennessee 37148

RE: Water System Improvements - Contract 2
Water Distribution Line
Portland, TN

Dear Mayor Calloway:

I am in receipt of your letter, dated February 12, 2003, and regret the time it took me to respond. As you know, our Chief Engineer, Mr. John Gilmore, who was in responsible charge of this project, died on February 2, 2003 and it took some research on the part of our staff to compile the information you requested.

Item 1. Hindsight is always 20:20. As to why Mr. Gilmore would recommend the low bidder, the obvious answer is money! John Gilmore was acutely aware of Portland's financial dilemma. As to how much investigation Mr. Gilmore did, I am terribly sorry I cannot ask him. We believe any investigation by Mr. Gilmore was conducted by phone. We can find no documentation, or notes, in this regard other than his letter of recommendation.

Item 2. Please see the attached Memorandum prepared by Mr. Donald Mac Farlane, Mr. Gilmore's Administrative Assistant.

The inspector's logs <u>do</u> <u>not</u> indicate excessive repairs being made during the pipe laying operation. Therefore, construction was not halted and there were no apparent problems to bring to the City's attention earlier. The problems were only apparent during the testing phase of the project and the extent of these problems was not known until a number of repairs were made and the pipe pressure tests still failed.

The Engineer did in fact reject the failed portions of the Contractor's work; i.e., pinched gaskets, insufficient kickers and unbedded pipe. That is the ultimate reason the bonding company took over the project. Again, hindsight being 20:20, I can only wish this had happened sooner.

Item 3. See Don Mac Farlane's attached Memorandum.

As to the bill for repairs and lost water - this should be worked out during final settlement with the Bonding company.

Item 4. I immediately called the attorney for the Bonding Company, Mr. Angus Gillis, and registered your view and faxed him a copy of your February 12, 2003 letter. I further suggested he talk with the Jones Brothers Construction Company regarding relaying portions of the pipe which indicated an excessive number of leaks.

Item 5. See Don Mac Farlane's attached Memorandum.

Frankly, the Engineer reported "unsatisfactory or questionable conditions" to the Contractor as a result of field observations, so there was no reason for the Contractor to produce same.

Item 6. Please see responses to Items 2. and 4. above.

I trust the above answers your current list of questions. As you know, every effort is being made to complete this project in a satisfactory manner.

Sincerely,

John C. Hayes, Jr.
President

/dlm.JCHLtr.9611.1

Attachments

cc: Mr. Brian Goodwin, P.E., City Engineer
Mr. David Amonette, City Attorney
Mr. Ken Wilber, Director of Public Work
File

Mayor:
Jim Calloway

Vice-Mayor:
Luther Bratton

City Council:
Don Anderson
Jim Butler
Jerry Denning
Ronnie Meadows
Walter "Buck" Morris
Marilyn Utley

CITY OF PORTLAND, TN
Proud, Progressive Portland
Home of the STRAWBERRY FESTIVAL

100 South Russell, Portland, Tennessee 37148
615-325-6776

February 12, 2003

John Coleman Hayes
Woodmont Centre
104 Woodmont Blvd., Suite 401
Nashville, Tennessee 37205

RE: Water System Improvements - Contract 2
Water Distribution Line

Dear Mr. Hayes,

As you're aware, we've experienced many difficulties with the contractor, Advantage Construction, in construction of the above mentioned project. Even though the contractor's surety provider is now involved, **I still have serious concerns about accepting this line with the excessive number of repairs that have been made during installation.**

Even your letter dated December 30, 2002 stated that seven leaks in a 250-ft. length of pipe is totally unacceptable, and that that section and perhaps other sections should probably be re-laid in its entirety. And even further, the representative from Jones Brothers Construction who met with us on January 22, 2003, made these comments: "it's an unusual number of leaks"; "it's acceptable to use sleeves - you could live with one or two but for the long term, ten is not good"; "too many potential leaks"; and "best if no fittings at all".

Having discussed this matter extensively with City Engineer Brian Goodwin and Public Works Superintendent Kenneth Wilber, they share my concern in accepting a line that is far from what we expected when we contracted with Advantage last year. In meeting with them and reviewing

the contract, we have the following statements to make and questions to ask that we feel should be addressed before we're required to accept such a project:

1. The Project Engineer's letter of recommendation, dated March 26, 2002, stated that *"...the low bidder intends to sub most, if not all, work out to Cyclone Construction Company"*. This appears to be in violation of the General Conditions of the contract - 26.2 states *"The contractor shall not award work to subcontractors in excess of fifty (50%) percent of the Contract price, without prior written approval of the Owner"*. Granted, we took that recommendation and signed off on the contract, but I fail to understand why our representative (Engineer) would recommend Advantage when it was known that they planned to sub almost all the work to another crew (Cyclone); especially when the letter went on to say: *"...Cyclone Construction Company performs adequately, although I did not get shining praises about their work..."*. How much investigation was done on the contractor and the subcontractor?
2. Would you please provide copies of all the project inspector's log sheets on this work? We also request that copies be provided of all correspondence that may have passed between the inspector and the Engineer. We have the log sheets that were provided with the first pay request but nothing beyond that. And if these log sheets indicated excessive repairs being made, why was the construction not halted and these problems brought to our attention much earlier? General Conditions of the contract (16.1) allow for the Engineer to reject the contractor's work and cause it to be removed from the premises - with the contractor to promptly replace or re-execute the work in accordance with the contract documents.
3. The General Conditions (11.2) also direct the contractor to notify owners of adjacent utilities when prosecution of the work may affect them. In our case, this would have been Tennessee One Call. The contractor buried debris on site (another violation - the debris was to have been removed from the site) and damaged our water main, causing disruption and water loss. We billed them for water and repair materials, requesting their call in ticket as proof they contacted TN One Call. They've submitted neither.
4. The specifications of the contract, Section 01045, CUTTING AND PATCHING, Submittals: 1.03 A. The contractor is required to *"Submit a written request to the Engineer well in advance of executing any cutting or alteration which affects: 2. The structural integrity of any element of the project, and 4. The efficiency, operational life, maintenance, or safety of operational elements"*. We feel that the excessive sleeve repairs fit both those descriptions.
5. In that same section, 1.03 B. *"That written request shall also include..."* - 8 items are listed there instructing the contractor to describe the project, the reason for the cutting and patching, the effect on the work, the alternatives to cutting and patching, etc. and further instructing that written notice be given the Engineer to designate the date and the time that the work would be uncovered. And in 1.03 C. The contractor is also required to *"Report unsatisfactory or questionable conditions to the Engineer in writing and not proceed with the work until the Engineer has provided further instructions"*. Did the

contractor submit any of the above-described written requests to the Engineer? If so, would you please provide copies?

6. In Section 02713-11, Item E 2. The contract states *"Repair, or replace, any damaged, or defective pipe, fittings, valve or hydrants, that are discovered with sound material and repeat the test until it is satisfactory to the Owner"*. Does this not protect our right to reject a **new** line that has been repaired to the extent that it is **no longer a new line**?

Accepting a line that is sleeved in numerous places seems unfair to the taxpayers of the City of Portland, who are paying for a new water distribution main. Their water rates will reflect every nickel that's spent on this project and any potential problems that can be prevented now will save considerable dollars on expensive repairs to the line in the future. Not to mention the loss of treated water and we absolutely can't afford either.

As the City's representative for this project, I'd like your answers to the questions posed and to know your stance on the issue. Your prompt attention to this matter will be very much appreciated.

Sincerely,

Jim Calloway

Jim Calloway
Mayor

JC:tk

c: Brian Goodwin
Kenneth Wilber
David Amonette

City of Portland
Office of the Mayor
100 South Russell Street
Portland, Tennessee 37148
615/325-6776

February 5, 2003

TO: All City Council Members

RE: 16" Water Distribution Main Construction

To keep you up to date on the latest dealings with RLI, the surety for Advantage Construction Company, the following information is being provided.

David Amonette received a fax from RLI - a *Takeover Agreement* that the City would be required to sign, entering into an agreement with RLI to provide for the completion of the construction that was botched and left undone by Advantage.

Today, Brian Goodwin, Ken Wilber and I talked with David Amonette by conference call about our concerns with this agreement. An attached copy of the agreement (highlighted on page 2) states that the City would accept the repaired line, with its unusually high number of sleeves (representing leaks that have been repaired on the main). The three of us are very uncomfortable in accepting this compromised water main and plan to address it further with David Amonette and John Coleman Hayes, and by obtaining other engineer's opinions about the integrity of the main with so many repairs having been made.

We've asked Amonette to have RLI submit a written explanation to us of exactly how the main will be completed before we consider signing off on the agreement.

There are also questions about the amount of liquidated damages owed to the City, and another amount (approx $3,000.) that Advantage owes us for damages during construction.

I will let you know when we resolve the issue.

Thank you,

Jim Calloway

Jim Calloway
Mayor

JC:tk

Post-it® Fax Note 7671

| | | | |
|---|---|---|---|
| To David Amonette | | Date 2/6/03 | # of pages ▶ 1 |
| Co./Dept. | | From Jim Calloway | |
| Phone # | | Co. | |
| Fax # 452-5592 | | Phone # | |
| | | Fax # 325-5343 | |

Bill city had to pay due to contractor on 16-inch line.

**COPY**

Shane Riggsbee
323-0317 Home
598-0318 Cell

NO. [redacted]3

NAME: Case — DATE: 12/3/02

ADDRESS: 408 Westland

CITY, STATE, ZIP: home (325-5633)

| SOLD BY: | CASH | C.O.D. | CHARGE | ON ACCT. | MDSE RTD. | PAID OUT |
|---|---|---|---|---|---|---|
| | | | | | | |

| QUAN. | | DESCRIPTION | AMOUNT | |
|---|---|---|---|---|
| 1 | 1 | Fluidmaster | 15 | 00 |
| 1 | 2 | 1/2 x 3/8 Cutoff | 5 | 00 |
| 1 | 3 | Bullseye Flapper | 5 | 00 |
| 1 | 4 | Split Esc Plate | 1 | 00 |
| 1 | 5 | Labor + Service Call | 55 | 00 |
| | 6 | | 81 | 00 |
| | 7 | original | | |
| | 8 | | | |
| | 9 | 12/4/02 | | |
| | 10 | | | |
| | 11 | 413)\$2100)240 | | |
| | 12 | | | |

CUSTOMER'S ORDER NO.

RECEIVED BY:

Jim Case

damage occurred when valve was turned on 16-inch line. Advantage Contractor

# FAX TRANSMISSION

**AMONETTE & STUBBS**
564 WEST MAIN STREET
GALLATIN, TENNESSEE 37066
(615) 452-5537
FAX: (615) 452-5592

| | | | |
|---|---|---|---|
| **To:** | John Coleman Hayes | **Date:** | November 22, 2002 |
| **Fax #:** | 269-6415 | **Pages:** | 1, including this cover sheet. |
| **From:** | DAVID M. AMONETTE | | |
| **Subject:** | 16 inch water line project - City of Portland | | |

COMMENTS:

John,

On November 12, 2002 you called me with respect to the Mayor's request to notify the Bonding company for Advantage Construction Company of the failure of this company to complete the project as contemplated by the contract. After our call, I discussed this matter with Mayor Calloway and told him that I generally concurred in your thoughts about contacting the bonding company at that time. You indicated that you had spoken with the President of Advantage and believed that this company was seriously attempting to complete the project and would be notifying you shortly about a final test of the pipe construction.

I have not heard from you since that time and am concerned about the present status of this project. As engineer for this project I believe it is appropriate that the City of Portland hear from you regarding your opinion on what actions are now appropriate to be taken. I suggest that you personally contact Mayor Calloway and set up a meeting with the appropriate city officials being present to evaluate the options available to the City.

I look forward to hearing from you soon.

cc: Mayor Jim Calloway by facsimile
Ken Wilber, Director of Public Works by facsimile

# FAX TRANSMISSION

AMONETTE & STUBBS
554 WEST MAIN STREET
GALLATIN, TENNESSEE 37066
(615) 452-5537
FAX: (615) 452-5502

**To:** Ken Wilber
**Fax #:** 615-325-5345
**From:** David M. Amonette
**Subject:** Re: Water Line Project

**Date:** November 22, 2002
**Pages:** 2, including this cover sheet.

COMMENTS:

See Attached