IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

RLI INSURANCE COMPANY,

Plaintiff,

VS. NO. 3-04-0555

ADVANTAGE CONSTRUCTION
SERVICES, LLC;
TRENT B. SMITH;
ILLIAD JEFFERSON;
and SOUTHERN CONSULTING, LLC,

Defendants/Third Party Plaintiffs,

VS.

TYRONE TACKETT,

Third Party Defendants.

---

DEPOSITION OF: **TERRANCE DAVID VAN NUCK**

June 6, 2005

---

---

**BERES & ASSOCIATES**

230 Fourth Avenue North, Suite 503

Post Office Box 190461

Nashville, Tennessee 37219

## A P P E A R A N C E S

For the Plaintiff: Mr. Angus Gillis III
Attorney at Law
Suite 701
501 Union Street
Nashville, Tennessee 37219

For the Defendants/
Counter Plaintiff: Mr. Timothy V. Potter
Attorney at Law
210 East College Street
Dickson, Tennessee 37055

## I N D E X


Examination by Mr. Gillis . . . . . . . . . . . . . 4

Examination by Mr. Potter . . . . . . . . . . . . .45

Further Examination by Mr. Gillis . . . . . . . .52


## E X H I B I T S


1 Plan Documents. . . . . . . . . . . . . . . . .43

2 Billing . . . . . . . . . . . . . . . . . . . .43

3 Reports . . . . . . . . . . . . . . . . . . . .44

4 Notes . . . . . . . . . . . . . . . . . . . . .46

5 Summary Notes . . . . . . . . . . . . . . . . .47

6 Billing . . . . . . . . . . . . . . . . . . . .53

The deposition of **TERRANCE DAVID VAN NUCK** was taken by counsel for the Plaintiff, at 4:07 p.m., on June 6, 2005, pursuant to the Federal Rules of Civil Procedure, to be used for ALL PURPOSES, in the above-styled cause, before Lise S. Matthews, court reporter and Notary Public at Large, at the offices of Schulman, LeRoy & Bennett, P.C., Suite 701, 501 Union Street, Nashville, Tennessee, in accordance with the following stipulation.

**S T I P U L A T I O N**

It is agreed that Lise S. Matthews, being a Court Reporter and Notary Public at Large for the State of Tennessee, may swear the witness, take the deposition in machine shorthand and afterwards reduce the same to typewriting, and that the deposition may be used on the hearing of the above-styled cause. All objections, except as to the form of the question, are reserved until the hearing of this cause.

It is further agreed that all formalities as to caption, certificate, transmission, filing, et cetera, including the signature of the witness, are expressly waived.

* * *

TERRANCE DAVID VAN NUCK

having been first duly sworn, testifies as follows:

**EXAMINATION BY MR. GILLIS:**

Q. Would you state your full name for the record, please.
A. It's Terrance David VanNuck, V-A-N-N-U-C-K.
Q. Mr. VanNuck, my name is Angus Gillis. I'm going to ask you a series of questions today. I want to be sure we communicate and communicate accurately. So if I ask you a question and the meaning of that question is not clear, just tell me and I'll rephrase the question, and explain exactly what I mean. Do you understand?
A. Yes, sir.
Q. What is your residence address?
A. 5312 East Bend Drive, Old Hickory, Tennessee.
Q. Where is East Bend Drive?
A. It's Langford Farms subdivision.
Q. Okay. What is your educational background?
A. A degree in business administration from Eastern Michigan University.
Q. When did you obtain that degree?
A. 1972.

Q. What is your date of birth?
A. 9/10/50.
Q. So if you graduated in '72 that would have been right on schedule; is that correct?
A. Yes, sir.
Q. Give me a rundown of your employment background since graduation from college.
A. I first was employed for about a six-year period with the City of Mt. Clemens, the town I was raised in, in the engineering department. My duties were that of an engineering aide. And I was also a surveyor and a foreman of the inspection staff of the city. After that period I quit and went to work for an underground contractor, which we -- primarily the type of work was laying sewer, water mains, storm sewers, that sort of thing.
Q. What contractor was that?
A. It was Dan's Excavating. And they were based out of Utica, Michigan. And I worked there for about a six-year period.
Q. What were your job responsibilities there?
A. I was a project manager and office manager. So I would oversee the projects, you know, compile record, create the billings, and order the materials, you know, general project coordinator type of duties.

Q. Did you also have direct supervisory responsibilities for certain jobs?

A. Yes. You know, through the foremen, would have interaction with them, and, you know, dictate the requirements of the owner, what his plans are, and again as part of this coordinating of getting the work done.

Q. Why did you leave there?

A. At that point I moved to Tennessee. To be honest with you I guess I was a little dissatisfied with the job. I was working for about three different companies for them and decided I wanted to do a change and at that point we moved -- my family to Old Hickory, Tennessee.

Q. When did you move to Tennessee?

A. It would be August of 1984.

Q. Where did you go to work at that time?

A. I began work with Jones Brothers, Incorporated, out of Mt. Juliet, where I spent the next about 19 years and left in April of 2004.

Q. What were your job responsibilities with Jones Brothers?

A. Similar duties as the other company, was project manager, is what they termed it. But it was again project coordinating, same -- similar duties,

oversee all the jobs, direct the formens on, you know, the tasks to be done on the project, collected the daily report records or things of that nature for billing purposes, interacted with the owners, which primarily did a lot of state highway work, you know, general interaction with the -- with the owner in getting the projects done. Also was handling any type of complaints or claims or things of that nature. We did a great deal of subdivision and apartment type of work where in addition to the grading type of work, you know, there's often storm sewers and utilities and, you know, turnkey setup that -- that a developer would want and ready to start their development.

Q. You mentioned 2004 that you mentioned left Jones Brothers. Where did you go to work at that time?

A. I'm presently employed as division manager with Lojac Enterprises, Incorporated, out of Lebanon, Tennessee.

Q. As division manager what do you do?

A. I'm in charge of the entire grading division, which is the grading utilities and with similar duties, again project coordinator. I have I'd say about 10 or 11 supervisors that directly report to me, and just coordinate getting the work done and same type of thing where -- interaction with the owners and

handle any claims, oversee things for billing purposes, get into some design work. I report directly back to the vice-president of the company.

Q. So has -- since you left the City that you started to work for right out of college, since you left that employment, has all of your employment been involved in the supervising of the installation of underground utilities, water lines, storm sewer lines, pipelines?

A. Yes. That has somewhat been a biproduct -- grading is my primary business of the companies that I stated. I just might add, prior to that I worked construction as I worked through college. So every summer I would work through the construction business. So actually started about 18.

Q. What type construction business was it?

A. It was an asphalt business.

Q. Okay. Now, during the time you were employed by Jones Brothers, did you get a call about a water line project -- I think it was called Contract 2 Water Distribution Line for the City of Portland?

A. Yes, I did.

Q. Okay. And who contacted you about doing some work up there?

A. It was Larry Wall. I think Larry Wall &

Associates out of Birmingham.

Q. Are they a consultant to RLI Insurance Company?

A. Yes, sir.

Q. What were you requested to do?

A. To do -- they were having difficulty with close to a mile of -- a little over mile of 16-inch water main. Advised me they were having trouble testing it and it was long overdue in turning it over to the owner, to go up and investigate it and to try to determine if there was any leaks and then also physically locate the -- where the leaks were and discover the nature of the type of leaks. And at that point as thing evolved just basically hold, do not make repair, but just go find out what's wrong with the main so we can decide a course of action for repairs.

Q. And when did you get this call from Larry Wall? Do you know?

A. I want to tell you it was probably about mid January of 2003. I attended a meeting with yourself, Angus Gillis, here on January 22nd, '03, at the site. So I think just a few days ahead of that.

Q. Did you go up to a meeting on or about January 8th, 2003, in the City of -- at the City of Portland?

A. Not that I recall.

Q. Did you then undertake to perform on behalf of Jones Brothers -- to investigate the cause of -- to see what leaks there were and possible fixes or repairs for these leaks?

A. Could you rephrase that again?

Q. Why don't you tell us what you did.

A. Okay. Larry Wall contracted us to go up there. At the time we had been doing some other work for Wall & Associates and some other contracts. They asked me to go up and take a look. What we did first thing was attended a meeting in January with yourself and the -- it was -- it was at the city council. And they were at a point trying to decide whether they wanted to suspend their contractor from the site. I've got some notes on that which they talked about what the issues were. We can get into that if you'd like. But the next thing for me is I attended a meeting on January 30th with the -- a fellow named Gregg Harris, with the design engineer, which was John Coleman Hayes, and he presented us with a set of as-built drawings so we could identify from their records where the sleeves were, which was a point of concern, of possible previous repairs that had been done. So we -- from that set of drawings then we would be able to develop a

game plan on how we want to proceed systematically in trying to isolate the leaks.

Q. Okay. Let's back up to the meeting that you attended. You said it was January 22nd of '03?

A. Yes, sir. And I kept some notes of that meeting here in my documents.

Q. Okay. Tell us what transpired at that meeting.

A. It was an impromptu meeting by the City council. I'm not sure it was scheduled. But they were trying to decide whether to suspend their contractor from the site. From my notes I indicated here that the completion date was somewhere of October of 2001. Again, the design engineer was John Coleman Hayes. The prime contractor I have was Advance Contracting. I put down here Trent Smith, which I understood to do the principal. But apparently he subcontracted the work to Cyclone Construction or Cyclone something, but a gentleman named Tyrone is as much as I have in my notes, his last name. I have notes that Jim Calloway was the Mayor and David Amonette was the City attorney, that they were all present, as well as is city council members. Tyrone made a statement that there was about 14 or 15 patches. Said it would up to 120 to 150 pounds psi. I remember remarks about needing water

from the city so he could complete his testing, that the water had been cut off by the City Wednesday of the prior week around 10:00. You have to have water to pump and test a main. You need a source for it. He indicated that the plant to the midline valve, like halfway point of the mile distance, roughly, would hold at 138 pounds psi. And he requested ten more days to finish. He thought that he could have the main -- completed testing process and able to turn it over by then. He indicated that tapping sleeve and valve at Westland was in good -- and holding up pressure. Then the Mayor spoke. And he said he understood there was about ten leaks that had been repaired. And apparently they had paid two-thirds of the cost of the pipe, withholding money, that there was suspect about whether it's any bad pipe. And U.S. pipe company, I have in my notes here, was the supplier along with -- with the manufacturer and the supplier was a Wood's Supply. I have directed by Larry Wall on January 24th to prepare an estimate of what we thought the cost of -- to detect and repair the leaks. And we really formally began -- he directed us to begin work on February 3rd. I indicate February 3d, was a first day of moving -- of '03, of moving to the site and gathering up tools, the water main, things necessary to begin the work. And

that at that time my -- would you like to get specifically into the method and sequence?

Q. Yes. Tell us what you did when you started up there on February --

A. Okay.

MR. POTTER: What's the date of that meeting again that you're referring to?

THE WITNESS: With the City hall meeting?

MR. POTTER: Yes.

THE WITNESS: I indicated it was January 23rd of -- 22nd of 2003. Let me confirm that if there's some question. And so these are the notes, these yellow sheets here, that I made that day. That's the date I have indicated at the top. I don't know if that fits with all your records or not, but that's what I have here.

MR. GILLIS: Off the record.

(Off-the-record discussion.)

Q. (BY MR. GILLIS) Okay. Go ahead. When you started -- the question was when you started work February 3rd, 2003, what did you do.

A. Well, first order of business was to cut and cap the main and isolate it from the system. That's very important. You had some drawings here.

Q. Okay. For the record, he's pulling out --

there are four sheets of drawings in front of him that have been marked as Exhibit Number 1 to Mr. Harris' deposition.

A. Actually, what you have here is one set and an incomplete set. So we'll get into that. This first set of plans with -- they're dated -- this is my signature and Jones Brothers' stamp. They're dated 1/30/03. And the overlying way of identifying this -- you'll see some things about calling about testing, phase one, two, three and four. These are the plans that were received around January 30th from Gregg Harris. And it was simply beginning a plan of attack on how we wanted to try to look at making repairs on this -- or trying to determine where the leaks were on the main. The first and primary thing to do is to cut and cap and isolate this main off the public system. So you cut and cap both ends and then you would do a -- what we call a feeder, you know, a jumper we call it here, but it's a copper line running from the public minute main to your main where you can turn it on and off and pressurize in that manner. I say that's important for a couple reasons here is that you don't ever want to test your main that you just constructed back against valves because there's a question whether they're holding pressure or not.

Q. Talking about whether the valves at the end of the line are holding pressure?

A. Yeah. If they've been operated, there's a good chance of leaks. So you want to isolate your main off of that -- from that system. Secondly, and most importantly, I think it's a safeguard. I was quite surprised to see that the main was already tied in and it hadn't completed testing. The testing of a main is a two-fold process. It's pressurization test to -- in this case the specifications were to reach 150 pounds PSI for a two-hour period and secondly it's chlorination. It's called -- the slang term is a background test, but it's a bacteriological test. You have to inject the line with chlorine to very high rate where it will kill any bacteria within the main and then it's flushed out back to safe levels and checked before you tie it into the main. So in the process that -- we don't know what we're dealing with going in there. You could have pockets of hot chlorine. You could have a hot main, is what we term it, you know, a heavy concentration of chlorine. And in the pumping process the chlorine could be forced back into the public system, which could cause problems, health problems. So you don't want to put yourself in that situation. So I was quite surprised to see it tied in

already prior to being tested and approved.

Q. Okay. So did you disconnect it from the system?

A. Isolate the main was the first thing.

Q. Wait a minute. Did you disconnect it from the system then?

A. Yes, sir, first thing we did.

Q. Did you cap both ends?

A. Yes, sir.

Q. Okay.

A. If you'd like I could read through a little summary of some of our daily reports and walk you through how -- what -- explain it, but --

Q. Go ahead and just walk us through and tell us what you did.

A. The first thing we would have done on February 4th, '03, and the 5th and 6th, it's all generally the same thing, was to cut and cap and isolate the 16-inch main for testing. We installed six corporations for testing, five at the high points and one at the -- at the water treatment plant end for filling the line. Let me explain about why at the high points.

Q. Wait a minute. You said installed six corporations?

A. Yes, sir.

Q. Okay. Now, you're dealing with lawyers. And we think a corporation is something you file up at the Secretary of State's office. So you need to explain it.

A. This is a three-quarter inch brass small valve that you could operate with a wrench. So it's simply where we drill and tap the main with threaded connections. And this device -- this brass connection is screwed in there. It's about -- it's three-quarter inch inside diameter, but it's about a one inch outside. It stands about three inches tall. Every house service to a home has one of these. We install the corporation. And then you run a copper or whatever type of water line to your home. So that's the way to operate it, turning it on and off. It's buried in the road. You know, you never know that they're out there. But it's a common device that's installed.

Q. So why were you putting those in?

A. In testing of water, what you do is you fill the main up full and then pressurize it to gain this 150 pounds of psi that's needed for testing. One of the situations you deal with is trapped air in the line. I suspect that maybe the connections they made were for the ease of filling the line fast. And that's

the last thing you want to do. You want to feed slow. You want to feed from the low end and try to fill up upgrade where water is pushing the air out as it travels through the line. One thing about the lay of the -- lay of the land up there and the way this water main what was constructed, it not only has what we call horizontal curves, these bows and bends that are going, it also has vertical curves where it's going up and down the hills. At the high points of the hills is a place that water can easily get trapped. Water will flow beyond that point maybe leaving a pocket of air. So in terms of testing, you could have difficulty trying to test and get a main up to the 150 pounds pressure because you are just pushing air around trapped inside the line. So you want to bleed all the air off that you possibly can. So we noticed in the process out here that there was -- didn't appear to be any blow-offs or these -- that's what we used it for, was simply to blow the air off. As you're filling the main, have those open where air has a way to escape. And didn't notice where that was done in our discovery out there. So the first thing we wanted to do is get the air off the line to aid us in the pressure testing of the main.

At that point, when we had the main



Case 3:04-cv-00555 Document 87 Filed 07/19/05 Page 18 of 54 PageID #: 827

isolated, the City of Portland made a tap connection for us on their existing 18-inch main which provided the water source for us to pump into this main for pressurizing. It -- the manner in which you do that is from a corporation on that main, you run a three-quarter inch copper to a gasoline pump, typically like about a ten horse pump and a copper line coming out the other side that goes to the main. You use that pump to help transfer the water and to pressurize the main up to the desired pressure that you're looking for. So that was what we began to do, filling the main up. And a mile of 16-inch water main takes a day or two to fill up. So we began that process for the next few days. And I indicated on here that we had a meeting on February 11th of 2003 in which Larry Wall came to the site, and also yourself, Angus Gillis, to see what we had found so far and decide what course of action we wanted to take. We decided at that point to hire a Master Leaks, Incorporated -- I believe they're out of Madison, Tennessee -- to help us discover the leaks. The manner in which we did this was to physically dig up the joints every 20 -- roughly, every 20 foot. Standard length of a pipe is about 18, little over 18. So you see 20 is generally getting you into that area of each bell.

Q. You said each valve?
A. Bell.
Q. Oh, bell.
A. Joint of the pipe. What Master Leak aids us in is -- they have a sophisticated listening device. They can hear the water escaping. Water -- when you pressurize the main, water leaking through the joint will sing, you know, will have kind of a high pitched sound. So this listening device in the open hole could determine whether they were -- water was leaking at that location. So from that we began a systematic process of checking the main from end to end and determining where the leaks were.
Q. Let me stop you for just a moment. When you attempted to pressurize this pipe, did you find -- was it or was it not holding pressure?
A. My notes, it was not. It would not hold pressure for a consistent period here. Let me just -- we found that the -- on February 12th of '03, we pressurized the line up to 150 pounds psi. So I've got here so Master Leak to test for leaks. The line pressure fell to 100 psi in five minutes. We found eight leaks in the first section of pipe from Westland to the middle line valve.
Q. Okay. Wait a minute. You're going to have

to show us on this drawing what you're talking about.

A. Okay. This was -- again, these first two sheets here with the words testing was our preliminary plan of attack on January 30th.

Q. Before we go further, did you all cut in two additional valves along this water line?

A. No.

Q. Was there just one initial valve from one end of this job to the other?

A. There was a total of three valves on this system, one on each end and one in the middle.

Q. Okay. And y'all didn't cut in two additional valves?

A. No. No.

Q. Okay. You had three phases of testing that was outlined; is that correct?

A. That was our preliminary path on January --

Q. Or four phases. I'm sorry.

A. On January 30th -- when I got the plans from the engineer, I sat down and looked at it, and thinking out a plan of attack and how to isolate and check this main given what I was looking at, the plans with the series of sleeves and bends and repairs that had been made. The best thing you can do is try to isolate this down into sections for testing. We didn't go about

this process in -- according to these drawings. This was strictly preliminary before we began physical work on the site.

Q. Okay. Then let's -- these first two sheets -- and this is Exhibit 1 to Mr. Harris' deposition. And so we can identify these, can we put an A and a B on these two sheets?

(Whereupon the previously mentioned Plan Documents were marked Exhibit Numbers 1A and 1B.)

Q. (BY MR. GILLIS) Okay. Now, the documents that have been marked Exhibit 1A and 1B -- and those are to Mr. Harris' deposition. There's no sense duplicating them for yours. These were nothing but -- these are what you got from Mr. Harris with the engineer; is that correct?

A. Yes.

Q. John Coleman Hayes?

A. That's what I seem to recall, from Gregg Harris, yes.

Q. And the only thing you've done to these is to write on here the testing phases and anything else that's in black magic marker; is that correct?

A. The other -- this is also my handwriting on these drawings.

Q. Okay. So --

A. And this handwriting right here is that from, I believe, Gregg Harris. I was told to inspect that thrust block at that location. I'll have to tell you what that is, but -- but most of the writing on these drawings are all mine.

Q. Okay. Let's try it this way. Any of the typewritten language on here or machine printed language on this drawing --

A. Yes, sir.

Q. -- was on this drawing when you got it; is that correct?

A. Yes, sir.

Q. Okay. Now, any of the handwritten language on here you added, with the exception of one note that says re-inspect thrust block; is that correct?

A. Yes, sir. All -- all other handwriting on there is my writing.

Q. Okay. Now, you indicated earlier that this was your preliminary attack and what you anticipated doing.

A. Yes, sir.

Q. You didn't actually do it this way; is that correct?

A. That's correct.

Q. Why not?

A. Well, as we began the discovery process with Master Leaks out there we developed a -- our direction or procedure up there was to identify where the leaks were. And to -- upon identifying -- when Master Leak would determine a leak, we excavated that to physically observe what we thought the problems were.

Q. Okay. Now, the sheets -- do Exhibits 1A and 1B show us where Master Leak ascertained that there were leaks?

A. No, they do not.

Q. Okay. Now, let's go to the last two sheets of these four sheets. Mark those Exhibits 1C and 1D.

A. Can I make a comment? These two sheets are one in the same. So they're not a complete set. So if you -- I prefer to rather use my own here, which is identical copies. Or if you find me sheet 2.

Q. Okay. Well, let's add these to -- let's just leave these as Harris 1A, 1B, and the other two sheets constitute part of Exhibit Number 1.

Now, you've got your own sheets as to what you did; is that correct?

A. Yes, sir. And you'll see they're similar to the exact copies of the other ones.

Q. Okay.

A. The difference is you had two number 1

sheets and this set is compiled of a sheet number 1 and 2. You're missing 2.

Q. Okay. Now, let's -- let's be sure where we are on here. Can we get the end up by the pumping station first, whichever sheet shows that?

A. Okay. These plans I've identified as -- my handwriting here, repair map and test results as of February 12th, 2003, leak -- Master Leak upon excavation. So this is where we recorded what we physically found at the site during those couple three days of testing.

Q. Okay. Can you just start -- this line was about a mile long; is that correct?

A. Yes, sir.

Q. Can you start at the end by the pumping station and just tell us -- and that's station 0 plus 00; is that correct?

A. Yes, sir.

Q. Can you explain for the benefit of the Court what station number means?

A. Station is a length of measurement along a route. It starts at zero plus zero. One plus 00 is 100 foot. Two plus 44 is 244 foot. So it's a means of measuring a length of -- along a project and it's customarily used on all type of construction projects.

Q. Okay. Could you just start then at the pump house end and tell us in layman -- yeah. Tell us in layman's terms what you found and what you did at each of the stations.

A. Okay. Right at point 0 plus 00 we, as we mentioned, did remove a section of pipe and cap the 16-inch main to isolate it off the system. The first thing I noticed in there was that the first pipe was deflected badly coming into the -- into the valve. So there was a question in my mind about a leak right there. It appeared that the line started off in the wrong location or they made a quick adjustment in the first length. So there was a deflection right there. Do you want me to identify the sleeves here? But basically I can tell you what the plans identified to us, that there was 14 sleeves already installed in the line.

Q. Okay.

A. Prior to us doing anything.

Q. Okay. And those -- we don't need to go over those in detail. They're shown on here; is that correct?

A. Yes.

Q. The 14 existing sleeves?

A. I have them indicated on the plans here not

only by the typed call out, but this red shading that I've added on the lines.

Q. Okay. Now, that had already been done. Tell us what your testing revealed.

A. Okay. First thing we noticed -- the second thing you would notice is there's a section of about 55 foot of water main going through this wooded area that -- it was shallow. It was too shallow. It was only a foot of cover. Typically a water main should have 30 inches to three foot, depending on local specifications, but that is typically a minimum buried depth. And I guess you could understand just for frost reasons, you know, you want it below the frost level. So there's a section of main that was too shallow. There was also the area where the engineer had directed us to excavate and inspect the thrust block. The thrust block is a concrete structure that is poured and abuts up to the main and also to the bank of the excavated trench. And this is to have a solid mass there that the -- water will tend to want to -- a water main will tend to want to move at a bend because the water going through under pressure is having difficulty going through a bend. So there's some -- there's friction or resistance there that the main wants to try to move. So you put this concrete thrust block to help

secure the main at bends. And that was his note, to make sure there was proper size. Depending on the size of the main there is standards for the size of these type of concrete thrust blocks. It's also -- the slang name used is kicker, is often what people will use. So that was in the area of the -- of the shallow main. So we wanted that to be investigated. Coming around the corner --

Q. Well, what did you find when you investigated the kicker block or thrust block?

A. I don't recall on that specific one, but I generally -- and I physically wasn't out there on the site digging up every one of them. But I generally recall my workmen saying they were undersized. They were smaller than they would, you know, imagine or that was required for a 16-inch main. And I didn't notice in going through the notes that I had where I had the thrust blocks where I was observing what the proper size was supposed to be. So I just recall that whole conversation going on. That specific one I don't know. We didn't get to a point of repair so we didn't do anything with it. The -- do you want me to continue with repairs?

Q. Yes.

A. With the help of Master Leak we determined

at station 6 plus 95 there was an extremely bad leak in the water main. And it was at a bell joint or the standard joint of the pipe. And it was over-deflected where it was not a good seal. That seemed to be the biggest source of water loss in this first half mile section of the pipe. Beyond that point with a couple sleeves and at station 10 plus 34 was -- a 45-degree bend was installed. And we found it was leaking at that bend. So obviously the fitting or the 45-degree bend apparently wasn't properly installed and causing a source of leak. Further up the line, at station 18 plus 00 we discovered another leak. And this one was quite severe also. I recall looking at that. What -- what it was is you -- you came out of a woods and went across some flat, level land and then it climbed up a hill. The main coming up the hill was at a certain alignment, say like a 45-degree type of bend, and then when it reached the top of the hill, it leveled back up. And it was no fitting installed, but it was such a severe deflection in the pipe that it was -- failed at that area. It was another one of the biggest losses of water on this first half mile section. Just generally told me they weren't watching what they were doing in laying pipe and if -- certainly should have been a fitting installed to make a deflection. So they tried

to deflect out of the normal joint.

A pipe manufacturer has strict requirements on how much allowable deflection there is on each joint. And I don't have those records, but off the top of my head it was something about eight degrees. So on the far end of the pipe that doesn't let you deflect but four to six inches, somewhere generally in that area. And that's typically what we were finding, was over-deflected pipe and rolled gaskets. You get two pieces of ductile iron pipe, and the bell end requires a rubber gasket to be installed in there. It's somewhat triangle shaped, that the one flat side rests in a groove inside the bell. The other V section then comes in contact with the pipe as it -- as it comes -- countersinks into the bell. They generally countersink about four to six inches. The pipe is marked with -- it's called the spicket end. It's marked with a white line so you know when you have it what we term home, when you have a good joint and the seal. We -- in excavating down and observing the leaks, it appeared that sometimes we would have maybe good alignment but it was still leaking. So we suspected there was a rolled gasket. And this can happen from dirty pipe. Dirt or sand getting in there would cause -- or pushing the pipe home, maybe by use

of machinery. It needs to be gently and securely placed using a pry bar with hand labor. You don't want to do that operation too fast, and also that you put a lubricant on the pipe. It's termed soap. But it's -- it's a lubricant provided by the manufacturer that you grease up this bell to ease the sliding process.

If I could turn to the next sheet to proceed through it. At station 37 plus 40 was the midline valve. And we found that was also leaking upon testing. And nearby is a series of two sleeves that were within -- it appears to be about 20 foot of that location. So there's little severe alignment breaks but the valve was leaking at that point. At station 39 plus 00 we found another leak. At station -- I don't have this identified by station, but it's approximately 42 plus 00, it was leaking. Yeah, just a leak at a bell joint. At station 41 plus 24 we discovered another leak. And that one appears to be at a sleeve. So one of the repairs that was made was also leaking. So I'll say it was improperly repaired. It was leaking at the fitting they installed. Station 45 plus 80, found another leak. And nearby the other end of the pipe at 46 plus 00, that joint was also leaking. At station 47 plus 50 we found another leak at a joint. At station 51 plus 00 discovered another leak. And

finally at the beginning of the project -- I mean, at the end of the project, near 54 plus 50 at Westland Street it was leaking at a joint.

So in summary, what we found out there is we had 14 existing sleeves, some of which were leaking. And there was approximately, I think if I counted right, ten other leaks. Excuse me. Eleven leaks in addition to the sleeves. So at that point was -- you know, discover what the problems were. And I was asked by Larry Wall, as well as RLI Construction, to determine three things, which was what were our costs to date in investigating out there, what would be a cost make repairs of the line, and thirdly what would be a cost to re-lay the entire line from end to end. So we developed estimates of those costs and presented them to the owner.

Q. Okay.

A. Or to RLI. In turn you also asked me to send the remove and re-lay price to the City of Portland.

Q. Okay. Now, were you sure you had all the leaks located at this time?

A. No. No, you're not. All you've done is basically -- you won't know until you fix leaks. You're finding the worst ones. They're the ones that

are a little more apparent. So the process would be to get these repaired and then go back to resume the testing period to see if it would hold pressure once those were repaired. You certainly could find more. These were the more apparent ones that were obvious at this time.

Q. So any estimate you gave to just repair leaks would only be for these that you had found so far?

A. Yes.

Q. Why could you not find all of them with this sound equipment?

A. It's a matter that -- the worst ones are leaking. Let me explain. You could have a perfect line -- normal pressure on a main is somewhere around 60 pounds psi. I believe this being a main transmission line coming right off the treatment plant to the public system, if I recall, was going to run somewhere around 100 psi. So when you're pumping a line up to 150 you're exceeding its normal operating pressure. But it also causes the joints to partially fail. Let me just say you're going to have some leaks. You can't always get all the little dirt specs and things out. So when you pressurize at 150 pounds psi, you still may strain a system and cause some leaks.

But that is covered by the specifications. And if I might go into that slightly here. They understand, the engineers, in putting a main under extreme pressure -- normal pressure is often 200 pounds testing in most communities. This was 150. But they allow you what they call an allowable leak. They know the system may have some minute leaks during this testing process. So there's a calculated formula about how much you could lose. I have looked at those calculations. And over a two-hour period, under those pressures, you would be allowed up to 13.8 gallons of water. The process of doing this is you pump up to 150 pounds pressure. And any time your pumps -- and you have a gauge there on the pump that you're reading. Any time that drops below five pounds -- so if you're at 150, it drops to 145, you have to pump the main back up to 150. So it's -- that five pounds to raise the pressure of the main is going to take more water into the system to regain its pressure. So this is where they're looking at it. But it's not necessarily leaks. Again, you've got this air factor going in there, too. You may have not bled all the air and you're just consolidating air and it's giving back and you've got to force it together again. So that's why it's a two-hour test. They're just saying if it passes that you've got a sound line. And,

of course, it's normal operating pressure is less than that.

Q. So you're talking about over two hours you can lose 13 and-a-half gallons?

A. Yes, sir. Back to your question. Whether we got them all, I don't know. But we physically dug the pipe up at every joint and had Master Leak sound -- these were the more obvious ones that were apparent. And at that point -- we dug down about -- it was approximately two foot just to take the overburden off the main. They would test it. And if we determined there was a leak there then we completed the excavation down to the pipe to physically observe what was going on and determine is it a bad deflection or was it leaking at the gasket. And that's as far as the extent of our work was. We just did not go into making repair to determine anything further.

Q. Did you uncover all the leaks and find that they were, in fact, leaking?

A. Yes.

Q. Okay. Now, you mentioned that you came up with some figures then as far as what it would cost to repair this line; is that correct?

A. Yes, sir.

Q. What was your estimate to repair the line?

A. According to my notes here, we had $80,423. And again the way we looked at it was 14 sleeves and all these eleven additional repairs was to try to systematically repair sections, maybe here's an area -- if I might add, there's three leaks in a row, re-lay that whole section. Just don't come in and piecemeal repair three spots and create more sleeves in the line. We were looking to eliminate as many sleeves as we could by doing segment repairs instead of just isolated fixing a joint with a sleeve. That thought -- with 14 sleeves, 11 more we're talking here, you know, the last thing we need to do is keep adding more sleeves into the job. You know, it would be like a garden hose with 20 holes in it that you taped up. You know, you don't really have much at that point, you know. And it's -- being this was going do run at 100 pounds pressure and the City relied on it as part of their system -- feeding their overall system, we'd rather be safe than sorry and make good segment type of repairs and again isolate the number of sleeves that were in the line.

Q. Now, was that just an estimate?

A. Yes. We physically didn't do any work. So it was --

Q. It would have been done on a time and material basis?

A. Yes, sir.

Q. Now, if -- could you have exceeded that estimate in making the repairs?

A. Yes.

Q. And was that just an estimate based on the known repairs that had to be made?

A. Yes, it was.

Q. If you had come back in then and found additional leaks once you got these stopped, would that have caused additional money to have to be spent?

A. Yes, it would have.

Q. Okay. And did you estimate what it would cost to take up this line and re-lay it?

A. Yes, sir, I did. And I -- the figure I came up with was $104,005. So for an additional 24,000 it looked like you could re-lay the entire line. And that was -- looked at re- using the existing pipe, buying all new gaskets and physically just starting at one end and re-lay it all the way through and adding bends where they were needed, you know, where they weren't used, maybe over deflected, adding bends to those locations to have a better system.

Q. Now, again, was that estimate you were giving, was that a firm number that you were willing to do the work for or was that just an estimate what it

would cost based on a time and material basis?

A. That was an estimate on time and material basis.

Q. So if you had been actually bidding the project, would you have bid it higher than that?

A. Yeah. I would make sure we were covered, we didn't go broke on this thing. It was -- the conditions were bad. You know, in the sense that it was probably one of the worst times of the year. It was the middle of winter. And you're cross-country out in the open fields. That also dictated a little bit of our type of equipment. I recall looking through the notes, we had a crawler loader in here, which a track mounted loader. It's about twice the price of rubber tire loader. But rubber tire equipment wouldn't get around in that type of conditions back in there. It was just wet and boggy at that time of the year.

Q. Okay. Now --

A. So that would have factored. But, yes, sir, I would bid it to make sure I had myself covered.

Q. Did you make a recommendation as to whether they should take up and re-lay the line?

A. That was my recommendation, was to remove and replace the entire line. And, frankly, I don't know what ever became of it. We -- we never pursued

anything or -- other than providing the price. We were asked to leave at that point and really don't know what happened after this.

Q. And RLI was paying you to do the work at that time?

A. Yes, sir.

Q. Okay. Now, did -- the City sent this back out for bid to take up and re-lay the line. Did Jones Brothers rebid it -- or bid it at that time?

A. No. I don't recall ever being asked to bid. I don't remember any bid documents.

Q. Okay.

A. I suspect they dealt with some local folks or something. I don't know. I don't recall any bid solicitation.

Q. If the actual bid to redo this -- to take up and re-lay the line was $107,110, is that a reasonable bid for this?

A. In my opinion, yes. My own estimate was 104. So yes, sir.

Q. And you would have charged more if it was a lump sum price; is that correct?

A. Yes.

Q. So would you have actually bid it higher than that?

A. Again, you know, bond -- yes, sir, I would have. I mean, I just looked at some -- a bond would be an automatic cost that would have added on to my price. You know, general fixed cost, home office overhead, things of that nature. So yes.

Q. You're saying your price would have been higher than the 107,000?

A. It could have been. I don't know. It would have been higher than the 104 if I went into a firm contract. I would have added some fixed costs where I was somewhat protected here with a time and material bid going in.

Q. Okay.

A. Cost-plus.

Q. Why did you recommend that the entire line be taken up and re-laid?

A. Again we only -- first of all, the factors. It was 14 sleeves on the line, when customarily you probably would have used two. So didn't have a good comfort feeling with that. We found, what, 11 additional areas were leaking and also some of the repairs that they had made were leaking. So again under pressure you didn't know if some of those other sleeves would -- would leak after the worst ones were sealed. And physically hadn't looked at every joint.

Again, when we determined there was a leak with Master Leak's help, we dug down physically and looked at it. No repair was made. It was just an observance of a piece of pipe in the ground. So you really weren't too sure where all the problems were. We had some suspicions again of rolled gaskets or over-deflected, but we didn't physically look at every joint of the pipe. We excavated every joint about two foot down, but the main is still another foot below. So we physically didn't see everything. But the general overall feeling that I had was just of poor workmanship to be honest with you. I was just suspect of the entire line and felt that if I was going to stand behind it we were going to remove and re-lay the whole line and know we had a good system that would properly test.

Q. Okay. Were you paid by RLI Insurance Company to do this work on a time and material basis?

A. Yes, sir.

Q. And do you have your billing for services rendered?

A. Yes, sir. It's in two separate billings, but the grand total of it is $33,004. We had the first initial billing, and then there was some -- a few things after that billing period. I'd just have to

look a little more closely at it here. But you've got the records here. It's backed up by daily reports and a detailed breakdown of all the labor and equipment that was involved.

MR. GILLIS: We're about to get out of order. Let's mark these two drawings that show the pipeline and denotations as to where the leaks occurred as exhibit -- Collective Exhibit 1.

(Whereupon the previously mentioned Drawings were marked Exhibit Number 1.)

Q. (BY MR. GILLIS) Okay. Let's mark -- let me show you a document and ask you if this is the initial billing for $29,311, along with the backup documentation for it.

A. Yes, sir. And it's identified as the period from January 30th through February 13th, 2003.

MR. GILLIS: Let's mark that as next Exhibit -- as Exhibit 2.

(Whereupon the previously mentioned Billing was marked Exhibit Number 2.)

Q. (BY MR. GILLIS) Let me show you another document and ask you if that is the invoice for the remainder of the work, bringing the total to $33,004.

A. Yes, sir. This has an additional billing, bringing the grand total up to $33,004. And it's

identified by the period of February 28th to March 20th. So the -- a little extended period is the reason for the additional costs.

Q. And does it have the backup documentation for that?

A. Yes, sir. There's daily reports and a detailed breakdown of men and equipment to materials to backup the billing.

MR. GILLIS: I'd ask that be marked as Exhibit Number 3.

(Whereupon the previously mentioned Reports was marked Exhibit Number 3.)

Q. (BY MR. GILLIS) Are the charges represented on Exhibit 2 fair and reasonable for the work that was performed?

A. Yes, sir.

Q. And are these charges in line with what other contractors in this locality would charge for the same or similar work?

A. Yes, sir.

Q. And was all of your work billed purely on a time and material basis?

A. Yes, it was.

Q. Is this how you bill all other customers, on a time and material basis?

A. Yes.

Q. Did you ever have any conversations with the owner of Advantage Construction or with Tyrone Tackett, the owner of Cyclone, Inc.?

A. No, sir, none prior or since. No, I don't know the gentlemen.

Q. Was there anything that Jones Brothers did to the pipeline that could have in any way caused any leaks?

A. No, sir. We were strictly -- had not touched or removed and replaced anything other than the connections at the end, isolating those and capping them off, was the extent of it.

Q. You also put in these bleed-off valves?

A. Yes, sir, we did install the six corporations.

MR. GILLIS: You may ask.

**EXAMINATION BY MR. POTTER:**

Q. Mr. VanNuck, I'm Tim Potter. I represent Advantage Construction. The testing of this line, was it at 150 pounds or 200 pounds? I didn't catch that earlier.

A. At 150 -- we would begin the operation by bringing the main up to 150 pounds and see if it would

hold or how quickly it dropped. So it was generally 150 was the maximum we were pumping at. That's what the test requirements were.

Q. You were reading earlier from notes from the January 2003 meeting.

MR. POTTER: Have those notes been marked as an exhibit?

MR. GILLIS: They have not been.

MR. POTTER: I would like to mark those, please.

(Whereupon the previously mentioned Notes were marked Exhibit Number 4.)

Q. (BY MR. POTTER) Do you have notes from any other meetings?

A. That was the only meeting I attended at the City with respect to this. No. Any other meetings or notes in the file here, interaction between Larry Wall, the consultant, and RLI and possibly Angus, just the people I'm working for.

Q. Do you have notes from any other meetings which -- at which either Tyrone Tackett of Cyclone or Trent Smith of Advantage Construction attended?

A. No.

Q. Also, you were reading earlier into the record some notes giving kind of a chronology of what

was done at the project. Are those notes that you created at the time?

A. No. I'm going -- working off a sheet that I just prepared myself from -- dated June 4th of 2005, as I reviewed the contract documents as far as testing, review of all the daily reports that I found in the file and review of all the correspondence in the file. So it was simply just a cheat sheet for me to be able to identify, but there's some more detailed information in those that are a matter of the records.

Q. But this document you created, does that fairly and accurately summarize things that were done on the project?

A. Yes, sir.

MR. POTTER: If we could mark that document as the next exhibit, please.

(Whereupon the previously mentioned Summary Notes were marked Exhibit Number 5.)

Q. (BY MR. POTTER) The next question might be a naive one. But could you tell the Court why simply putting a second line in the ground wouldn't be a possibility?

A. I really don't understand the question. Are you saying another main parallel to this one?

Q. Yes.

A. It wouldn't seem cost feasible. I mean you're buying all the pipe all over again. It could be done I guess. I would have concern about the easement. There was a defined easement that you had stay within, whether that could be done. But you're just -- you're just doubling your cost.

Q. Okay.

A. Buying all new pipe and all the labor associated with it.

Q. Okay. That's a fair answer. You -- assuming, though, that you could work within the confines of the easement across these properties, would it have been more or less expensive to put a second line in as opposed to the $104,000 estimate that you gave for replacing the line?

A. I don't know without doing any cost estimates on the thing. Certainly you've got a new fixed cost of the cost of all the brand new pipe you're doing and the labor to put it in and testing, whatnot. With the remove and re-lay price, yes, there is some labor -- what I'm going to call lost labor -- pulling the old pipe out of the ground and cleaning it and re-gasketing it and re-laying it, whether that cost offsets the material cost, I don't know without doing some calculations. So not necessarily. You would have

to -- I guess you could look at your original bid on the job.

Q. Your bid -- your estimate of $104,000 to remove and re-lay the pipe included the reuse of much of the pipe; is that correct?

A. Oh, yes. Yes.

Q. How much of the pipe did you estimate could be reused?

A. Off the top of my head all of it, but if you would like I could get to my files and I can look at --

Q. I'm not asking you to give me a specific amount, but maybe a percentage of how much of the pipe.

A. I think -- we looked at buying very little. It was -- maybe some of these pieces that were cut up or where he cut the bells off, where there was a repair on each end of the bell, the joint. You know, to me that's a lost pipe. We put it aside. Maybe it could be fitted into some other -- used somewhere else. But a situation like that I would figure on buying a brand new pipe. And that was typically it, I guess, is where it was kind of just cut up with repeated sleeves. Buy a new section of pipe and put it in, rather than dealing with some pieces. I need a bell section in order to lay the pipe. But it was very minimal. I think there's a schedule in here of materials that we

bought just prior to leaving with the anticipation of trying to do some repairs. And it wasn't over $7,000. So I mean I could find that schedule and identify it. But I thought with that you probably had all the pipe you would need.

Q. Was Jones Brothers ever able to test the pipe at 150 pounds?

A. No, sir. Again, at initial testing we pumped the first half of the main from Westland to the midline valve, we pumped up at 150 pounds psi. And it fell to 100 pounds in the first five minutes. The section from the treatment plant to the midline valve would not hold line pressure over 120 pounds. And it just completely dissipated to nothing in quick time because we had a couple known severe deflections that was leaking the water out. So during the course of -- you know, overnight, or particularly a weekend, you would have to start all over again pumping it up because the water would have drained off. You've got to remember there was leaks in some of this low area here. So that's at the bottom of a hill. So it's completely draining itself empty. So that's part of the testing problem, I guess, is to keep refilling the main. So. . .

Q. And Jones Brothers never actually repaired

any of the leaks?

A. No, sir.

Q. Okay.

A. Not that I recall. We were strictly a seek and discovery mission.

Q. Do you have any knowledge about how Jones Brothers was selected by RLI to do this work?

A. No. Other than I had been doing two other projects with RLI and Larry Wall where they were forced to take over some other projects. We went in and helped them finish it. And this one just came about during the course of that work. And they were looking to make an immediate response back to the City. You know, they're upset. You know, you can imagine. They thought the line was going to be done in October and here we are in February of '03, a year and-a-half later, and they wanted that water main installed. So they were, I think, just trying to respond, as a bonding company would, to the owner. And they asked us to get involved in it to get immediate answers and determine what's the best course of action to go about getting it repaired.

Q. What is Mr. Wall's job?

A. He works as a consultant for the bonding company. It's my general understanding that he helps

decide contractors or seeks out contractors to physically perform the work. He doesn't have crews and things. So he seeks out contractors. And it's often -- this one was kind of again a hurry-up thing. The other ones were done on a bid basis where they solicited prices from some other contractors and we turned in the low price and began work on those jobs.

Q. This is not one where Jones Brothers submitted bids to Mr. Wall or RLI?

A. No. It was, again, get up there and try to figure out why this thing is leaking, was just an investigation on a time and material basis.

MR. POTTER: I appreciate your time. Thank you.

THE WITNESS: Okay.

**FURTHER EXAMINATION BY MR. GILLIS:**

Q. There was one other bill from you, I think, for some individual work you did for about 300 and some odd dollars; is that correct?

A. Yes, sir. This is my personal records. It's $356.25. It's a bill identified as March 11th, '03. The arrangement I had with Larry Wall, that if I personally would work after hours trying to prepare documents for this case or for this subject here,

whatever, that I was reimbursed as a private consultant. And anything done during the office or on Jones Brothers' time is identified by these bills. And basically this was coming so fast. The request for information was so fast, I was just working a few hours at home trying to keep up with it. 4.75 hours. So I did have that billing also, yes, sir.

Q. Is that fair and reasonable for a man of your experience?

A. Yes, sir.

Q. Okay. And you billed -- you worked 4.75 hours and you build $356 for that?

A. Yes, sir. It's identified as $75 an hour.

Q. Do you remember what you prepared on that time?

A. Yeah. It's detailed in the records here. There's a separate daily entry, what I was doing. A lot of it was compiling the records, daily reports and stuff. Again I was asked for quick turnarounds on cost estimates. And so I was just trying to keep up with the pace.

MR. GILLIS: Let's just mark this document that shows the $356.25 billing as the last exhibit.

(Whereupon the previously mentioned Billing was marked Exhibit Number 6.)

MR. GILLIS: I have nothing further.

MR. POTTER: Okay.

FURTHER THIS DEPONENT SAITH NOT

STATE OF TENNESSEE)
)                    s.s.
COUNTY OF DAVIDSON)

I, Lise S. Matthews, Notary Public in and for the State of Tennessee at Large,

DO HEREBY CERTIFY that the foregoing deposition was taken at the time and place set forth in the caption thereof; that the deponent therein was duly sworn on oath or affirmed to testify the truth; that the proceedings of said deposition were stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my skill and ability.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any such attorney or counsel, nor do I have any interest in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 29th day of June, 2005, at Nashville, Davidson County, Tennessee.

Lise S. Matthews, RMR
Notary Public at Large
State of Tennessee

My Commission Expires:
May 26, 2006