IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

---

RLI INSURANCE COMPANY,

Plaintiff,

VS. NO. 3-04-0555

ADVANTAGE CONSTRUCTION
SERVICES, LLC;
TRENT B. SMITH;
ILLIAD JEFFERSON;
and SOUTHERN CONSULTING, LLC,

Defendants/Third Party Plaintiffs,

VS.

TYRONE TACKETT,

Third Party Defendants.

---

DEPOSITION OF: **TRENT BLAKE SMITH**

June 13, 2005

---

---

**BERES & ASSOCIATES**

230 Fourth Avenue North, Suite 503

Post Office Box 190461

Nashville, Tennessee 37219

## A P P E A R A N C E S

For the Plaintiff: Mr. Angus Gillis III
Attorney at Law
Suite 701
501 Union Street
Nashville, Tennessee 37219

For the Defendants/
Counter-Plaintiff: Mr. Timothy V. Potter
Attorney at Law
210 East College Street
Dickson, Tennessee 37055

## I N D E X

Examination by Mr. Gillis . . . . . . . . . . . . . . 4

Examination by Mr. Potter . . . . . . . . . . . . . .43

## E X H I B I T S

1 (Late-filed) Invoice. . . . . . . . . . . . . . . .18

2 (Late-filed) Extension Letter . . . . . . . . . . .18

3 Letter (2/7/03). . . . . . . . . . . . . . . . . .27

4 Indemnity Agreement . . . . . . . . . . . . . . . .32

The deposition of **TRENT BLAKE SMITH** was taken by counsel for the Plaintiff, at 1:02 p.m., on June 13, 2005, pursuant to the Federal Rules of Civil Procedure, to be used for ALL PURPOSES, in the above-styled cause, before Lise S. Matthews, court reporter and Notary Public at Large, at the offices of Schulman, LeRoy & Bennett, P.C., Suite 701, 501 Union Street, Nashville, Tennessee, in accordance with the following stipulation.

**S T I P U L A T I O N**

It is agreed that Lise S. Matthews, being a Court Reporter and Notary Public at Large for the State of Tennessee, may swear the witness, take the deposition in machine shorthand and afterwards reduce the same to typewriting, and that the deposition may be used on the hearing of the above-styled cause. All objections, except as to the form of the question, are reserved until the hearing of this cause.

It is further agreed that all formalities as to caption, certificate, transmission, filing, et cetera, including the signature of the witness, are expressly waived.

* * *

TRENT BLAKE SMITH

having been first duly sworn, testifies as follows:

**EXAMINATION BY MR. GILLIS:**

Q. Would you state your full name, please.
A. Trent Blake Smith.
Q. Mr. Smith, you are one of the owners of Advantage Construction Services, LLC; is that correct?
A. Yes.
Q. And the other owner is Illiad Jefferson, your wife; is that correct?
A. Yes.
Q. What is your educational background?
A. I have a Bachelor of Science in civil engineering.
Q. Where did you obtain that?
A. California State Polytechnic University.
Q. When did you obtain that degree?
A. 1985.
Q. What's been your work experience since getting that degree?
A. I've been working as an engineer ever since.
Q. Well, generally you can't get your professional engineering license for -- I'm trying to remember. You had to pass the EIT exam and then

work --

A. I did that in school. Oh, I don't remember when I got licensed as a professional.

Q. Okay. I've got an engineering degree myself. As I recall, you took the EIT exam --

A. I did that while I was still in school.

MR. POTTER: She's typing. She's got to take down his question fully and then take down your answer. And if you guys are talking over one another --

THE WITNESS: I'm sorry.

MR. POTTER: So even if you know the answer like on Do You Want to Be a Millionaire, wait until he finishes before you answer.

Q. (BY MR. GILLIS) Once you passed that exam, you had to work for several years before you were eligible to sit for the professional engineering exam. Is that still the way it is?

A. Yes.

Q. Okay. Now, when you left school, where did you go to work?

A. County Sanitation Districts of Las Angeles County.

Q. What did you do for the County Sanitation Districts?

A. I worked in their sewerage department for a couple of years.

Q. Doing what?

A. I worked on -- let me think back. Sewerage conveyance mostly, but some treatment facilities. And then following -- I don't know how many years I was -- two, three, four years, I forget. Then I transferred to another department. That was solid waste. And then I worked on issued related to landfills.

Q. Okay. So how long did you work then for the counties -- these counties in Las Angeles?

A. Well, it's County Sanitation District of Las -- it's like a special district.

Q. Okay.

A. I worked there from 1984 through -- to February of '93.

Q. And did you get your professional engineering license during that time?

A. Yes.

Q. What happened in 1993?

A. I quit.

Q. Okay. And where did you go to work then?

A. I quit and moved to Virginia and worked for Draper, Aden & Associates.

Q. Would you spell that for the court reporter?

A. D-R-A-P-E-R, A-D-E-N & Associates.
Q. Where are they located in Virginia?
A. Their headquarters are in Blacksburg.
Q. What did you do for them?
A. I was an engineer.
Q. I mean did you design roads? Did you do water and sewer? Did you design bridges? What did you do?
A. Initially designed landfills, then water and sewer, things like that.
Q. How long did you work for --
A. Draper, Aden. Approximately four years.
Q. Okay. And what happened that you left your employment there?
A. We -- I bought -- I got transferred to Nashville, electively transferred. And I bought that office. They were wanting to close. And so they kind of gave me a choice I couldn't refuse or an --
Q. Did they go under the same name, Draper?
A. Yes, Draper, Aden.
Q. And did you buy the Nashville office of Draper, Aden then?
A. Yes.
Q. How long did you continue to operate under the name Draper, Aden?

A. No time at all. I mean from when -- it immediately changed to Southern Consulting.

Q. And you operate Southern Consulting, LLC now; is that correct?

A. Correct.

Q. Is your wife also an engineer?

A. No.

Q. What is her educational background?

A. She has a bachelor's -- I think it's a science degree in -- oh, gosh -- geography. And then she's a master's candidate for something.

Q. Okay. You're aware RLI Insurance Company has filed a Complaint against Advantage Construction Services, LLC, Trent B. Smith, Illiad Jefferson and Southern Consulting, LLC, and an Answer has been filed on behalf of all defendants. The Answer denies the allegations of Paragraph 10 of the Complaint. Paragraph 10 states as follows: With respect to the City of Portland job, Advantage defaulted under the terms of its contract. Do you maintain that Advantage did not default under the terms of its contract?

A. Do I maintain that?

MR. POTTER: Just Answer his questions. What he's asking is did Advantage breach its contract with the City or not.

THE WITNESS: If I said did not I'm saying that we did not breach? I'm thinking not.

Q. (BY MR. GILLIS) Okay. We want to communicate and communicate accurately. So tell me -- just tell me, did you or did you not breach the contract with the City of Portland?

A. I'm thinking that we did not.

Q. You say we're thinking --

A. Well, I'm hoping that we did not.

Q. On what basis do you claim that Advantage did not breach its contract with the City of Portland?

A. We were performing the work. And I guess I'm thinking that -- even when they -- they did not pay us a payment that they were supposed to under the contract, we continued to try to, you know, perform. I'm kind of thinking more the City may have been the ones who . . .

Q. Okay. Now, we've been here -- you've been in the depositions today.

A. Right.

Q. And I assume your attorney's basically told you what happened in the other depositions, which is fine. And basically people have recounted that there were a number of leaks up and down this pipeline when Advantage, and perhaps more accurately your

subcontractor Cyclone, were thrown off this job. Do you have any records or any information that would indicate that all these leaks did not exist?

A. I don't think so.

Q. And so the only way you're claiming, as I understand it, that you all did not breach is because you maintain the City should have made another payment to you which the City did not make?

A. Correct.

Q. And you acknowledge that -- I assume -- that that money, if it had been paid to you, would have had to been used to correct the leaks and/or repair the line; is that correct?

A. I think -- correct. Yes.

Q. It was your obligation to get in a line that did not leak --

A. Correct.

Q. -- is that correct?

A. Yes. Correct.

Q. Okay. The third sentence of paragraph 10 says RLI was notified by the City of Portland of a default in the contract by Advantage. You admit that's true, don't you?

A. Is that just saying that they notified you?

Q. Yes.

A. Oh, yeah. They -- I'm sure they -- yes.

Q. Okay. Then the next sentence says pursuant to the agreement of indemnity, RLI made demand on the defendants, through the attorney for the defendants, to post bonds -- funds with RLI that would indemnify RLI from any loss. RLI did make demand on you all to place funds --

A. Okay. Yes.

Q. -- with them that would indemnify RLI, didn't it?

A. Yes.

Q. Okay. And you and the rest of the defendants have failed and refused to post any funds at this point in time with RLI Insurance Company; is that correct?

A. Yes.

Q. You would admit, would you not, that RLI complied with the obligations it had under the agreement of indemnity?

A. Can you -- I'm sorry. Can you --

Q. Did RLI fail to do anything RLI was obligated to do with respect to you or any of the other defendants?

A. I'm not sure. I mean, can we turn her off for a second and ask you a question?

MR. GILLIS: Yeah. We can go off the record.

(Off-the-record discussion.)

MR. GILLIS: Let's go back on the record a minute.

MR. POTTER: Answer the question. Whatever you think.

Q. (BY MR. GILLIS) Let me try it this way. Off the record you said you're sort of wondering if RLI jumped the gun a little bit; is that correct?

A. Yes.

Q. Now, RLI sent you all notices they were obligated to send you under the indemnity agreement; is that correct?

A. I believe so. I guess. Yes.

Q. Okay. Now, tell me how RLI may have jumped the gun in some respect.

A. Well, I was -- I guess 20/20 hindsight I would have hoped that RLI would have contacted -- we would have worked together. I had contacted RLI before there was a bond claim, maybe out of being naive or not, but I thought, you know, I want to keep them informed that, hey, I think -- we even talked. I called Tim Winship and said, hey, this project -- something's going south. What do we do? And Tim said

something to the effect can't really do anything until they do file a claim. Well, they finally did. But I think that before the City would have been paid -- I'm not sure if the City was paid or not -- but that we could -- RLI and myself could have sat down and kind of reviewed the history and found out that maybe if they had they paid us we would have had the funds to throw more staff at it or even buy more sleeves and maybe RLI might have concluded, you know -- pay City of Portland -- you guys didn't do the right thing under the contract. But I -- I don't know if that answers any question but . . .

Q. Well, did you tell RLI that you didn't personally have any manpower or equipment that you, Advantage Construction Services, could utilize to do the job?

A. Did I tell them that we did not have any?

Q. Yes.

A. No.

Q. Okay. You sublet -- you being Advantage Construction Services --

A. Correct.

Q. -- sublet this entire project to --

A. That's not true.

Q. -- Cyclone Construction; is that correct?

A. No, not entirely. In fact, we did -- our people that actually work for us did go out and do work on it. So I guess no. I'm sorry. The answer to the question is no.

Q. What did you subcontract to Cyclone?

A. He was responsible for laying the pipe, and we were responsible for doing all the construction cleanup and restoring it to the condition equal to or -- you know, as equal to what it existed prior to construction.

Q. Okay. So Advantage Construction Services was going to go back and --

A. And we did.

Q. -- the grass?

A. Yeah.

Q. Is that what it amounts to?

A. Clean up, plant the grass and make everything look like nothing had been there.

Q. Okay. Do you have a copy of your contract with --

A. No.

Q. -- Cyclone?

A. No, I do not.

Q. Did you have a written contract with Cyclone?

A. No, I did not.

Q. What was Cyclone to be paid for this work?

A. He was to be paid everything except for what it cost us to clean up and we were just going to be on time and materials.

Q. Did you have a billing you sent to Cyclone as far as what your time and material for clean up was?

A. No. I was just -- I just keep that. I don't need to bill him because it was. . .

Q. Did you make an accounting to them, to Cyclone, as to what your time and material was for cleanup?

A. No.

Q. There had been one draw made. Out of that draw how much money was paid to Cyclone?

A. Cyclone? I don't recall. I mean, I know -- we know. I just don't know off the top of my head.

Q. Did you pay all of it to Cyclone?

A. Probably most of it. I'm -- probably most of it went out just because that first draw came in before we had done all the cleanup.

Q. Can you just provide me with the amount you actually paid Cyclone?

A. Yeah. Can I have a piece of paper?

MR. POTTER: I'll write it down.

Q. (BY MR. GILLIS) Now, let's talk about Cyclone for a minute. How did you find out who Cyclone was?

A. I had done -- he had built projects that I had designed. That's how I met him.

Q. What projects had -- okay. We're using him. That being Tyrone Tackett; is that correct?

A. Correct. Can I -- I mean, I don't think this hurts if I say this without you asking. We didn't hire Cyclone. We hired Tyrone.

Q. Individually?

A. Yeah. I mean there wasn't -- you know, I did not -- I don't know if that makes any difference to you all or not but. . .

Q. So did you have any discussions that he had a contracting company known as Cyclone, Inc.?

A. Oh, I knew -- yeah. I mean I knew that. He had done some projects that we had designed.

Q. Well, was there a specific agreement that Advantage is hiring you, Tyrone Tackett, we are not hiring Cyclone, Inc.?

A. There was no Cyclone, Inc.

Q. Okay.

A. He had let his business license lapse or something. So that's . . .

Q. So you were just hiring Tyrone Tackett?

A. Yeah. I mean, he -- yes. Excuse me. I'm sorry.

Q. Did Tyrone Tackett have any kind of contractor's license at the time?

A. I do -- I think I know now that he didn't because I saw in one your correspondences or someone's correspondence I saw that he was not licensed. I'm not real sure but I think I read that.

Q. Okay. When did you -- was the scheduled completion date October 31st, 2002?

A. I don't recall off the top of my head. That's -- plus -- that sounds about right. It was about 150 day -- I know we started in June, I think. So that sounds about -- close enough for what we're talking about I'm sure.

Q. Now, there was mention of an October 14th, 2002, letter from Advantage requesting additional time on this project. And I don't think I have seen that letter. Do you have a copy of it?

A. Not on me. And I'm not -- I'll -- if -- I can fax it to you or something like that if you'd like.

Q. Can you just provide that as a late-filed exhibit?

MR. POTTER: I've got that as late-filed

Exhibit Number 2.

MR. GILLIS: Yeah.

MR. POTTER: The first one I've got invoices from Tyrone Tackett and documents showing what he was paid.

(Whereupon the previously mentioned Invoices and Extension Letter were designated to be marked Exhibit Numbers 1 and 2 when furnished.)

Q. (BY MR. GILLIS) Do you recall why you were requesting additional time?

A. Because that's when we -- the testing. We were having leaks, and just wanted additional time to get the leaks fixed.

Q. Now, you're a civil engineer. There's been testimony that they had something in the neighborhood of 20 sleeves at the time that Advantage was declared in default by the City. Is that an inordinate number of sleeves for a job this long?

A. Yes.

Q. Have you ever seen more than a couple of sleeves on a job this long?

A. No.

Q. As an engineer, would you have accepted a job like that?

A. I don't know. I mean I don't know. It's

easy for me to say yes or no because I'm -- it's -- you know, I don't have an unbiased opinion now.

Q. I understand. Is it a fact that every time you use a sleeve you've then got two gaskets instead of one that can leak?

A. No. I mean I kind of disagree with some of Mr. Whitehead's --

Q. That's fine. Explain to me why you don't have two gaskets instead of one.

A. Well, it's not -- the question was more that can leak. I mean, once you bolt the sleeve on, its -- its -- I mean its design is to prevent a leak. So I have -- I disagree with him in saying that it increases your chance for leaks. It eliminates a leak. Their engineer told us to -- I mean, that's one of the things, he did direct us to continue putting sleeves in.

Q. Okay. Now, correct me if I'm wrong, when you're dealing with ductile iron pipe you just don't have a leak in the middle of the pipe, do you?

A. No.

Q. So if you've got a leak, it's at a joint where you've got a gasket; is that correct?

A. Correct. Yeah.

Q. And that may be due to improper

installation, the gasket gets crimped for instance?

A. Correct.

Q. Or it may be because you install the pipe at two sharp an angle; is that correct?

A. Can you say that one again?

Q. You can only have so much of an angle at a joint; is that correct?

A. Yes. You're only -- the manufacturer provides, you know, their allowance in that angle.

Q. And if you exceed that angle you may have a leak at that joint, correct?

A. Correct.

Q. You've heard testimony today that the pipe was at too shallow an elevation. And that's just something that shouldn't have been under the specs; is that correct?

A. If it was too shallow -- yeah, I mean, it has a minimum cover identified.

Q. And it's certainly your obligation as the contractor to stay within the easement area, is it not?

A. Correct.

Q. Now, even if you had been allowed to stay on the job and repair leaks, did you have manpower that was trained in installing pipes and repairing leaks?

A. You mean Tyrone's guys that were doing it?

Q. No. Did Advantage?

A. No. Well, can I ask -- can I go off the record again?

Q. Just go ahead and tell me.

A. I had another contractor that -- that was ready to come down there if needed to and that did. He's -- but. . .

Q. Who was that contractor?

A. Developers Excavation.

Q. Where are they located?

A. In Dickson.

Q. Who was the owner of Developers Excavation?

A. Paul Singleton.

Q. Are they still in business?

A. Yeah.

Q. Okay. So it isn't something that Advantage would have done themselves?

A. Right. I would have just had him come.

Q. You may know how to lay a pipeline but really don't have construction crew that knows how to lay a pipeline, do you?

A. Well, my foreman could, but that's just something -- we were hoping to break into and ease into that, but -- I didn't want to jump in all the way so to speak.

Q. At that time Advantage Construction Services had never put in a pipeline, had they?
A. Correct.
Q. Now, you mentioned this contractor came to the job. Did he do any work on the job?
A. No. You mean Singleton?
Q. Yes.
A. No. No. No. He came to my office.
Q. Okay.
A. His office and mine are right next door. And I was telling him what's going on. And he said, well, if we need to, we'll go and fix it.
Q. Now, there was -- there was a print that was produced as Exhibit 1 to Terry VanNuck's deposition -- it's actually a total of two prints -- showing all the places that they found leaks.
A. Is the orange --
Q. It's the small handwritten language. It gives you the --
A. Oh, okay. The orange and red represent a sleeve, I guess.
Q. Well, I think the sleeves are in the boldface print, but --
A. Okay. I see the draft of the text.
Q. Then the small handwritten language I think

indicates where they were going to have to make repairs because of where they had found leaks. Do you have any personal knowledge or know of anybody that has personal knowledge as to where repairs were going to have to be made?

A. No.

Q. Did you have anybody that gave you an estimated cost to make any of the these repairs?

A. I mean, this is the first time I've seen this.

Q. Okay.

A. But to answer your question, sort of yes and no. I mean, this is the first time I've seen this, but Tyrone was -- his cost for repairing this was supposed to be zero to me. I don't know if that's not quite the same thing as what you asked.

Q. Okay. In other words, Tyrone was supposed to put the line in and have the line leak free, correct?

A. Yeah. Correct.

Q. You would concede that Tyrone did not do what he was supposed to do, wouldn't you?

A. I would say he didn't complete what he started out to do.

Q. And at the time the City terminated this

contract, you were roughly two and-a-half months late in completing it at that time; is that correct?

A. Yeah.

Q. And this contract provided for liquidated damages, did it not?

A. I -- yeah, I'm sure it did.

Q. Also provided that you would pay any extra engineering expenses and legal fees if you were in breach of the contract, did it not?

A. I don't remember that but it's -- you probably know.

Q. And when RLI paid the City 60 some odd thousand dollars, are you aware that that included everything and that there weren't any additional bills for liquidated damages or attorney fees?

A. No. I didn't know how much you paid them until you just said that.

Q. Okay. Going back to the interrogatories. You also denied paragraph 17 of the Complaint. And this says on March 20th, 2003, RLI made demand on the indemnitors that they place certain funds, $176,169.00 on deposit with the surety. No such funds were placed on deposit with the surety. These funds were to indemnify RLI. The indemnitors refused to place any sums on deposit with RLI. Indemnitors continue to

refuse to place any sums on deposit with the surety.

MR. POTTER: Actually, we didn't deny that.

MR. GILLIS: Pardon me?

MR. POTTER: Actually, that wasn't denied. In the answer it says it's admitted that or about March 20, 2003, RLI made demand on the indemnitors that they place certain funds, 176,169, on deposit with the surety. It's further admitted that no such funds were placed on deposit with the surety. Any other allegations of paragraph 17 are denied.

MR. GILLIS: Then I apologize. I have misstated a question.

THE WITNESS: Oh, that's all right.

MR. GILLIS: I'm like anybody else. I can make a mistake going through here. And I apparently have. And your attorney is exactly right. It said what he said it said. And I apologize. I just made some incorrect notes.

Q. (BY MR. GILLIS) In your affirmative defenses you state that the City of Portland breached its contract with Advantage Construction Services, LLC. Is that just by refusing to pay the money -- the balance of the contract proceeds?

A. No. That was -- they didn't pay the second pay request, which there was even more after that.

There would have been a balance even after that, but they didn't pay that pay request on number 2.

Q. You also allege that the plaintiff fails to state a claim upon which relief can be granted. Do you have any knowledge as to how the Complaint fails to state a claim upon which relief can be granted?

MR. POTTER: I'll object to the form. It's a legal question. But go ahead if you can answer to the best of your ability.

THE WITNESS: I'm not -- can you --

Q. (BY MR. GILLIS) That's a phrase that lawyers throw into a Complaint -- into an Answer a lot of times. And I'm just trying to figure out if there's any -- and you can have your attorney answer it. If there's anything in here that fails to state a claim, I just want to know what it is.

MR. POTTER: I'm not aware of anything.

MR. GILLIS: Okay.

Q. (BY MR. GILLIS) Now, in addition to the March 2004 letter that was referenced above, you also got -- you also got notices requesting funds be put in -- or be placed with RLI on February 7th, 2003; is that correct? Let me show you a letter dated February 7th, 2003. You received that, did you not?

A. Yes.

MR. GILLIS: Let's mark that as Exhibit Number 3.

(Whereupon the previously mentioned Letter (2/7/03) was marked Exhibit Number 3.)

Q. (BY MR. GILLIS) Now, did Walter A. Woods Supply Company get paid?

A. Some yes and some no.

Q. Do you know what Walter A. Woods Supply Company was paid?

A. I don't know off the top -- I have that information, but I don't have it with me.

Q. There were actually two jobs, one in Webster County Kentucky and one in Portland, Tennessee that RLI had bonded; is that correct?

A. Correct.

Q. I believe RLI ended up paying Walter A. Woods Supply Company $27,923.18 on the Webster County job. Is that the amount that they were owed on Webster County?

A. I don't -- can I ask you a question?

Q. Sure.

A. There was a letter, I think, that I wrote to you guys, either you or Tim outlining what -- what their invoices and payment -- account balance was. And I don't know -- if I remember correctly, that letter

said that they're paid for Webster but that I'm withholding money from Portland.

Q. No. I'm just trying to be sure is there any dispute but that 27,923.18 was properly due and owing on to Walter A. Wood on the Webster County job.

A. Is that my letter? I'm not sure if it was you or Tim wrote me a letter asking me about open invoices. And I responded and outlined what they had been paid and had not been paid.

MR. POTTER: When you say Tim, you mean Tim Winship. I'm not sure if it was you or Tim Winship.

Q. (BY MR. GILLIS) Oh, not Tim Potter?

A. No, not Tim Potter. It would have been Tim Winship. They had been paid in full for Webster County. And what I owed them was for Portland. That I was withholding payment because their guys said it was defective pipe.

Q. Now, let me show you an invoice from Walter A. Woods Supply Company indicating that $29,833.21 was owed on Webster County -- I'm sorry -- on Portland. And that amount is exclusive of service charges. Do you know if that is correct?

A. I'm actually thinking this is probably not correct.

Q. Do you maintain that there were any

additional payments?

A. Well, I -- I'm -- I'm actually -- I mean I think it's probably an issue of semantics. They've -- what I'm claiming is they were paid in full on Webster; they've applied that to Portland. I mean the math probably works out the same but . . .

Q. Bottom line, how much did you all owe?

A. I don't recall off the top of my head. They're saying 30,000 plus or minus?

Q. Yes.

A. I think we withheld 60,000, didn't we? I mean, you might be able to help me there.

MR. GILLIS: Let's go off the record a minute.

(Off-the-record discussion.)

MR. GILLIS: RLI Insurance Company paid Walter A. Wood $27,923.18 on the Webster County Kentucky job, and paid them $29,833.21 on the City of Portland job. Are those amounts correct?

MR. POTTER: I think what he's telling me -- and, Trent, you tell me if I'm wrong. But I think what he just now told me was he doesn't dispute that those are the amounts which Walter A. Woods claims is owed, and he does not dispute the fact that they, in fact, did supply the pipe for those jobs. He dismissed

his third-party Complaint against U.S. Pipe for defective pipe. Having said that, he still believes that some of the pipe was defective, and he alleges that that's a potential defense he might have whether or not to pay Walter A. Wood.

THE WITNESS: But I think the amount you paid on Webster -- I was saying I paid them in full but that that amount I withheld -- I held that from Portland. Do you know what I'm saying?

Q. (BY MR. GILLIS) Regardless of which -- the total amount that Walter A. Wood has been paid is the proper amount assuming the pipe was not defective?

A. Yeah. I mean, I don't know to the penny but you're definitely in the right ball park.

MR. POTTER: You stated that properly.

THE WITNESS: Okay. Sorry.

Q. (BY MR. GILLIS) And you don't have any independent proof that that pipe was defective; is that correct?

A. All I have is that Steigal guy.

Q. Who is what?

A. Mr. Steigal stating --

Q. Who is Mr. Steigal?

A. For U.S. Pipe. And I have -- at the meeting we went to in January -- I forget the date. Didn't

they have a reporter or recorder?
Q. Wait a minute. Because --
MR. GILLIS: Let's go off the record. On the record let me make a statement. I don't mind talking to you some off the record but --
THE WITNESS: Am I going too much?
MR. GILLIS: No. I need to ask the questions if we're on the record. Now let's go off the record.
(Off-the-record discussion.)
Q. (BY MR. GILLIS) Let's go back on the record. Did you have anybody present when the sound testing equipment was brought on site to listen for the leaks?
A. I -- I'm not -- I think this might be the first time I've heard about that.
Q. Okay. Did you go on site at all and inspect what Jones Brothers did?
A. No. They told -- after that meeting they said don't come back. I -- so, no.
Q. Are you familiar with Jones Brothers?
A. Yes.
Q. Reputable, competent contractor?
A. I assume. I mean, I don't know how reputable they are.
Q. Let me show you an agreement of indemnity

and ask you if you -- if you executed that on -- and your wife executed that -- and if either you or your wife executed it on behalf of Advantage Construction Services, LLC and Southern Consulting, LLC.

A. I did.

Q. Did your wife?

A. Yes.

Q. That is her signature?

A. Yeah. It was -- I didn't see it. I was looking. Yeah.

Q. And then it was properly executed by both of the corporate entities, that being Advantage Construction Services, LLC and Southern Consulting, LLC?

A. I believe so. Yes.

MR. GILLIS: Let's mark that indemnity agreement as the next exhibit.

(Whereupon the previously mentioned Indemnity Agreement was marked Exhibit Number 4.)

Q. (BY MR. GILLIS) And you did request RLI Insurance Company to write -- to execute both the Webster County bond and the City of Portland bond; is that correct?

A. Yes.

Q. Is there any family relationship between you

and your family and Tyrone Tackett?

A. No.

Q. I mean he's not a second cousin twice removed by marriage or anything?

A. Not 20th cousin. No.

Q. What about with your wife's family?

A. No. None.

Q. And I'm only asking that question because there had been rumor floating around that he was some relative of yours or your wife's. That's not accurate; is that correct?

A. No.

Q. And you're only prior business dealings had been where he constructed a pipeline?

A. Well, he did a couple jobs. Well, your question was how did I meet him.

Q. Yes.

A. And that's how I met him, is engineering he constructed.

Q. Where were those jobs?

A. Crossville, Tennessee.

Q. What kind of lines were they?

A. Ductile iron and PVC. I think the ductile iron was bigger than 16-inch, if I remember correctly.

Q. Okay.

A. I can't remember off the top of my head.
Q. Once you had been -- once Advantage had been declared in default by the City of Portland, do you believe RLI acted reasonably in bringing in Jones Brothers to try to explore how many leaks there were and where those leaks occurred?
A. I wish you guys had contacted me first. I would have helped, you know, in every way possible. I don't -- I mean, I don't know if that's normal to have -- you know, I don't know to answer your question.
Q. Well, how could you have investigated the cause of the leaks?
A. Me personally or just anybody?
Q. Anybody.
A. Well, they could have asked and we could have sat down and told them what was causing the leaks.
Q. Okay. Terrible question. How would you determine where the leaks were?
A. Where the leaks are. Pump -- fill it, pump it up and look for the where the water is coming out. And that's kind of the process that was going through or being performed.
Q. And do you have to uncover the joints?
A. You have to have -- well, not necessarily to have the water -- if it comes to the surface you can

see where the location is.

Q. But if it's very deep you've got to have it --

A. If it's a deep one you have to have it uncovered.

Q. Is sound detection equipment an appropriate method to use to ascertain where the leaks are?

A. I don't know.

Q. Have you reviewed the invoices of Jones Brothers for the work that was done?

A. No.

Q. So I assume you have no opinion one way or the other as to whether those invoices are reasonable or not?

A. Correct.

Q. Do you know whether it would cost more money to dig up the line, clean the pipe, and re- install the pipe or whether it would cost more money just to put in all new pipe?

A. I don't know how much it cost to do what you just said.

Q. You don't know which one would be more expensive, do you?

A. I don't know how much plan A cost. I know plan B would be in the $140,000 range.

Q. To re-install --
A. To re-install --
Q. -- new pipe?
A. Yeah.
Q. Did you have any discussions with the City as to why they were not paying Partial Pay Estimate Number 2?
A. No. I need to rephrase that. I contacted the engineer.
Q. Okay. What did the engineer tell you?
A. First he told me, you know, wait, he'll check into it, and then he checked into it and got back with me and said that the City wasn't paying because they had heard bad rumors about Tyrone.
Q. Did they tell you what they had heard about Tyrone?
A. I don't know if they did or not. I can't remember.
Q. Let me show you an invoice for -- an invoice dated 2/18/03 for cost of work performed to date by Jones Brothers, and ask you if you find anything in there to be unreasonable.
A. Angus, I'm not sure if I'm qualified to say it's reasonable. I don't know if it's reasonable.
Q. Okay. So you don't know whether the Jones

Brothers' estimate is reasonable or not?

A. No, I do not.

Q. Or the Jones Brothers --

A. I don't know what that -- what was that invoice for? Is that re-laying the pipe?

Q. No. That was where they tested for leaks, uncovered holes, pressure testing the pipe, using in -- bringing in sound equipment to listen and find the leaks.

A. Okay. I know we left the pipes with the joints almost all exposed. So they shouldn't have had to have -- unless someone went back and covered them up, and they had to overexpose them again. But they were all exposed.

Q. Are you just telling me you don't know whether they're reasonable -- those charges are reasonable or not?

A. Well, I'm inclined to think something happened between us leaving and them doing that to have excavation costs in there. Because the joints were all -- I mean relatively exposed. There could have been a little sluffiing in of trench side walls, but they still should have been relatively exposed. It wasn't that deep in most cases. So there wouldn't be much sluffiing in. I don't know if the whole pipe got

covered back up and then they came back in. I don't know.

Q. So is your testimony you don't know?

A. I would -- there's more to it than just saying -- I'd say no.

Q. On what basis?

A. Well, I'd have to know what condition was the mile in when they showed up. Had someone gone in and covered up all the joints? And if they had, that might be reasonable. But if the joints had not been covered up, I'm -- I think almost every joint there was exposed, which should have made it fairly easy to see where it's leaking. That's the last thing we did -- they did, was expose all the joints.

Q. Did you ever go up there and see the joints exposed?

A. I went up there either the day before our meeting or that day of the meeting back in January of '03. Yeah.

Q. Were the joints exposed then?

A. They had dug up every joint.

Q. Or did they just have some area dug up?

A. The joints. Not the entire -- not entire 20 foot section of pipe, but --

Q. No. The joints?

A. Yeah.
Q. But hadn't they filled back in and hadn't the dirt washed back in those holes?
A. There may have been some sluffiing off in there, but in most cases -- I mean, even that's not going to be a whole lot.
Q. Were there any unusual things that caused any kind of delay on this project?
A. Just the testing. The project effectively -- the pipe was effectively installed mid July.
Q. But just never could get it to test between mid July and the end of October?
A. There was about a -- a week gap. We went out, finished cleaning up. There might have been another week gap, and then that's when the testing started. So, I mean, that might have been -- I don't -- these dates -- don't -- please don't hold me to them, but I'm going to say probably late August is when testing started back up with just a short gap between completion of laying it and cleaning up, gap, testing.
Q. Why would you clean up until you knew if you had all the leaks repaired?
A. Well, at that time we didn't know there were

any leaks. The assumption being that there might be one or two and it's not -- go back and fix those one or two spots.

Q. So the pipe got laid by mid July and then y'all came in and cleaned up?

A. Yeah, within a week or two of that. I mean, probably a week gap.

Q. But the City didn't cause any kind of delays?

A. The only delays -- I mean, they weren't real -- they were a little thrifty with giving us water. It wasn't exactly what he's saying where they would run out and turn the water on for us. That wasn't quite accurate. I'd say the biggest delay they would have caused would have been being a little tight with their water supply and -- well. . .

Q. Did you all have unlimited water until after October 31st?

A. I believe so. I take that back. There was one time period where they put a restriction on it because -- gosh. They had -- they were having some water shortage or something and the plant wasn't functioning right or something. I mean there was some time period where there was a little bit of a -- they were being thrifty with their water and not giving --

and at that time I don't think it was the big panic like it was in January.

Q. Why hadn't Tyrone Tackett been able to repair the line between, you know, basically mid August when he started testing and January of 2003?

A. Well, each joint that they repaired, it would take two or three days to fill the line. Roughly speaking, it's almost a week per joint repair. Three days to fill it, start running the pump, pump it up, find a leak, dig it up, drain it, you know, start all over.

Q. Jones Brothers wasn't sure they had all the leaks identified, but they had like 13 more that they found out there. Are you saying that would have taken 13 more weeks to fix?

A. I would say four or five days -- each one -- it would have taken approximately that. Well, they identified all of them at one time? Then they could have all been repaired at one time. It's any that pop up that you don't know about that adds another -- you know, you start all over with your four or five day.

Q. Did you ever obtain any estimates to take up and re-lay this line?

A. No.

Q. How did you come up with your bid on this

job?

A. Basically I worked with Tyrone.

Q. You've heard the testimony that a number of these gaskets were rolled, crimped, et cetera, that they found. Do you have any idea how that occurred?

A. I do not know.

Q. It's improper workmanship, is it not?

A. That's one way I'm sure that it could occur, yeah.

Q. Do you know of any other way?

A. I'm -- I don't know that you could tear up a gasket on the way out. I just wonder how they dismantled the pipe. They weren't probably too concerned about maintaining the integrity of the gasket as they're yanking it out so much as someone would on the way in. I don't know if there's any way to tell if they tore it up coming out or if it tore up going in.

Q. If there is a leak at a joint that would be an indication of improper workmanship, would it not?

A. Sure. I . . .

Q. How long was the City supposed to give you to get this job finished?

A. Well, the correct answer is 150 days.

Q. And the City gave you until mid January of 2003; is that correct?

A. Yes.

MR. GILLIS: I don't have any further questions.

MR. POTTER: I've got one question.

**EXAMINATION BY MR. POTTER:**

Q. Mr. Gillis asked you if -- I think his question was if there's a leak at a joint would that be an indication of poor workmanship. You said yes. Is that always true?

A. I think the definition of poor workman -- I -- if it leaks -- I mean, it's improper for it to leak. But I don't know that it's necessary -- you know, the pipe layer did -- you know, a -- it sounds like when you answer that question that you're saying, oh, they -- you know, they just were a smug and put it in wrong, as opposed to any human being in the course of work not everything goes exactly right in each case. So a craftsman could still have something that leaks and then he fixes it and it doesn't leak. So -- but the bottom line is it's poor workmanship up until the point you fix it.

Q. In your opinion, was it possible for Advantage Construction to repair the leaks in that line?

A. Sure. Yes. I'm sorry.

Q. If Advantage had had more time to repair the leaks, could it have?

A. Yes.

Q. Is there anything in your contract with -- in the contract between Advantage and the City of Portland that prohibited sleeves?

A. No, I'm not aware of anything.

Q. The purpose of the contract was to put a line in, approximately a mile long, that worked, that didn't leak, right?

A. Correct.

MR. POTTER: That's all.

MR. GILLIS: I don't have any further questions.

FURTHER THIS DEPONENT SAITH NOT

STATE OF TENNESSEE)
) s.s.
COUNTY OF DAVIDSON)

I, Lise S. Matthews, Notary Public in and for the State of Tennessee at Large,

DO HEREBY CERTIFY that the foregoing deposition was taken at the time and place set forth in the caption thereof; that the deponent therein was duly sworn on oath or affirmed to testify the truth; that the proceedings of said deposition were stenographically reported by me in shorthand; and that the foregoing pages constitute a true and correct transcription of said proceedings to the best of my skill and ability.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any such attorney or counsel, nor do I have any interest in the outcome or events of this action.

IN WITNESS WHEREOF, I have hereunto affixed my official signature and seal of office this 29th day of June, 2005, at Nashville, Davidson County, Tennessee.

Lise S. Matthews, RMR
Notary Public at Large
State of Tennessee

My Commission Expires:
May 26, 2006

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Advantage Construction
Services, LLC
101-B West Railroad Street
Dickson, TN 37055
Attn. Mr. Trent B. Smith

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by *(Please Print Clearly)* Trent Smith
B. Date of Delivery 2-10-03

C. Signature
X [signature]
☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail ☐ Express Mail
☐ Registered ☐ Return Receipt for Merchandise
☐ Insured Mail ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

2. Article Number *(Copy from service label)*
7099 3400 0018 8058 1733

PS Form 3811, July 1999 Domestic Return Receipt 102595-00-M-0952

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Mr. Ilia Jefferson
1182 Turkey Creek
Dickson, TN

**COMPLETE THIS SECTION ON DELIVERY**

A. Received by *(Please Print Clearly)* [handwritten]
B. Date of Delivery 2-27-3

C. Signature
X [signature]
☐ Agent
☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Southern Consulting, LLC
101-B West Railroad Street
Dickson, TN 37055

2. Article Number *(Copy from service label)*

7001 1940 0006 7462 1246

**_COMPLETE THIS SECTION ON DELIVERY_**

A. Received by *(Please Print Clearly)* Trent Smith

B. Date of Delivery 2-10-03

C. Signature

X [signature] ☐ Agent ☐ Addressee

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
- ☒ Certified Mail
- ☐ Express Mail
- ☐ Registered
- ☐ Return Receipt for Merchandise
- ☐ Insured Mail
- ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)* ☐ Yes

PS Form 3811, July 1999 Domestic Return Receipt 102595-00-M-0952

LAW OFFICES
SCHULMAN, LEROY & BENNETT, P.C.
SUITE 701-THE FIVE HUNDRED AND ONE UNION BUILDING
POST OFFICE BOX 190676
NASHVILLE, TENNESSEE 37219-0676
TELEPHONE (615) 244-6670
FACSIMILE (615) 254-5407

W. WAYNE LEROY
ANGUS GILLIS, III
GARY S. RUBENSTEIN
KEENE W. BARTLEY
BARBARA J. PERUTELLI
J. ANTHONY ARENA
DOUGLAS E. JONES
ASHLEY N. ARNOLD

OF COUNSEL
J. CARSON STONE
JOHN I. HARRIS, III
BRENDA MEASELLS DOWDLE

I. R. SCHULMAN
(1908-1986)
T. T. McCARLEY
(1918-1975)
LEWIS D. PRIDE
(1933-1978)
H. MICHAEL BENNETT
(RETIRED 1998)
OF COUNSEL
SEYMOUR SAMUELS, JR.
(1912-1992)

February 7, 2003

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Advantage Construction Services, LLC
101-B West Railroad Street
Dickson, TN 37055
Attention Mr. Trent B. Smith:

Mr. Trent B. Smith
1182 Turkey Creek
Dickson, TN 37055

Mr. Ilia Jefferson
1182 Turkey Creek
Dickson, TN 37055

Southern Consulting, LLC
101-B West Railroad Street
Dickson, TN 37055

EXHIBIT
#3 Smith
6-13-05 cm

Re: City of Portland Contract

Dear Gentlemen:

As you are aware, each person or entity to whom this letter is addressed has executed an Agreement of Indemnity dated June 29, 2001. This Agreement of Indemnity was executed to induce RLI Insurance Company to issue certain payment and performance bonds in which Advantage Construction Services, LLC would be the Principal and RLI Insurance Company would be the Surety.

RLI Insurance Company was the Surety on payment and performance bonds written in connection with a contract Advantage Construction Services, LLC entered into with the City of Portland for the installation of a water main. The City of Portland has now declared Advantage Construction Services, LLC to be in default under the contract. In the second paragraph of the Agreement of Indemnity entitled "Indemnity", it is specifically provided as follows:

SECOND: The Contractor and Indemnitors jointly and severally shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor and indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) in enforcing any of the covenants and conditions of this Agreement.

Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore. Such payment shall be equal to the amount of the reserve set by the Surety or equal to such amounts as the Surety, and its sole judgment, deems sufficient to protect it from loss or potential loss. In the event of any payment by the Surety, the Contractor and Indemnitors further agree that in any accounting between the Surety, the contractors and Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in good faith in and about the matters herein contemplated by the Agreement under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed; and that the vouchers or other evidence of any such payments made by the Surety shall be prima facie evidence of the fact and amount of the liability to Surety.

At this time the Surety has set up a reserve in the amount of $66,000.00. This is based on a $41,000.00 estimate for the cost to complete, a $35,000.00 reserve for payment claims including the payment of U.S. Pipe and a $10,000.00 reserve for legal fees and expenses. After the liquidated damages are subtracted, it is estimated that there will be $20,000.00 remaining in the job. This results in a reserve of $66,000.00. This reserve may be increased or decreased as the work progresses. Pursuant to the Agreement of Indemnity, payment of the reserve amount is to be made to Surety as soon as liability is asserted against the Surety, whether or not Surety shall have made any payment therefore. Such payment is to be equal to the amount of reserve set by Surety. This letter is a demand that you deposit with RLI Insurance Company the sum of $66,000.00. Please send this to RLI Insurance Company, c/o Tim Winship, 9025 B Lindbergh Drive, Peoria, IL 61614-1413.

You should be aware that RLI Insurance Company does not waive any right it might have to recover additional monies under the Agreement of Indemnity in the future where RLI increases the reserve or pay sums over and above the reserve amount.

**THIS LETTER IS AN ATTEMPT TO COLLECT A DEBT. PURSUANT TO THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT CODIFIED IN 15 USC §1692, UNLESS YOU DISPUTE THE VALIDITY OF THIS DEBT WITHIN THIRTY DAYS AFTER RECEIPT OF THIS LETTER, THE DEBT WILL BE PRESUMED TO BE VALID BY MY CLIENT. IF YOU NOTIFY THE UNDERSIGNED AT THE ABOVE ADDRESS WITHIN THE THIRTY DAY PERIOD THAT THE ALLEGED DEBT OR ANY PORTION THEREOF IS DISPUTED, I WILL OBTAIN VERIFICATION OF THE DEBT AND WILL SUPPLY SUCH VERIFICATION TO YOU. ANY INFORMATION OBTAINED WILL BE USED FOR ASSISTING IN SUCH DEBT COLLECTION.**

Should you have any questions, please do not hesitate to contact me.

Sincerely,

Angus Gillis, III

Angus Gillis, III

AG:ags

cc: Mr. Tim Winship
RLI Insurance Company

EXHIBIT

153529 TW

#4 Smith 6-13-05 cm

# Agreement of Indemnity

**RLI Insurance Company**
Peoria, Illinois 61615

THIS AGREEMENT of Indemnity, made and entered into this 29th day of June, 2001

by Advantage Construction Services, LLC, 101-B W. Railroad Street, Dickson, TN 37055
(Insert full name of Contractor)

(hereinafter called the Contractor)

and the undersigned, (hereinafter called the Indemnitors, if any), and **RLI Insurance Company**, located in Peoria, Illinois, (hereinafter called Surety).

**WITNESSETH**

WHEREAS, the Contractor, in the performance of contracts and the fulfillment of obligations, whether in its own name solely or jointly with others, may desire or be required to give or procure certain surety bonds, undertakings, or instruments of guarantee, and to renew, continue, or substitute the same from time to time, or to give or procure new bonds, undertakings, or instruments of guarantee with the same or different penalties and/or conditions in renewal, continuation, extension, or substitution thereof (any one or more of which are hereinafter called Bond or Bonds) or the Contractor or Indemnitors may request the Surety to refrain from cancelling said Bonds; and

WHEREAS, at the request of the Contractor and the Indemnitors and upon the express condition that this Agreement of Indemnity (the Agreement) should be given, the Surety has executed or procured to be executed, and may from time to time hereafter execute or procure to be executed, said Bonds on behalf of the Contractor; and

WHEREAS, the Indemnitors have a substantial, material, and beneficial interest in the obtaining of the Bonds or in the Surety's refraining from cancelling said Bonds.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants set forth herein, the Contractor and Indemnitors for themselves, their heirs, executors, administrators, successors and assigns, jointly and severally, hereby convenant and agree with the Surety, its successors and assigns, as follows:

**PREMIUMS**

FIRST: The Contractor and Indemnitors jointly and severally will pay to the Surety in such manner as may be agreed upon all premiums and charges of the Surety for the Bonds in accordance with its rate filings, its manual of rates, or as otherwise agreed upon until the Contractor or Indemnitors shall serve evidence satisfactory to the Surety of its discharge or release from the Bonds and all liability by reason thereof.

**INDEMNITY**

SECOND: The Contractor and Indemnitors jointly and severally shall exonerate, indemnify, and keep indemnified the Surety from and against any and all liability for losses and/or expenses of whatsoever kind or nature (including, but not limited to, interest, court costs and counsel fees) and from and against any and all such losses and/or expenses which the Surety may sustain and incur: (1) By reason of having executed or procured the execution of the Bonds, (2) By reason of the failure of the Contractor and Indemnitors to perform or comply with the covenants and conditions of this Agreement or (3) In enforcing any of the covenants and conditions of this Agreement.

Payment by reason of the aforesaid causes shall be made to the Surety by the Contractor and Indemnitors as soon as liability exists or is asserted against the Surety, whether or not the Surety shall have made any payment therefore. Such payment shall be equal to the amount of the reserve set by the Surety or equal to such amounts as the Surety, and its sole judgment, deems sufficient to protect it from loss or potential loss. In the event of any payment by the Surety, the Contractor and Indemnitors further agree that in any accounting between the Surety, the Contractors and Indemnitors, the Surety shall be entitled to charge for any and all disbursements made by it in

(1) any abandonment, forfeiture or breach of any contracts or obligations referred to in the Bonds or of any breach of any said Bonds;

(2) any breach of the provisions of any of the paragraphs of this Agreement;

(3) a default in discharging such other indebtedness or liabilities when due;

(4) any assignment by the Contractor and/or Indemnitor(s) for the benefit of creditors, or of the appointment, or of any application for the appointment, of a receiver or trustee for the Contractor and/or Indemnitor(s) whether insolvent or not;

(5) any proceeding which deprives the Contractor or Indemnitor(s) of the use of any of the machinery, equipment, goods, plant, tools, inventory and materials comprising any part or all of the Collateral; and/or

(6) the Contractor and/or Indemnitor(s) dying, absconding, disappearing, incompetency, being convicted of a felony, or imprisoned if Contractor and/or Indemnitor is an individual.

**TRUST FUND**

FOURTH: If any of the Bonds are executed in connection with a contract or obligation, or any part thereof, the Contractor and Indemnitors covenant and agree that all payments received for or on account of said contract or obligation shall be held as a trust fund in which the Surety has an interest, for the payment of debts incurred in the performance of the contract or obligation and for labor, materials, and services furnished in the prosecution of the work provided in said contract or obligation or any authorized extension or modification thereof; and, further, it is expressly understood and declared that all monies due and to become due under any contract/contracts or obligations covered by the Bonds are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for the benefit of and for payment of all such obligations in connection with any such contract/contracts or obligations for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit of the Surety for any liability or loss it may have or sustain under any said Bonds, and this Agreement and declaration shall also constitute notice of such trust.

**SECURITY AGREEMENT**

FIFTH: That this Agreement shall constitute a Security Agreement and the grant of a security interest in the Collateral to the Surety and also a financing statement, both in accordance with the provisions of the Uniform Commercial Code (the "Code"), in every jurisdiction where such Code is in effect, and may be so used by the Surety without in any way abrogating, restricting or limiting the rights of the Surety under this Agreement or under law, or in equity. A photocopy or facsimile of this Security Agreement may be filed for recording in lieu of a financing statement(s) in each and every jurisdiction where the Code so permits. The Surety is hereby appointed as the attorney in fact to execute and file such additional instruments and financing statements on behalf of the Contractor and Indemnitors as may be reasonably necessary to perfect the foregoing security interest.

**TAKEOVER**

SIXTH: In the event of any breach or default asserted by the obligee on any said Bonds, or where the Contractor has abandoned work on or forfeited any contract or contracts or obligations covered by any said Bonds, or has failed to pay obligations incurred in connection therewith, or in the event of the death, disappearance, Contractor's conviction for a felony, imprisonment, incompetency, insolvency, or bankruptcy of the Contractor, or the appointment of a receiver or trustee for the Contractor, or the property of the Contractor, or in the event of an assignment for the benefit of creditors of the Contractor, or if any action is taken by or against the Contractor under or by virtue of the National Bankruptcy Act, or should reorganization or arrangement proceedings be filed by or against the Contractor under said Act, or if any action is taken by or against the Contractor under the insolvency laws of any state, possession, or territory of the United States, the Surety shall have the right, at its option and in its sole discretion, without any obligation, and is hereby authorized, with or without exercising any other right or option conferred upon it by law or in the terms of this Agreement, to take possession of any part or all of the work under any contract or contracts or obligations covered by any said Bonds, and at the expense of the Contractor and Indemnitors to complete or arrange for the completion of the same, and the Contractor and Indemnitors shall promptly upon demand pay to the Surety all losses, and expenses so incurred.

**CHANGES**

SEVENTH: The Surety is authorized and empowered, at its sole option and without obligation, without notice to or knowledge of the Indemnitors to assent to any change whatsoever in the Bonds, and/or any contracts or obligations referred to in the Bonds, and/or in the

## DECLINE EXECUTION

TWELFTH: Unless otherwise specifically agreed in writing, the Surety may decline to execute any Bond and the Contractor and Indemnitors agree to make no claim to the contrary in consideration of the Surety's receiving this Agreement; and if the Surety shall execute a Bid or Proposal Bond, it shall have the right to decline to execute any and all of the Bonds that may be required in connection with any award that may be made under the proposal for which the Bid or Proposal Bond is given and such declination shall not diminish or alter the liability of the Contractor and/or the Indemnitors that may arise by reason of having executed the Bid or Proposal Bond.

## NOTICE OF EXECUTION

THIRTEENTH: The Indemnitors hereby waive notice of the execution of said Bonds and of the acceptance of this Agreement, and the Contractor and Indemnitors hereby waive all notice of any default, or any other act or acts giving rise to any claim under said Bonds, as well as notice of any and all liability of the Surety under said Bonds, and any and all liability on their part hereunder, to the end and effect that, the Contractor and Indemnitors shall be and continue liable hereunder, notwithstanding any notice of any kind to which they might have been or be entitled, and notwithstanding any defenses they might have been entitled to make.

## HOMESTEAD

FOURTEENTH: The Contractor and Indemnitors hereby waive, so far as their respective obligations under this Agreement are concerned, all right to claim any of their property, including their respective homesteads, as exempt from levy, execution, sale or other legal process under the laws of any State, Territory, or Possession.

## SETTLEMENTS

FIFTEENTH: The Surety shall have the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bonds, unless the Contractor and Indemnitors shall request the Surety to litigate such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety, at the time of such request, cash or collateral satisfactory to the Surety in kind and amount to be determined at the Surety's sole descretion, to be used in paying any judgment or judgments rendered or that may be rendered, with interest, cost, expenses and attorneys' fees, including those of the Surety.

SIXTEENTH: The Contractor and Indemnitors agree that their liability shall be construed as the liability of a compensated Surety, as broadly as the liability of the Surety is construed toward its obligee.

SEVENTEENTH: The word Contractor and Indemnitors, or personal pronouns used to refer to said word, shall apply regardless of number or gender, and to individuals, partnerships or corporations, as the circumstances require.

## SURETIES

EIGHTEENTH: In the event the Surety procures the execution of the Bonds by other sureties, or executes the Bonds with co-sureties, or reinsures any portion of said Bonds with reinsuring sureties, then all the terms and conditions of this Agreement shall inure to the benefit of such other sureties, co-sureties and reinsuring sureties, as their interests may appear.

## SUITS

NINETEENTH: Separate suits may be brought hereunder as causes of action accrue, and the bringing of suit or the recovery of judgment upon any cause of action shall not prejudice or bar the bringing of other suits upon other causes of action, whether theretofore or thereafter arising.

## OTHER INDEMNITY

TWENTIETH: That the Contractor and Indemnitors shall continue to remain bound under the terms of this Agreement even though the Surety may have from time to time heretofore or hereafter, with or without notice to or knowledge of the Contractor and Indemnitors, accepted or released other agreements of indemnity or collateral in connection with the execution or procurement of said Bonds, from the Contractor and Indemnitors or others, it being expressly understood and agreed by the Contractor and Indemnitors that any and all other rights which the Surety may have or acquire against the Contractor and Indemnitors and/or others under any such other or additional agreements of indemnity or collateral shall be in addition to, and not in lieu of, the rights afforded the Surety under this Agreement.

## INVALIDITY

TWENTY-FIRST: In case any of the parties mentioned in this Agreement fail to execute the same, or in case the execution hereof by any of the parties be defective or invalid for any reason, such failure, defect or invalidity shall not in any manner

TWENTY-SIXTH: ______________________________

IN WITNESS WHEREOF, we have hereunto set our hands and seals the day and year first above written.

**RLI Insurance Company**
(Surety)

ATTEST

By ______________________ By ______________________ **(Seal if required)**

Print Name and Title Carla Barackman Print Name and Title Dave Sandoz, Vice President

**Contractor**

Advantage Construction Services, LLC 62-1789301
Name & Social Security/FIN # of Contractor (Please print or type)

101-B W. Railroad Street, Dickson, TN 37055
Address, City, State & Zip of Contractor (Please print or type)

ATTEST

By ______________________ By ______________________ **(Seal if required)**

Print Name and Title Trent Smith, Secretary Print Name and Title Ilia Jefferson, Chief Manager

WITNESS SIGNATURE: ______________________

Print Name Charles B. Royse

______________________

Print Name ______________________

**Corporate Indemnitors**

Advantage Construction Services, LLC 62-1789301
Name of Corporate Indemnitor and FIN # (Please print or type)

101-B W. Railroad Street, Dickson, TN 37055
Address, City, State & Zip of Corporate Indemnitor (Please print or type)

ATTEST

By ______________________ By ______________________ **(Seal if required)**

Print Name and Title Trent Smith, Secretary Print Name and Title Ilia Jefferson, Chief Manager

Southern Consulting, LLC 62-1715871
Name of Corporate Indemnitor and FIN # (Please print or type)

101-B W. Railroad Street, Dickson, TN 37055
Address, City, State & Zip of Corporate Indemnitor (Please print or type)

ATTEST

By ______________________ By ______________________ **(Seal if required)**

Print Name and Title Trent Smith, Secretary Print Name and Title Ilia Jefferson, Chief Manager

**Individual Indemnitors**

WITNESS SIGNATURE: [signature]

Print Name Charles B. Royse

Print Name

Ilia Jefferson 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

Name & Social Security # of Individual Indemnitor (Please print or type)

1182 Turkey Creek, Dickson, TN 37055

Address, City, State & Zip of Individual Indemnitor (Please print or type)

By [signature]

Print Name Ilia Jefferson

WITNESS SIGNATURE: [signature]

Print Name Charles B. Royse

Print Name

Trent B. Smith 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

Name & Social Security # of Individual Indemnitor (Please print or type)

1182 Turkey Creek, Dickson, TN 37055

Address, City, State & Zip of Individual Indemnitor (Please print or type)

By [signature]

Print Name Trent B. Smith

WITNESS SIGNATURE:

Print Name

Print Name

Name & Social Security # of Individual Indemnitor (Please print or type)

Address, City, State & Zip of Individual Indemnitor (Please print or type)

By

Print Name

WITNESS SIGNATURE:

Name & Social Security # of Individual Indemnitor (Please print or type)

Address, City, State & Zip of Individual Indemnitor (Please print or type)

## Partnership Indemnitors

| | |
|---|---|
| | Name of Partnership Indemnitor (Please print or type) |
| WITNESS SIGNATURE: | Address, City, State & Zip of Partnership Indemnitor (Please print or type) |
| ______________________ | By ______________________ |
| Print Name ______________________ | Print Partner Name ______________________ |
| ______________________ | |
| Print Name ______________________ | |
| | Name of Partnership Indemnitor (Please print or type) |
| WITNESS SIGNATURE: | Address, City, State & Zip of Partnership Indemnitor (Please print or type) |
| ______________________ | By ______________________ |
| Print Name ______________________ | Print Partner Name ______________________ |
| ______________________ | |
| Print Name ______________________ | |

IMPORTANT: ALL SIGNATURES MUST BE ACKNOWLEDGED ON THE ATTACHED FORM(S).

**CORPORATION ACKNOWLEDGMENT**

State of TENNESSEE
County of DAVIDSON ss:

On the 29th day of JUNE, 2001, before me personally came ILIA JEFFERSON

to me known, who, being by me duly sworn, did depose and say that he resides in Dickson, TN

that he is the Chief MANAGER of the ADVANTAGE Construction Services, LLC the corporation which executed the attached Agreement of Indemnity; that he knows the seal of the said corporation; that the seal affixed to the said Agreement of Indemnity is such corporate seal; that it was so affixed by order of the Board of Directors of the said corporation, and that he signed his name to the said Agreement of Indemnity by like order.

Robert T. Harris
Notary Public

COMMISSION EXPIRES NOVEMBER 27, 2004

State of TENNESSEE
County of DAVIDSON

## CORPORATION ACKNOWLEDGMENT

State of ______________________
County of ______________________ ss:
On the ________ day of ______________________, ________, before me personally came
______________________________________________
______________________________________________
to me known, who, being by me duly sworn, did depose and say that he resides in ______________________
______________________________________________
that he is the ______________________ of the ______________________
______________________________________________ the corporation
which executed the attached Agreement of Indemnity; that he knows the seal of the said corporation; that the seal affixed to the said Agreement of Indemnity is such corporate seal; that it was so affixed by order of the Board of Directors of the said corporation, and that he signed his name to the said Agreement of Indemnity by like order.

______________________
Notary Public

## CORPORATION ACKNOWLEDGMENT

State of ______________________
County of ______________________ ss:
On the ________ day of ______________________, ________, before me personally came
______________________________________________
______________________________________________
to me known, who, being by me duly sworn, did depose and say that he resides in ______________________
______________________________________________
that he is the ______________________ of the ______________________
______________________________________________ the corporation
which executed the attached Agreement of Indemnity; that he knows the seal of the said corporation; that the seal affixed to the said Agreement of Indemnity is such corporate seal; that it was so affixed by order of the Board of Directors of the said corporation, and that he signed his name to the said Agreement of Indemnity by like order.

______________________
Notary Public

## PARTNERSHIP ACKNOWLEDGMENT

State of ______________________
County of ______________________ ss:
On the ________ day of ______________________, ________, before me personally came
______________________________________________
______________________________________________
to me known, to be a partner of the partnership of ______________________
______________________________________________
who acknowledged to me that he/she is duly authorzed to execute this Agreement on behalf of and as the act of the partnership, and that he/she has executed this Agreement on behalf of and as the act of the partnership.

______________________
Notary Public

## PARTNERSHI

State of ______________________
County of ______________________ ss:
On the ________ day of ______________________, ________, before me personally came
______________________________________________

## INDIVIDUAL ACKNOWLEDGMENT

State of ______________________

County of ______________________ ss:

On the ________ day of ______________________, ________, before me personally came

______________________________________________

to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed the same.

______________________

Notary Public

## INDIVIDUAL ACKNOWLEDGMENT

State of ______________________

County of ______________________ ss:

On the ________ day of ______________________, ________, before me personally came

______________________________________________

to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed the same.

______________________

Notary Public

## INDIVIDUAL ACKNOWLEDGMENT

State of ______________________

County of ______________________ ss:

On the ________ day of ______________________, ________, before me personally came

______________________________________________

to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed the same.

______________________

Notary Public

## INDIVIDUAL ACKNOWLEDG

State of ______________________

County of ______________________ ss:

On the ________ day of ______________________, ________, before me personally came

______________________________________________

to me known, and known to me to be the individual who executed the attached Agreement of Indemnity, and acknowledged that he executed the same.

Case 3:04-cv-00555 Document 96 Filed 07/19/05 Page 58 of 58 PageID #: 1059